# EXHIBIT  A

Approved, SCAO

| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| Court of Claims | **JUDICIAL DISTRICT** **SUMMONS** | 19- 000072 MM |
| | **JUDICIAL CIRCUIT** | Stephens |
| | **COUNTY PROBATE** | |

**Court address**
State Office Building / 350 Ottawa NW / Grand Rapids, MI 49503-2349

**Court telephone no.**
(517) 373-2252

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| CATHOLIC CHARITIES WEST MICHIGAN<br>40 Jefferson Avenue, SE<br>Grand Rapids, MI 49503<br>(616) 456-1443 | v | DANA NESSEL, in her official capacity as Attorney<br>General of Michigan<br>G. Mennen Williams Building, 7th Floor<br>525 W. Ottawa Street<br>Lansing, MI 48909<br>(517) 335-7622 |
| Plaintiff's attorney, bar no., address, and telephone no.<br>James R. Wierenga (MI Bar No. P48946)<br>DAVID, WIERENGA & LAUKA, PC<br>99 Monroe Ave., NW, Suite 1210<br>Grand Rapids, MI 49503<br>(616) 454-3883 | | |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.    **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party or **take other lawful action with the court (28 days** if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>4/30/19 | Expiration date<br>7/25/19 | Court clerk<br>Jerome W. Zimmer Jr. |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (1/19) **SUMMONS**    MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

*(stamp)* COURT OF CLAIMS JEROME W ZIMMER 2019 APR 25 PM 3:31

*(stamp)* DEPT. OF THE ATTORNEY GENERAL MAY 0 9 2019 Assigned to

| | SUMMONS | |
|---|---|---|
| | Case No. 19- | MM |

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notarization required) |

☐ I served personally a copy of the summons and complaint.
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,
together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____ _____ County, Michigan.
Date

My commission expires: _____ _____
Date                    Signature                Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____ _____
Day, date, time                    on behalf of

_____
Signature

Approved, SCAO

| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| **JUDICIAL DISTRICT** | **SUMMONS** | 19- 000072 MM |
| Court of Claims **JUDICIAL CIRCUIT** | | Stephens |
| **COUNTY PROBATE** | | |

**Court address**

State Office Building / 350 Ottawa NW / Grand Rapids, MI 49503-2349

**Court telephone no.**
(517) 373-2252

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| CATHOLIC CHARITIES WEST MICHIGAN<br>40 Jefferson Avenue, SE<br>Grand Rapids, MI 49503<br>(616) 456-1443 | v | MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>333 S. Grand Avenue<br>Lansing, MI 48909<br>(517) 373-3740 |

Plaintiff's attorney, bar no., address, and telephone no.
James R. Wierenga (MI Bar No. P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 4/30/19 | 7/25/19 | **Jerome W. Zimmer Jr.** |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (1/19)   **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

| | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|

Approved, SCAO

| | | | CASE NO. |
|---|---|---|---|
| **STATE OF MICHIGAN** | | | |
| Court of Claims | JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS** | 19- OOCC72-MM<br>*Stephens* |

Court address | Court telephone no.
State Office Building / 350 Ottawa NW / Grand Rapids, MI 49503-2349 | (517) 373-2252

Plaintiff's name(s), address(es), and telephone no(s).
CATHOLIC CHARITIES WEST MICHIGAN
40 Jefferson Avenue, SE
Grand Rapids, MI 49503
(616) 456-1443

v

Defendant's name(s), address(es), and telephone no(s).
ROBERT GORDON, in his official capacity as Director of
the Michigan Department of Health and Human Services
333 S. Grand Avenue
Lansing, MI 48909
(517) 373-3740

Plaintiff's attorney, bar no., address, and telephone no.
James R. Wierenga (MI Bar No. P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk. | **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 4/30/19 | 7/25/19 | **Jerome W. Zimmer Jr.** |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (1/19) **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

| Approved, SCAO | | Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|---|

| **STATE OF MICHIGAN**<br>JUDICIAL DISTRICT<br>Court of Claims  JUDICIAL CIRCUIT<br>COUNTY PROBATE | **SUMMONS** | **CASE NO.**<br>19- OOOO72-MM<br>Stephens |
|---|---|---|

| Court address | Court telephone no. |
|---|---|
| State Office Building  /  350 Ottawa NW  /  Grand Rapids, MI 49503-2349 | (517) 373-2252 |

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| CATHOLIC CHARITIES WEST MICHIGAN<br>40 Jefferson Avenue, SE<br>Grand Rapids, MI 49503<br>(616) 456-1443 | v | JENNIFER WRAYNO, in her official capacity as Acting<br>Executive Director of Michigan Children's Services Agency<br>333 S. Grand Avenue<br>Lansing, MI 48909<br>(517) 241-9859 |
| Plaintiff's attorney, bar no., address, and telephone no.<br>James R. Wierenga (MI Bar No. P48946)<br>DAVID, WIERENGA & LAUKA, PC<br>99 Monroe Ave., NW, Suite 1210<br>Grand Rapids, MI 49503<br>(616) 454-3883 | | |

Instructions: Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

It was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer  pending.

Summons section completed by court clerk.        **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons and a copy of the complaint **to file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>4/30/19 | Expiration date<br>7/25/19 | Court clerk<br>Jerome W. Zimmer Jr. |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01   (1/19)   SUMMONS                        MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

| | SUMMONS | |
|---|---|---|
| Case No. 19- | 000072 | MM |

## PROOF OF SERVICE

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ OFFICER CERTIFICATE | OR | ☐ AFFIDAVIT OF PROCESS SERVER |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notarization required) |

☐ I served personally a copy of the summons and complaint.
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with _____
List all documents served with the summons and complaint

_____

_____, on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled  Fee $ | | Signature |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled  Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
Date

My commission expires: _____  Signature: _____
Date                                    Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with   Exhibits 1-9
Attachments

_____ on _____
Day, date, time

Jennifer Wrayno, in her official
capacity as Acting Exec. Director of
on behalf of Michigan Children's Services Agency

_____
Signature   Toni Harris

Approved, SCAO

| Original - Court<br>1st copy - Defendant | 2nd copy - Plaintiff<br>3rd copy - Return |

| STATE OF MICHIGAN | | CASE NO. |
| Court of Claims | **JUDICIAL DISTRICT**<br>**JUDICIAL CIRCUIT**<br>**COUNTY PROBATE** | **SUMMONS** | 19- OOOO72 MM<br>Stephens |

**Court address**
State Office Building / 350 Ottawa NW / Grand Rapids, MI 49503-2349

**Court telephone no.**
(517) 373-2252

Plaintiff's name(s), address(es), and telephone no(s).
CATHOLIC CHARITIES WEST MICHIGAN
40 Jefferson Avenue, SE
Grand Rapids, MI 49503
(616) 456-1443

v

Defendant's name(s), address(es), and telephone no(s).
MICHIGAN CHILDREN'S SERVICES AGENCY
333 S. Grand Avenue
Lansing, MI 48909
(517) 241-9859

Plaintiff's attorney, bar no., address, and telephone no.
James R. Wierenga (MI Bar No. P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. Attached is a completed case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>4/30/19 | Expiration date<br>7/25/19 | Court clerk<br>Jerome M. Zimmer Jr. |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01  (1/19)  **SUMMONS**                                      MCR 1.109(D), MCR 2.102(B), MCR 2.104, MCR 2.105

**PROOF OF SERVICE**

| SUMMONS |
|---|
| Case No. 19- 000072   MM |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ OFFICER CERTIFICATE | OR | ☐ AFFIDAVIT OF PROCESS SERVER |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult who is not a party or an officer of a corporate party, and that: (notarization required) |

☐ I served personally a copy of the summons and complaint.
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint, together with _____
List all documents served with the summons and complaint

_____

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled $ | Fee | | Signature _____ |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled $ | Fee | TOTAL FEE $ | Name (type or print) _____ |
| | | | | Title _____ |

Subscribed and sworn to before me on _____ County, Michigan.
                                          Date

My commission expires: _____   Signature: _____
                        Date                    Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with  Exhibits 1-9
                                                                                         Attachments

_____ on _____
                                      Day, date, time
_____ on behalf of  Michigan Children's Services Agency
Signature  Toni Harris

STATE OF MICHIGAN
COURT OF CLAIMS

CATHOLIC CHARITIES WEST
MICHIGAN,

      Plaintiff,

v.

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ROBERT
GORDON, in his official capacity as
Director of the Michigan Department of
Health and Human Services; MICHIGAN
CHILDREN'S SERVICES AGENCY; and
JENNIFER WRAYNO, in her official
capacity as Acting Executive Director of
Michigan Children's Services Agency;
DANA NESSEL, in her official capacity as
Attorney General of Michigan.

      Defendant.

No. 19- 0000072 -MM

Hon. Stephens

**VERIFIED COMPLAINT
FOR DECLARATORY
JUDGMENT AND
INJUNCTIVE RELIEF**

---

Roger Brooks (NC Bar No. 16317)*
Jeremiah Galus (AZ Bar No. 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA 30043
(202) 339-0774
dcortman@ADFlegal.org

James R. Wierenga (P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

---

There is no other pending or resolved civil action arising out of the transaction or
occurrence alleged in the complaint.

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

NOW COMES Plaintiff Catholic Charities West Michigan (Catholic Charities), by and through its attorneys, and hereby alleges as follows:

## INTRODUCTION

1.     Our country has a foster care crisis. In recent years, the opioid epidemic ravaging families and communities has sent thousands of children into the Nation's foster care system. Today, there are over 430,000 children in the system, and there are simply not enough homes for these abused, neglected, and abandoned children. The same is true in Michigan, which has approximately 13,000 children in its foster care system alone.

2.     The Michigan Legislature is aware of the crisis. And it knows that the problem cannot be adequately addressed without the faith community's help. It is also aware that regulations in other states—namely, those shutting down or excluding faith-based foster care and adoption providers unless they agree to facilitate child placements in violation of their consciences and religious beliefs about marriage and family—have aggravated the problem by pushing effective and reliable providers out of the system.

3.     Concluding that there is a better way, the Michigan Legislature passed legislation in 2015 which—like legislation passed by at least nine other states—guaranteed that faith-based foster care and adoption providers could continue serving Michigan children consistent with their religious beliefs, while at the same time ensuring that no person's ability to adopt or participate in foster care is denied.

2

*See* 2015 PA 53 (codified at MCL 722.124e & 722.124f); 2015 PA 54 (codified at MCL 710.23g); and 2015 PA 55 (codified at MCL 400.5a), attached hereto as **Exhibits 1, 2, and 3.**

4. Under those laws, private foster care and adoption providers cannot be forced to provide services or accept referrals from the state that conflict with the provider's religious beliefs. *See* MCL 722.124e(2), 722.124f(1); *accord* MCL 710.23g. The laws also prohibit the government from taking adverse action against any provider that has declined services or rejected a referral based on its religious beliefs. MCL 722.124e(3), 722.124f(2); *accord* MCL 400.5a, 710.23g. If the provider's religious beliefs prevent it from performing any services, however, the provider must refer the applicant to a list of other providers or to a provider "that is willing and able to provide the declined services." MCL 722.124e(4).

5. In accommodating the religious beliefs and practices of faith-based providers, the Michigan Legislature found that they "have a long and distinguished history of providing adoption and foster care services in this state," and that allowing them to continue providing these services in accordance with their beliefs "will benefit the children and families who receive publicly funded services." MCL 722.124e(1)(f) & (g). The Michigan Legislature further recognized that faith-based providers "have the right to free exercise of religion under both the state and federal constitutions," including "the freedom to abstain from conduct that conflicts with an agency's sincerely held religious beliefs." MCL 722.124e(1)(e).

3

6.     In short, the Michigan Legislature intended to—and did—protect the religious exercise of faith-based providers like Catholic Charities. And for good reason. For over 70 years, Catholic Charities has worked to feed the hungry, counsel those who struggle, and build strong families throughout West Michigan. And as one of state's largest foster care and adoption providers, Catholic Charities has provided a safe and nurturing home to thousands of children, with approximately 4,500 children placed in loving homes in the past decade alone.

7.     But if Defendants have their way, that number over the next ten years will be zero. Defendants have adopted a new policy that forces Catholic Charities to choose between violating its religious beliefs about same-sex marriage and shutting down its foster care and adoption ministry. Defendants' new policy misinterprets state law, violates Catholic Charities' rights under the U.S. and Michigan Constitutions, and adopts the anti-religious views and policy preferences of Defendant Attorney General Dana Nessel—who has previously criticized Michigan's statutory protections for faith-based foster care and adoption providers as "a victory for the hate mongers."[1]

8.     This action thus seeks a declaratory judgment and injunctive relief to ensure that Defendants correctly interpret and comply with Michigan law—specifically, MCL 400.5a, 710.23g, 722.124e, and 722.124f—and to ensure that Catholic Charities' statutory and constitutional rights are respected.

---

[1] Fox 2 Detroit, *Opponents say adoption bill discriminates against gays and lesbians* (Mar. 4, 2015, 5:34 PM), https://bit.ly/2Dcr49R.

9.     Declaratory and injunctive relief is needed to prevent Defendants from taking adverse, and irreversible, action against Catholic Charities based on its religious beliefs and in violation of its statutory and constitutional rights.

## JURISDICTION AND VENUE

10.     This lawsuit raises questions under Michigan state law—specifically, MCL 400.5a, 710.23g, 722.124e, and 722.124f—and under Article 1, Sections 2, 4, and 5 of the Michigan Constitution. This lawsuit also raises questions under the First and Fourteenth Amendments to the United States Constitution and under federal law, particularly 42 USC § 1983.

11.     This Court has jurisdiction and is the proper venue under MCL 600.6419.

12.     This Court has authority to grant the requested declaratory and injunctive relief under MCR 2.605 and 3.310.

## PARTIES

13.     Plaintiff Catholic Charities West Michigan, or Catholic Charities, is a nonprofit religious organization that was formed to assist the Roman Catholic Diocese of Grand Rapids and its Bishop to carry out the social mission of the Roman Catholic Church through programs of social service, social action, and education for justice. Catholic Charities "provide[s] services, in accord with the tradition of Catholic social teaching, to support individuals, families, and communities in their emotional, social and spiritual development with particular concern for those who are poor and vulnerable." **Exhibit** 4. As an exercise of its religious beliefs, Catholic Charities offers

5

a wide-array of child welfare, family preservation, behavioral health and counseling, and community outreach services throughout 18 counties in West Michigan. Its principal place of business is located at 40 Jefferson Ave, SE, Grand Rapids, MI 49503.

14.     Defendant Michigan Department of Health and Human Services, or DHHS, is a principal department in the executive branch of the State of Michigan. DHHS is responsible for developing, administering, and coordinating health and family security initiatives and programs in Michigan. DHHS also is responsible for licensing and regulating child placing agencies that provide foster care and adoption services. DHHS operates branch offices in each of Michigan's 83 counties.

15.     Defendant Robert Gordon is the Director of DHHS and is sued in his official capacity only.

16.     Defendant Michigan Children's Services Agency, or CSA, is a sub-agency of DHHS that exercises powers, duties, functions, and responsibilities assigned to it by DHHS. DHHS administers Michigan's foster care and adoption system through CSA.

17.     Defendant Jennifer Wrayno is the Acting Executive Director of CSA and is sued in her official capacity only.

18.     Defendant Dana Nessel is the Attorney General of the State of Michigan, and is responsible for representing state agencies and enforcing state law. Defendant Nessel was actively involved and instrumental in crafting the DHHS

policy that targets faith-based foster care and adoption providers. Defendant Nessel is sued in her official capacity only.

## FACTUAL BACKGROUND

### *Catholic Charities' History, Mission, and Religious Beliefs*

19.     Since 1947, Catholic Charities has ministered to the most vulnerable populations in West Michigan.

20.     Today, Catholic Charities is one of the largest social services providers in West Michigan, offering a broad spectrum of ministries focused on the needs of children and families.

21.     Catholic Charities' programs and services are designed to support individuals, families, and communities in their emotional, social, and spiritual development, with particular concern for those who are poor and vulnerable.

22.     As a Catholic organization, Catholic Charities believes and adheres to the teachings and doctrines of the Catholic Church.

23.     Catholic Charities' religious beliefs motivate and permeate all of its programs and services, which are offered in the spirit of God's love and in accord with the tradition of Catholic social teaching.

24.     The Epistle of St. James teaches that true religion is to care for the orphan and the widow, and the Catholic Church puts that teaching into practice through child welfare service organizations such as Catholic Charities.

25.     Catholic Charities believes that all human life is sacred and that the dignity of the human person is the foundation of a moral vision for society.

26.     Catholic Charities believes that God calls it to care for orphans and other children whose parents cannot care for them.

27.     Catholic Charities further believes that the human person is not only sacred but also social, and that marriage and the family are central social institutions that must be supported and strengthened, not undermined.

28.     Consistent with the teachings and doctrine of the Catholic Church, Catholic Charities believes that marriage is the sacramental union of one man and one woman "ordered toward the good of the spouses and the procreation and education of offspring." (Catechism of the Catholic Church, no. 1601)

29.     Consistent with these religious beliefs, Catholic Charities has adopted a written statement of faith for its foster care and adoption ministry.

30.     In relevant part, Catholic Charities' statement of faith declares that:

> As a Catholic organization, Catholic Charities West Michigan will serve children and families through the placement and adoption of children with individuals meeting our sincerely held Catholic social teachings and beliefs and married couples made up of two parents of the opposite sex....

**Exhibit 5**.

31.     Catholic Charities makes its religious nature and character clear throughout all of its programs and services.

32.     Catholic Charities' deeply held religious convictions, including its beliefs about marriage and family, are central to its Catholic identity and are very well-known.

8

*Catholic Charities' Extensive Ministry to West Michigan*

33.     Catholic Charities has offices throughout the 11-county Diocese of Grand Rapids, which includes the following counties: Ionia, Kent, Lake, Mason, Mecosta, Montcalm, Muskegon, Newaygo, Oceana, Osceola, and Ottawa.

34.     Catholic Charities also serves other counties as needed, including Allegan, Barry, Grand Traverse, Manistee, Benzie, Kalkaska, and Leelenaw.

35.     Through its team of highly trained employees, dedicated volunteers, and generous community, Catholic Charities provides a continuum of programs and services throughout West Michigan, ranging from prevention and early intervention to crisis intervention.

36.     Annually, Catholic Charities serves more than 21,000 individuals through its more than 35 ministries.

37.     Catholic Charities employs over 280 people.

38.     In 2017 alone, approximately 8,000 volunteers gave 386,400 hours of their time to assist Catholic Charities in its mission of serving children and families in distress.

39.     On information and belief, the vast majority of Catholic Charities' volunteers and supporting churches and organizations partner with Catholic Charities precisely because of its religious nature and character.

40.     Catholic Charities' programs and services focus on four primary areas: child welfare, family preservation, behavioral health and counseling, and community outreach.

9

41.     Catholic Charities operates more than 20 family preservation programs throughout West Michigan.

42.     Catholic Charities' family preservation programs include counseling, mentoring, parent education, and other supportive services.

43.     Catholic Charities also offers behavioral health programs through a staff that includes 16 clinicians who have a master's degree or higher.

44.     Catholic Charities ministers to more than 5,000 individuals though its behavioral health programs on an annual basis, helping individuals face the challenges of everyday life by providing counseling and treatment for parenting issues, family issues, substance abuse, depression, anxiety, and other mental health issues.

45.     Catholic Charities also offers numerous outreach programs designed to support West Michigan individuals and families in time of need.

46.     These outreach programs include food and pantry services, infant and toddler pantries, senior programs, representative payee services, and programs that address social justice issues, among other things.

47.     Every year, Catholic Charities helps thousands of families with food access and serves more than 150,000 hot meals through its meal and pantry programs.

48.     Catholic Charities serves a diverse population and offers its programs and services without regard to race, sex, religion, age, national origin, color, height,

weight, marital status, gender identity or expression, sexual orientation, political beliefs, disability, or background.

### *Catholic Charities' Foster Care and Adoption Ministry*

49.     Since being founded over 70 years ago, Catholic Charities has ministered to children and families through foster care and adoption services.

50.     As an approved child placing agency, Catholic Charities is authorized to receive and place children for foster care and adoption, to certify foster homes for licensure, and to evaluate and recommend applicants for adoption.

51.     Catholic Charities has approximately 100 employees dedicated exclusively to helping children and families through foster care and adoption.

52.     In the past decade alone, Catholic Charities has helped approximately 4,500 children find loving homes through its foster care and adoption ministry.

53.     Catholic Charities provides foster care and adoption services as an exercise of its sincerely held religious beliefs.

54.     As a Catholic organization, Catholic Charities actively works and succeeds at recruiting foster families and adoptive parents that DHHS and secular agencies do not (and cannot) recruit. While it does not limit those it serves to any particular religion, Catholic Charities successfully recruits many foster families and adoptive parents who share its faith and religious beliefs.

55.     Catholic Charities' recruitment efforts include, among other things, visiting Catholic parishes throughout West Michigan and encouraging parishioners to put their faith into action by serving as foster and adoptive parents.

56.   Catholic Charities also recruits prospective foster and adoptive parents through privately funded billboard, TV, radio, and social media marketing campaigns.

57.   Catholic Charities' foster care program is one of the largest in the State of Michigan.

58.   Catholic Charities has over 300 foster children in its care and custody on any given day, and it serves more than 450 foster children annually.

59.   Catholic Charities has approximately 170 licensed foster care homes that are able to care for children in need.

60.   Although Catholic Charities' foster care ministry primarily serves Kent, Muskegon, and Grand Traverse counties, it receives requests from all across Michigan to find foster homes for children needing care.

61.   Because the primary goal of Catholic Charities' foster care ministry is reunification, Catholic Charities works closely with the foster families, children, and birth parents to develop a plan for reunification and to ensure that the family is strong and healthy.

62.   Catholic Charities' foster care ministry goes above and beyond state minimum requirements, providing opportunities that the State of Michigan does not—and could not—provide.

63.   For example, Catholic Charities provides:

    a.    Monthly foster parent training opportunities;

    b.    Comprehensive consultations, mentors, and support groups;

c.   Behavioral specialists who assist foster parents in keeping children in the home;

d.   24-hour emergency on-call services;

e.   Medical, dental, and clothing funds for children;

f.   An on-site dentist to provide children with dental exams;

g.   Additional funds so that children can participate in extracurricular activities such as sports, equine therapy, martial arts, and summer camp; and

h.   Transportation so that birth parents can stay involved in their children's activities and appointments.

64.   Catholic Charities also provides one-on-one-parent mentoring for birth parents, giving them the opportunity to meet with a Parent Advocate on a weekly basis and work together on the goals identified by the foster care case worker, such as age appropriate discipline and child care.

65.   Moreover, Catholic Charities expends significant resources to own and maintain a "Family Visit House," a home where Catholic Charities offers support services for parents who have children in the foster care system and are participating in a reunification plan. The Family Visit House has a full kitchen, dining room, four large playrooms, a craft room, and a swing set, among other things.



66.     Parenting visits take place at the Family Visit House on a regular basis, allowing families to enjoy their time together in a comfortable, homelike environment.

67.    At the Family Visit House, families are welcomed to prepare and eat a meal together, play games, make a craft, read a book, do homework, or play outside— all under the supervision of trained staff.

68.    Catholic Charities raises additional funds to supplement any federal or state funding so that it can offer all of these extra services, including the Family Visit House, to children and families in need.

69.    In addition to foster care, Catholic Charities ministers to children, birth parents, and families through personalized adoption services.

70.    Catholic Charities offers adoption both through foster care and infant adoption.

71.    Although family reunification is the primary goal of Catholic Charities' foster care ministry, there are times when children are unable to return home and biological parents lose their right to parent their children.

72.    In those cases, Catholic Charities works with the children and potential adoptive families to find the children a "forever home."

73.    Catholic Charities' infant adoption program is an open adoption program for biological parents who wish to make a voluntary adoption plan for their child.

74.    Regardless of whether they intend to parent, are considering an adoption plan, or just need more time to decide, Catholic Charities offers free pregnancy counseling services to help women with the many questions they may have during pregnancy.

15

75.    Catholic Charities recruits, trains, and performs home studies for West Michigan families wishing to adopt an infant.

76.    Because Catholic Charities believes an open adoption relationship between birth parents and adoptive families provides the best possible outcome for children as they develop and grow into adulthood, it counsels birth parents and adoptive families toward open adoption.

77.    Throughout its adoption ministry, Catholic Charities provides extensive counseling and guidance to children, prospective adoptive parents, and birth parents.

78.    Catholic Charities provides the following adoption services at no cost to birth parents:

a.    Counseling during and after the adoptive placement;

b.    Exploration of parenting and adoption options to ensure an informed and thorough decision;

c.    A full explanation of the legal and emotional aspects of the adoption process;

d.    Assistance choosing an adoptive family, either selected from those prepared and educated by Catholic Charities, or identified by the birth parents to be evaluated by Catholic Charities; and

e.    Assistance identifying the degree of openness desired in the adoptive relationship.

79.   Consistent with state law and regulations, Catholic Charities must consider whether the birth parents desire the child to be placed with adoptive parents of a similar race, ethnicity, color, or religion.

80.   Moreover, during the adoption process, birth parents may instruct Catholic Charities about the family structure they desire for their child's placement, including a request for their child to be placed in a home that already has other biological or adopted children, or one that does not, or a preference for the child to be placed in a home with a married mother and father—a preference that many express.

81.   For adoptive parents, Catholic Charities' adoption specialists provide counsel and guidance during the waiting process, placement period, and long after the legal finalization of the adoption.

82.   Catholic Charities helps prospective adoptive parents by, among other things, assisting them in the creation of an adoptive-parent profile, which includes pictures and an individualized message designed to connect with birth parents.

83.   Catholic Charities reviews drafts, makes suggested edits, and provides prospective adoptive parents with helpful feedback about their parent profiles.

84.   Because both the foster care and adoption process are intensely personal experiences, close cooperation and collaboration between Catholic Charities and prospective foster and adoptive parents is required throughout the process.

85.   Catholic Charities provides counseling and guidance to prospective foster and adoptive parents through each step of the application, home study, placement, supervision, and finalization process.

86.    The home study process, in particular, is intensely personal, and allows Catholic Charities to provide prospective parents with counseling and guidance about the proper environment for, and approach to, raising children.

87.    As part of the home study, Catholic Charities visits the prospective parent's home in person and meets with everyone living in it.

88.    During the home study, Catholic Charities carefully interviews applicants to evaluate their strengths and weakness and to explore important and sensitive topics related to parenting experience, parenting philosophy, family origin and dynamics, faith and religious practice, financial stability, the ability to parent a child of a different race or culture or a child with special needs, and marital stability, among other things.

89.    In the case of a married couple, Catholic Charities is concerned about ensuring the intimacy and strength of the marriage for the benefit of any child placed with them.

90.    After the home study and assessment, Catholic Charities will refer the application to DHHS with a written recommendation about whether to approve the applicant as a foster care or adoptive parent.

91.    Catholic Charities must prepare a written report analyzing the home environment and relationships in the home and provide an official recommendation to DHHS stating whether it believes placement is consistent with the best interests of the child, and explaining its reasons for that conclusion.

92.     Michigan law requires child placing agencies to consider the following factors when evaluating children and prospective parents for foster care and adoption placements: religion; race; ethnicity; cultural identity and heritage; age; gender; marital and family status; and physical, mental, and emotional health. *See* Mich Admin Code, R 400.12310, R 400.12404, R 400.12605, R 400.12706, R 400.12709, and R 400.12711.

93.     As a Catholic organization, Catholic Charities shares the religious beliefs and teachings of the Catholic Church about marriage and family.

94.     Catholic Charities cannot perform home studies that certify same-sex couples as appropriate adoptive or foster parents or recommend specific adoption or foster placements to such couples to the state, without violating its sincerely held religious beliefs about marriage.

95.     If Catholic Charities is unable to evaluate an applicant or make written recommendations and certifications about an applicant to DHHS because of its religious beliefs about marriage and family, then it refers the applicant to one of the many nearby agencies that do not share Catholic Charities' beliefs.

96.     Catholic Charities has not prevented (nor made any attempt to prevent) anyone, including same-sex couples, from becoming foster care or adoptive parents.

97.     Catholic Charities serves and places children regardless of the child's race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs, disability, or background.

*The Michigan Legislature Protects Catholic Charities' Religious Beliefs*

98.    When the U.S. Supreme Court issued its same-sex marriage decision in

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), it explained that the belief that marriage

is "a gender-differentiated union of man and woman" is a "decent and honorable"

belief that continues to be held "in good faith by reasonable and sincere people." *Id.*

at 2594, 2602.

99.    The Court further stated that, because the First Amendment protects

the belief that marriage is between a man and woman, "religious organizations and

persons" must be "given proper protection" to "continue the family structure they

have long revered." *Id.* at 2607.

100.    The Michigan Legislature did just that in 2015, passing Public Acts 53,

54, and 55 to protect the religious beliefs of faith-based foster care and adoption

providers. *See* MCL 400.5a, 710.23g, 722.124e, and 722.124f.

101.    Public Acts 53, 54, and 55 allow child placing agencies to operate

consistently with their religious beliefs, including beliefs about marriage and family,

while at the same time ensuring that no person is prevented from adopting or

participating in foster care.

102.    Generally, under those laws, "a child placing agency" such as Catholic

Charities cannot be required to provide services or accept referrals from the state

that conflict with "the child placing agency's sincerely held religious beliefs contained

in a written policy, statement of faith, or other document adhered to by the child

placing agency." MCL 722.124e(2), 722.124f(1); *accord* MCL 710.23g.

103.   The laws prohibit Defendants from taking "adverse action against a child placing agency" that has declined to provide services or accept a referral based on its religious beliefs. MCL 722.124e(3), 722.124f(2); *accord* MCL 400.5a, 710.23g.

104.   In accommodating the religious beliefs and practices of faith-based providers, the Michigan Legislature concluded that "[c]hildren and families benefit greatly from the adoption and foster care services provided by faith-based and non-faith-based child placing agencies," and determined that "[e]nsuring that faith-based child placing agencies can continue to provide adoption and foster care services will benefit the children and families who receive publicly funded services." MCL 722.124e(1)(g).

105.   Recognizing that "[f]aith-based and non-faith-based child placing agencies have a long and distinguished history of providing adoption and foster care services" in Michigan, the Legislature concluded that "[h]aving as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state ... because the more qualified agencies taking part in this process, the greater the likelihood that permanent child placement can be achieved." MCL 722.124e(1)(c) & (f).

106.   The Michigan Legislature further noted that child placing agencies have "the right to free exercise of religion under both the state and federal constitutions," including "the freedom to abstain from conduct that conflicts with an agency's sincerely held religious beliefs." MCL 722.124e(1)(e).

21

*DHHS Contracts with Catholic Charities*

107. In Michigan, there are roughly 13,000 children in foster care, with approximately 3,000 of those foster children available for adoption at any given time.

108. Although DHHS itself does perform foster care services, it lacks the staff and resources to provide foster care placements for the large number of children who need such services in Michigan each year. Instead, DHHS partners with private faith-based and secular child placing agencies to help find loving homes for the numerous children in the state's foster care system.

109. Because DHHS does not perform adoption services, it depends entirely on private agencies to perform those services.

110. DHHS heavily relies on federal funds, including federal Temporary Assistance to Needy Families (TANF) block grants, to administer the state's foster care and adoption programs.

111. DHHS receives more than $3.8 billion annually from the federal government through TANF, Title IV-E, and similar programs.

112. Foster care and public adoption placements can only be performed by private child placing agencies if they contract with and accept referrals from DHHS to perform those placements.

113. DHHS contracts with more than 90 different private child placing agencies to perform foster care and adoption services throughout the state.

114. On information and belief, the vast majority of the private child placing agencies that perform foster care and adoption services—whether secular or faith-

based—do not share Catholic Charities' religious beliefs about marriage and family and have no religious objection to recommending child placements with same-sex couples.

115.   Catholic Charities has been providing foster care and adoption placement services under contracts with the state for decades, and it frequently receives commendations from local DHHS offices for the excellence of its foster care and adoption program.

116.   Currently, Catholic Charities has several contracts with DHHS to receive referrals for foster care and public adoption placements. *See* **Exhibit 6** (sample foster care contract); **Exhibit 7** (sample adoption contract).

117.   Each of Catholic Charities' contracts with DHHS are set to expire and/or renew on or around September 30, 2019.

118.   Catholic Charities does not receive payment under the contracts unless it accepts a referral from DHHS to perform a foster care or adoption placement for a particular child.

119.   Both the foster care and adoption contracts acknowledge that, under Michigan law, "[Catholic Charities] has the sole discretion to decide whether to accept or not accept a referral from MDHHS."

120.   If Catholic Charities accepts a referral from DHHS for foster care or adoption placement services, it enters into a separate individual service agreement for the particular child or individual who was referred by DHHS.

121.   If the placement goal for the referred child changes, Catholic Charities must enter into another separate service agreement to perform the new placement services for that particular child.

122.   For accepted foster care referrals, DHHS pays Catholic Charities a daily rate to perform case management services for the referred child.

123.   For accepted adoption referrals, DHHS pays Catholic Charities a lump sum whenever the referred child is placed, the adoption is finalized, and the adoption becomes permanent.

124.   Catholic Charities' efforts to recruit, train, study, assess, and recommend parents for foster care and adoption are pre-placement services that are not referred by DHHS or otherwise paid for under the contracts. Catholic Charities pays for those efforts with its own private funds.

### *The* Dumont *Lawsuit*

125.   In January 2017, two same-sex couples filed a lawsuit against DHHS and CSA, alleging that the agencies' practice of contracting with faith-based foster care and adoption providers violated the Establishment and Equal Protection Clauses of the United States Constitution. *See Dumont v. Lyon*, No. 2:17-cv-13080-PDB-EAS (E.D. Mich.).

126.   The *Dumont* plaintiffs sought a court order prohibiting the agencies from contracting with faith-based providers, such as Catholic Charities, whose religious beliefs prohibit them from recommending or licensing same-sex couples as foster and adoptive parents.

127.   Although Michigan's previous attorney general initially defended the agencies in the *Dumont* action, Michigan's current attorney general, Dana Nessel, refused to do so and instructed the agencies to settle the case.

128.   In March 2019, Defendants entered into a settlement agreement with the *Dumont* plaintiffs. **Exhibit 8.**

129.   The settlement agreement states that, "[u]nless prohibited by law or court order," Defendants will maintain a nondiscrimination provision in its foster care and adoption agency contracts prohibiting, among other things, sexual orientation discrimination.

130.   The settlement agreement further states that, "[u]nless prohibited by law or court order," Defendants will enforce the nondiscrimination provision, up to and including contract termination, against a child placing agency that "is in violation of, or is unwilling to comply with, such provisions."

### *Defendants' New Policy Targets Catholic Charities' Religious Beliefs*

131.   In April 2019, Defendants sent a directive to Michigan's child placing agencies, including Catholic Charities, purporting to implement the *Dumont* settlement and stating that DHHS's foster care and adoption contracts prohibit, among other things, sexual orientation discrimination. **Exhibit 9**.

132.   In particular, the directive demands that:

> In every case, regardless of whether the individual or couple being considered has identified a particular child for foster or adoptive placement, policies and practices prohibited under the non-discrimination provision include, among others:

- Turning away or referring to another contracted Child Placing Agency (CPA) an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract.

- Refusing to provide orientation or training to an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract.

- Refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract.

- Refusing to place a child accepted by the CPA for services under a contract or a subcontract with an otherwise qualified LGBTQ individual or same-sex couple suitable as a foster or adoptive family for the child.

Ex. 9 at 1–2.

133. This new policy threatens to terminate Catholic Charities' foster care and adoption contracts if it "refuses to comply" with the nondiscrimination provision. Ex. 9 at 2.

134. Instead of being neutral towards religion, Defendants' new policy is based on hostility towards certain religious beliefs about marriage and family.

135. The new policy forces faith-based providers that believe marriage is between a man and a woman to abandon or violate that belief as a condition to receiving government contracts.

26

136.   On information and belief, the only child placing agencies that cannot comply with this new policy and will be penalized by it are faith-based agencies.

137.   In enacting this new policy, Defendants blindly followed Attorney General Nessel's instructions to force faith-based providers to violate or give up their religious beliefs about same-sex marriage, thereby adopting Attorney General Nessel's anti-religious views and policy preferences as their own.

138.   Defendant Nessel has described Michiganders who follow their religious beliefs about marriage being between a man and woman as "a radical fringe," "reprehensible," and promoting a "demagoguery of hatred."[2]

139.   Defendant Nessel has stated that the "AG's office can always be used as a bully pulpit in order to educate on [LGBT] issues," and further explained that religious communities like Catholic Charities should be "educate[d]" "as much as possible" about "the importance of accepting LGBTQ people" because "there are a lot of religious organizations that have changed their views on this over the course of time."[3]

140.   Defendant Nessel has accused those who supported Michigan's protections for faith-based foster care and adoption providers of "dislik[ing] gay people more than [they] care about the needs of foster kids."[4]

---

[2] William Rameau, *Gay Marriage Fight is not in any way Similar to Civil Rights Movement," say 100 African-American Pastors: "Insulting to 100s Years of Struggle,"* BREATHECAST (May 19, 2014, 1:28 PM), https://bit.ly/2GCcv2t.

[3] Kate Opalewski, *Q&A with Mich. Democratic Attorney General Candidate Dana Nessel,* PRIDESOURCE (Jan. 10, 2018), https://bit.ly/2GRWNQh.

[4] Rick Pluta, *Faith-based adoption bills headed to House floor,* MICHIGAN RADIO (Mar. 4, 2015), https://bit.ly/2Eo4wUs.

141. Defendant Nessel has asserted that the "only purpose" of Michigan's statutory protections for faith-based foster care and adoption providers was "to discriminate against people" and "discriminatory animus."[5]

142. Defendant Nessel has also described Michigan's statutory protections for faith-based foster care and adoption providers as "a victory for the hate mongers."[6]

### *Irreparable Injury Suffered by Catholic Charities*

143. Catholic Charities desires to continue its longstanding foster care and adoption ministry and to continue performing under the existing contracts it has with DHHS.

144. Defendants' new policy prevents Catholic Charities from doing so because Catholic Charities cannot comply with the policy without violating its sincerely held religious beliefs about marriage and family.

145. Catholic Charities' religious beliefs about marriage and family prohibit it from recommending or licensing same-sex couples as foster and adoptive parents.

146. Catholic Charities' religious beliefs about marriage and family likewise prohibit it from placing a child with a same-sex couple.

147. If Defendants are allowed to take adverse action against Catholic Charities based on it acting in accordance with its religious beliefs about marriage and family, the effect on Catholic Charities would be catastrophic and irreversible.

---

[5] Ed White, *Dem AG candidate: Adoption law discriminates against gays*, ASSOCIATED PRESS (Sept. 27, 2018), https://bit.ly/2EoEGQm.

[6] Fox 2 Detroit, *Opponents say adoption bill discriminates against gays and lesbians* (Mar. 4, 2015, 5:34 PM), https://bit.ly/2Dcr49R.

148.   If Catholic Charities is unable to receive referrals from or contract with the state, it will be forced to shut down its foster care and adoption ministry and will thus be prohibited from exercising its sincerely held religious beliefs.

149.   Moreover, Catholic Charities has approximately 100 employees whose jobs are dedicated exclusively to carrying out the organization's foster care and adoption ministry. If Defendants are allowed to cancel Catholic Charities' contracts or otherwise penalize the agency for acting consistently with its religious beliefs about marriage and family, Catholic Charities would be unable to keep those employees on its payroll.

150.   Furthermore, if Defendants are allowed to cancel Catholic Charities' contracts or otherwise penalize the agency for acting consistently with its religious beliefs about marriage and family, the resulting loss of income and staff would force Catholic Charities to substantially reduce its other religious activities and services.

151.   On information and belief, if Catholic Charities were to violate its religious beliefs about marriage and family to avoid any adverse action on the part of Defendants, it would lose donors, supporters, and clients—most notably, birth parents, adoptive families, and foster families—who choose to work with Catholic Charities precisely because of their shared religious beliefs.

### ALLEGATIONS OF LAW

152.   Catholic Charities is currently suffering imminent and irreparable harm because of Defendants' actions.

153.   At all times relevant to this Complaint, each and every act alleged herein is attributable to Defendants and performed under color of a statute, regulation, custom, or policy of DHHS and/or the State of Michigan.

154.   Catholic Charities has no adequate remedy at law for the loss of its statutory and constitutional rights.

155.   Unless Defendants' conduct is enjoined, Catholic Charities will continue to suffer irreparable injury.

## COUNT I
### Violation of MCL 400.5a, 710.23g, 722.124e, and 722.124f

156.   Plaintiff incorporates by reference paragraphs 1 through 155.

157.   Michigan's statutory protections for faith-based foster care and adoption providers—specifically, MCL 400.5a, 710.23g, 722.124e, and 722.124f—protect the right of Catholic Charities to operate its foster care and adoption ministry consistent with its sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by Catholic Charities.

158.   Michigan's statutory protections for faith-based foster care and adoption providers prohibit Defendants from taking any adverse action against Catholic Charities because it has declined or will decline to provide services that conflict with its religious beliefs, including its beliefs about marriage and family.

159.   Defendants' new policy violates Michigan law because it threatens adverse action—and in fact would result in adverse action—against Catholic Charities based solely on Catholic Charities' decision to operate its foster care and adoption ministry in accordance with its sincerely held religious beliefs about

marriage and family, which are plainly set forth in Catholic Charities' statement of faith and numerous other documents adhered to by Catholic Charities and the Catholic Church.

160. In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

**COUNT II**
**Violation of Article 1, § 4 of the Michigan Constitution**
**(Freedom of Worship, Religious Belief, and Conscience)**

161. Plaintiff incorporates by reference paragraphs 1 through 155.

162. Under Article 1, Section 4 of the Michigan Constitution, "[e]very person shall be at liberty to worship God according to the dictates of his own conscience," and no person's "civil and political rights, privileges and capacities ... shall be diminished or enlarged on account of his religious belief."

163. Free exercise claims brought under Article I, Section 4 are analyzed under strict scrutiny. *Reid v. Kenowa Hills Public Schs*, 261 Mich App 17, 26; 680 NW2d 62 (2004).

164. Catholic Charities' sincerely held religious beliefs motivate and require it to care for orphans and other children whose parents cannot care for them.

165. Catholic Charities' foster care and adoption services are an exercise of its sincerely held religious beliefs.

166. Catholic Charities' sincerely held religious beliefs require it to operate its ministries, including its foster care and adoption ministry, in accordance with Catholic doctrine and teaching.

167.   Catholic Charities' sincerely held religious beliefs prohibit it from certifying same-sex couples as foster care or adoptive parents and from placing children with same-sex couples.

168.   Defendants' new policy imposes a substantial burden on Catholic Charities' sincerely held religious beliefs because it forces Catholic Charities to choose between violating its religious beliefs about same-sex marriage and shutting down its foster care and adoption ministry.

169.   Defendants' new policy violates Article I, Section 4 of the Michigan Constitution because it excludes Catholic Charities from a public benefit based solely on Catholic Charities' religious beliefs about marriage.

170.   Defendants' new policy violates Article I, Section 4 of the Michigan Constitution by conditioning Catholic Charities' ability to minister to needy children on its willingness to renounce or violate its religious beliefs about marriage and family.

171.   Defendants' new policy violates Article I, Section 4 of the Michigan Constitution by interfering with Catholic Charities' ability to carry out its religious doctrine, faith, and mission.

172.   Defendants' new policy violates Article I, Section 4 of the Michigan Constitution by targeting, discriminating against, and/or showing hostility towards Catholic Charities because of its religious beliefs and practices about marriage.

173.   Specifically, Defendants' new policy discriminates against child placing agencies that have religious objections to same-sex marriage, thereby targeting Catholic Charities' religious beliefs and practices.

174.   Defendants' new policy was motivated by and created to implement Attorney General Nessel's anti-religious views and policy preferences.

175.   Defendants' new policy violates Article I, Section 4 of the Michigan Constitution by burdening Catholic Charities religious exercise with a government rule and/or policy that is neither neutral nor generally applicable.

176.   On information and belief, the only child placing agencies that cannot comply with Defendants' new policy are faith-based, demonstrating that it is not neutral.

177.   Moreover, the nondiscrimination rule purportedly served by Defendants' new policy has not been evenly enforced, demonstrating that it is neither neutral nor generally applicable.

178.   The statutory and regulatory scheme also provides exemptions from the nondiscrimination requirement for secular, nonreligious purposes, demonstrating that the new policy is neither neutral nor generally applicable.

179.   Defendants do not have a compelling reason for applying their new policy to Catholic Charities, nor have they selected the means least restrictive of religious exercise to further any purported government interest.

180.   In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

## COUNT III
### Violation of Article 1, § 5 of the Michigan Constitution
### (Free Speech and Expressive Association)

181.   Plaintiff incorporates by reference paragraphs 1 through 155.

182.   Under Article 1, Section 5 of the Michigan Constitution, "[e]very person may freely speak, write, express and publish his views on all subjects ... and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

183.   Defendants' new policy unconstitutionally compels speech because it would force Catholic Charities to affirmatively recommend and endorse in writing that children be placed with same-sex couples, in direct violation of its sincerely held religious beliefs.

184.   Defendants' new policy violates Catholic Charities' free speech rights because Catholic Charities cannot certify same-sex couples as foster or adoptive parents as consistent with the best interests of children without saying that which Catholic Charities believes to be false.

185.   Defendants' new policy is an unconstitutional content-based and viewpoint-based restriction on speech.

186.   Defendants' new policy violates Catholic Charities' free speech rights because it forces Catholic Charities to choose between saying what it believes to be false or being forced to shut down its foster care and adoption ministry.

187.   Defendants' new policy violates Catholic Charities' free speech and expressive association rights by forcing Catholic Charities into an intimate expressive association with prospective foster and adoptive parents through the

training and home study process in which it must speak contrary to its conscience and religious beliefs.

188.  Additionally, Defendants' new policy violates Catholic Charities' free speech and expressive association rights because it conditions a government benefit on Catholic Charities' willingness to both make statements that conflict with its sincerely held religious beliefs and to enter into an intimate expressive association with prospective foster and adoptive parents in which it must speak contrary to its conscience and beliefs.

189.  In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

**COUNT IV**
**Violation of Article 1, § 2 of the Michigan Constitution**
**(Equal Protection)**

190.  Plaintiff incorporates by reference paragraphs 1 through 155.

191.  Under Article 1, Section 2 of the Michigan Constitution, "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."

192.  Defendants' new policy penalizes and discriminates against Catholic Charities because of its religious beliefs.

193.  Under Defendants' new policy, faith-based foster care and adoption providers that hold and espouse religious beliefs about marriage and family that are contrary to those held and espoused by Catholic Charities are allowed to contract with DHHS and continue their ministries.

194.   Defendants' new policy violates Catholic Charities' equal protection rights in that it prefers one set of religious beliefs over Catholic Charities' beliefs and denies Catholic Charities the right to contract with the government to perform foster care and adoption services solely because of its religious beliefs.

195.   In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

## COUNT V
## Violation of the First Amendment to the U.S. Constitution
### (Free Exercise)

196.   Plaintiff incorporates by reference paragraphs 1 through 155.

197.   Catholic Charities' sincerely held religious beliefs motivate and require it to care for orphans and other children whose parents cannot care for them.

198.   Catholic Charities' foster care and adoption services are an exercise of its sincerely held religious beliefs.

199.   Catholic Charities' sincerely held religious beliefs require it to operate its ministries, including its foster care and adoption ministry, in accordance with Catholic doctrine and teaching.

200.   Catholic Charities' sincerely held religious beliefs prohibit it from certifying same-sex couples as foster care or adoptive parents and from placing children with same-sex couples.

201.   Defendants' new policy violates the Free Exercise Clause by excluding Catholic Charities from a public benefit based solely on its religious beliefs about marriage.

202.   Defendants' new policy violates the Free Exercise Clause by conditioning Catholic Charities' ability to minister to needy children on its willingness to renounce or violate its religious beliefs about marriage and family.

203.   Defendants' new policy violates the Free Exercise Clause by interfering with Catholic Charities' ability to carry out its religious doctrine, faith, and mission.

204.   Defendants' new policy violates the Free Exercise Clause by targeting, discriminating against, and/or showing hostility towards Catholic Charities because of its religious beliefs and practices about marriage.

205.   Specifically, Defendants' new policy discriminates against child placing agencies that have religious objections to same-sex marriage, thereby targeting Catholic Charities' religious beliefs and practices.

206.   Defendants' new policy was motivated by and created to implement Attorney General Nessel's anti-religious views and policy preferences.

207.   Defendants' new policy also violates the Free Exercise Clause by burdening Catholic Charities' religious exercise with a government rule and/or policy that is neither neutral nor generally applicable.

208.   On information and belief, the only child placing agencies that cannot comply with Defendants' new policy are faith-based, demonstrating that it is not neutral.

209.   Moreover, the nondiscrimination rule purportedly served by Defendants' new policy has not been evenly enforced, demonstrating that it is neither neutral nor generally applicable.

210.   The statutory and regulatory scheme also provides exemptions from the nondiscrimination requirement for secular, nonreligious purposes, demonstrating that the new policy is neither neutral nor generally applicable.

211.   Defendants do not have a compelling reason for their actions, nor have they selected the least restrictive means to further any purported government interest.

212.   In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

## COUNT VI
### Violation of the First Amendment to the U.S. Constitution
### (Free Speech and Expressive Association)

213.   Plaintiff incorporates by reference paragraphs 1 through 155.

214.   Defendants' new policy unconstitutionally compels speech because it would force Catholic Charities to affirmatively recommend and endorse in writing that children be placed with same-sex couples, in direct violation of its sincerely held religious beliefs.

215.   Defendants' new policy violates Catholic Charities' free speech rights because Catholic Charities cannot recommend and certify same-sex couples as foster or adoptive parents as consistent with the best interests of children without saying that which Catholic Charities believes to be false.

216.   Defendants' new policy violates Catholic Charities' free speech rights because it forces Catholic Charities' to choose between saying what it believes to be false or being forced to shut down its foster care and adoption ministry.

217. Defendants' new policy is an unconstitutional content-based and viewpoint-based restriction on speech.

218. Defendants' new policy violates Catholic Charities' free speech and expressive association rights by forcing Catholic Charities into an intimate expressive association with prospective foster and adoptive parents through the training and home study process in which it must speak contrary to its conscience and religious beliefs.

219. Additionally, Defendants' new policy violates Catholic Charities' free speech and expressive association rights because it conditions a government benefit on Catholic Charities' willingness to make statements that conflict with its sincerely held religious beliefs and enter into an intimate expressive association with prospective foster and adoptive parents in which it must speak contrary to its conscience and beliefs.

220. In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

### COUNT VII
**Violation of the Fourteenth Amendment to the U.S. Constitution
(Equal Protection)**

221. Plaintiff incorporates by reference paragraphs 1 through 155.

222. The Equal Protection Clause prohibits discrimination on the basis of religion.

223. Defendants' new policy penalizes and discriminates against Catholic Charities because of its religious beliefs.

224.    Under Defendants' new policy, faith-based foster care and adoption providers that hold and espouse religious beliefs about marriage and family that are contrary to those held and espoused by Catholic Charities are allowed to contract with DHHS and continue their ministries.

225.    Defendants' new policy violates Catholic Charities' equal protection rights in that it prefers one set of religious beliefs over Catholic Charities' beliefs and denies Catholic Charities the right to contract with the government to perform foster care and adoption services solely because of its religious beliefs.

226.    In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

**COUNT VIII**
**Violation of 42 USC § 604a**

227.    Plaintiff incorporates by reference paragraphs 1 through 155.

228.    Under 42 USC § 604a, state agencies that receive federal Temporary Assistance to Needy Families (TANF) block grant funds may not discriminate against faith-based organizations when disbursing those funds through contracts with private organizations.

229.    In addition, under 42 USC § 604a, religious organizations that contract with the state agencies disbursing TANF block grant funds "shall retain [their] independence" from the government, including "control over the definition, development, practice, and expression of [their] religious beliefs."

230.    DHHS relies on TANF block grants to administer its foster care and adoption program through contracts with private child placing agencies.

231.    Defendants' new policy violates 42 USC § 604a because it discriminates against faith-based child placing agencies, including Catholic Charities, that have religious objections to same-sex marriage.

232.    Defendants' new policy also violates 42 USC 604a because it interferes with Catholic Charities' independence and ability to control the definition, development, practice, and expression of its religious beliefs about marriage and family.

233.    In the absence of declaratory and injunctive relief, Catholic Charities will be irreparably harmed.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Catholic Charities West Michigan requests that the Court:

a.    Declare that MCL 400.5a, 710.23g, 722.124e, and/or 722.124f prohibits Defendants from taking adverse action against Catholic Charities based on its religious beliefs, speech, or practices about marriage and family;

b.    Declare that Article 1, Sections 2, 4, and 5 of the Michigan Constitution prohibit Defendants from taking adverse action against Catholic Charities based on its religious beliefs, speech, or practices about marriage and family;

c.    Declare that the First and Fourteenth Amendments to the United States Constitution prohibit Defendants from taking adverse action against Catholic Charities based on its religious beliefs, speech, or practices about marriage and family;

d.      Declare that 42 USC § 604a prohibits Defendants from taking adverse action against Catholic Charities based on its religious beliefs, speech, or practices about marriage and family;

e.      Order Defendants to continue performance of the foster care and adoption contracts that it entered into with Catholic Charities;

f.      Issue preliminary and permanent injunctions prohibiting Defendants from taking adverse action against or otherwise penalizing Catholic Charities, including but not limited to cancelling, failing to renew, or refusing to enter into foster care and/or adoption contracts with Catholic Charities, for reasons or pursuant to policies that constitute violations of Catholic Charities' statutory or constitutional rights;

g.      Award Catholic Charities nominal and/or compensatory damages;

h.      Award Catholic Charities the costs of this action and reasonable attorney's fees; and

i.      Award such other and further relief as the Court deems equitable and just.

Dated: April 24, 2019                        Respectfully submitted,


James R. Wierenga (P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

Roger Brooks (NC Bar No. 16317)*
Jeremiah Galus (AZ Bar No. 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
rbrooks@ADFlegal.org
jgalus@ADFlegal.org

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA 30043
(202) 339-0774
dcortman@ADFlegal.org

*Pro Hac Vice application forthcoming

Attorneys for Plaintiff Catholic Charities
West Michigan

## **VERIFICATION**

I declare under penalty of perjury that the foregoing Verified Complaint has been examined by me and that the factual allegations therein are true to the best of my information, knowledge, and belief.

Dated: April 24, 2019

_____
Chris Slater, CEO
Catholic Charities West Michigan

# EXHIBIT 1

Act No. 53
Public Acts of 2015
Approved by the Governor
June 11, 2015

Filed with the Secretary of State
June 11, 2015

EFFECTIVE DATE: September 9, 2015

## STATE OF MICHIGAN
## 98TH LEGISLATURE
## REGULAR SESSION OF 2015

Introduced by Reps. LaFontaine, Crawford, McBroom, Cole, Runestad, Webber, Aaron Miller, Glenn, Jenkins, Cox, Poleski, Franz, Rendon, Price, Goike, Lauwers, Glardon, Jacobsen and Potvin

# ENROLLED HOUSE BILL No. 4188

AN ACT to amend 1973 PA 116, entitled "An act to provide for the protection of children through the licensing and regulation of child care organizations; to provide for the establishment of standards of care for child care organizations; to prescribe powers and duties of certain departments of this state and adoption facilitators; to provide penalties; and to repeal acts and parts of acts," (MCL 722.111 to 722.128) by adding sections 14e and 14f.

*The People of the State of Michigan enact:*

Sec. 14e. (1) The legislature finds and declares all of the following:

(a) When it is necessary for a child in this state to be placed with an adoptive or foster family, placing the child in a safe, loving, and supportive home is a paramount goal of this state.

(b) As of the effective date of the amendatory act that added this section, there are 105 licensed adoption and foster care agencies in this state that are authorized to participate in and assist families with adoption and foster parent placements of children.

(c) Having as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state who are in need of these placement services and to all of the citizens of this state because the more qualified agencies taking part in this process, the greater the likelihood that permanent child placement can be achieved.

(d) As of the effective date of the amendatory act that added this section, the adoption and foster care licensees of this state represent a broad spectrum of organizations and groups, some of which are faith based and some of which are not faith based.

(e) Private child placing agencies, including faith-based child placing agencies, have the right to free exercise of religion under both the state and federal constitutions. Under well-settled principles of constitutional law, this right includes the freedom to abstain from conduct that conflicts with an agency's sincerely held religious beliefs.

(f) Faith-based and non-faith-based child placing agencies have a long and distinguished history of providing adoption and foster care services in this state.

(g) Children and families benefit greatly from the adoption and foster care services provided by faith-based and non-faith-based child placing agencies. Ensuring that faith-based child placing agencies can continue to provide adoption and foster care services will benefit the children and families who receive publicly funded services.

(h) Under well-established department contracting practices, a private child placing agency does not receive public funding with respect to a particular child or particular individuals referred by the department unless that agency affirmatively accepts the referral.

(59)

(i) Under well-settled principles of constitutional law distinguishing "private action" from "state action", a private child placing agency does not engage in state action when the agency performs private-adoption or direct-placement services. Similarly, a private child placing agency does not engage in state action relative to a referral for services under a contract with the department before the agency accepts the referral.

(2) To the fullest extent permitted by state and federal law, a child placing agency shall not be required to provide any services if those services conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency.

(3) To the fullest extent permitted by state and federal law, the state or a local unit of government shall not take an adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide any services that conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency.

(4) If a child placing agency declines to provide any services under subsection (2), the child placing agency shall provide in writing information advising the applicant of the department's website, the Michigan adoption resource exchange or similar subsequently utilized websites, and a list of adoption or foster care service providers with contact information and shall do at least 1 of the following:

(a) Promptly refer the applicant to another child placing agency that is willing and able to provide the declined services.

(b) Promptly refer the applicant to the webpage on the department's website that identifies other licensed child placement agencies.

(5) A child placing agency may assert a defense in an administrative or judicial proceeding based on this section.

(6) If a child placing agency declines to provide any services under subsection (2), the child placing agency's decision does not limit the ability of another child placing agency to provide those services.

(7) For the purpose of this section:

(a) "Adverse action" includes, but is not limited to, denying a child placing agency's application for funding, refusing to renew the child placing agency's funding, canceling the child placing agency's funding, declining to enter into a contract with the child placing agency, refusing to renew a contract with the child placing agency, canceling a contract with the child placing agency, declining to issue a license to the child placing agency, refusing to renew the child placing agency's license, canceling the child placing agency's license, taking an enforcement action against a child placing agency, discriminating against the child placing agency in regard to participation in a government program, and taking any action that materially alters the terms or conditions of the child placing agency's funding, contract, or license.

(b) "Services" includes any service that a child placing agency provides, except foster care case management and adoption services provided under a contract with the department.

Sec. 14f. (1) If the department makes a referral to a child placing agency for foster care case management or adoption services under a contract with the child placing agency, the child placing agency may decide not to accept the referral if the services would conflict with the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency. Before accepting a referral for services under a contract with the department, the child placing agency has the sole discretion to decide whether to engage in activities and perform services related to that referral. The department shall not control the child placing agency's decision whether to engage in those activities or perform those services. For purposes of this subsection, a child placing agency accepts a referral by doing either of the following:

(a) Submitting to the department a written agreement to perform the services related to the particular child or particular individuals that the department referred to the child placing agency.

(b) Engaging in any other activity that results in the department being obligated to pay the child placing agency for the services related to the particular child or particular individuals that the department referred to the child placing agency.

(2) The state or a local unit of government shall not take an adverse action against a child placing agency on the basis that the child placing agency has decided to accept or not accept a referral under subsection (1).

(3) If a child placing agency decides not to accept a referral under subsection (1), that occurrence shall not be a factor in determining whether a placement in connection with the referral is in the best interest of the child.

(4) A child placing agency may assert a defense in an administrative or judicial proceeding based on this section.

(5) For the purpose of this section, "adverse action" includes, but is not limited to, denying a child placing agency's application for funding, refusing to renew the child placing agency's funding, canceling the child placing agency's funding, declining to enter into a contract with the child placing agency, refusing to renew a contract with the child placing agency, canceling a contract with the child placing agency, declining to issue a license to the child placing agency,

2

refusing to renew the child placing agency's license, canceling the child placing agency's license, taking an enforcement action against a child placing agency, discriminating against the child placing agency in regard to participation in a government program, and taking any action that materially alters the terms or conditions of the child placing agency's funding, contract, or license.

Enacting section 1. It is the intent of the legislature to protect child placing agencies' free exercise of religion protected by the United States constitution and the state constitution of 1963. This amendatory act is not intended to limit or deny any person's right to adopt a child or participate in foster care.

Enacting section 2. This amendatory act takes effect 90 days after the date it is enacted into law.

Enacting section 3. This amendatory act does not take effect unless all of the following bills of the 98th Legislature are enacted into law:

(a) House Bill No. 4189.

(b) House Bill No. 4190.

This act is ordered to take immediate effect.

..........................................................................................

Clerk of the House of Representatives

..........................................................................................

Secretary of the Senate

Approved .........................................................................

..........................................................................................

Governor

3

# EXHIBIT  2

Act No. 54
Public Acts of 2015
Approved by the Governor
June 11, 2015

Filed with the Secretary of State
June 11, 2015

EFFECTIVE DATE: September 9, 2015

## STATE OF MICHIGAN
## 98TH LEGISLATURE
## REGULAR SESSION OF 2015

**Introduced by Reps. Santana, Crawford, McBroom, Cole, Runestad, Webber, Aaron Miller, Glenn, Jenkins, Cox, Poleski, Franz, Rendon, Price, Goike, Lauwers, Glardon, Jacobsen and Potvin**

# ENROLLED HOUSE BILL No. 4189

AN ACT to amend 1939 PA 288, entitled "An act to revise and consolidate the statutes relating to certain aspects of the family division of circuit court, to the jurisdiction, powers, and duties of the family division of circuit court and its judges and other officers, to the change of name of adults and children, and to the adoption of adults and children; to prescribe certain jurisdiction, powers, and duties of the family division of circuit court and its judges and other officers; to prescribe the manner and time within which certain actions and proceedings may be brought in the family division of the circuit court; to prescribe pleading, evidence, practice, and procedure in certain actions and proceedings in the family division of circuit court; to provide for appeals from certain actions in the family division of circuit court; to prescribe the powers and duties of certain state departments, agencies, and officers; to provide for certain immunity from liability; and to provide remedies and penalties," (MCL 710.21 to 712B.41) by adding section 23g to chapter X.

*The People of the State of Michigan enact:*

CHAPTER X

Sec. 23g. In accordance with sections 14e and 14f of 1973 PA 116, MCL 722.124e and 722.124f, a child placing agency shall not be required to provide adoption services if those adoption services conflict with, or provide adoption services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency. Also, in accordance with sections 14e and 14f of 1973 PA 116, MCL 722.124e and 722.124f, the state or a local unit of government shall not take an adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide adoption services that conflict with, or provide adoption services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency.

Enacting section 1. It is the intent of the legislature to protect child placing agencies' free exercise of religion protected by the United States constitution and the state constitution of 1963. This amendatory act is not intended to limit or deny any person's right to adopt a child.

Enacting section 2. This amendatory act takes effect 90 days after the date it is enacted into law.

Enacting section 3. This amendatory act does not take effect unless all of the following bills of the 98th Legislature are enacted into law:

(a) House Bill No. 4188.

(b) House Bill No. 4190.

This act is ordered to take immediate effect.

.............................................................................
Clerk of the House of Representatives

.............................................................................
Secretary of the Senate

Approved ....................................................................

.............................................................................
Governor

2

# EXHIBIT 3

Act No. 55
Public Acts of 2015
Approved by the Governor
June 11, 2015

Filed with the Secretary of State
June 11, 2015

EFFECTIVE DATE: September 9, 2015

## STATE OF MICHIGAN
## 98TH LEGISLATURE
## REGULAR SESSION OF 2015

Introduced by Reps. Leutheuser, Crawford, McBroom, Cole, Runestad, Webber, Aaron Miller, Glenn, Jenkins, Cox, Poleski, Franz, Rendon, Price, Goike, Lauwers, Glardon, Jacobsen and Potvin

# ENROLLED HOUSE BILL No. 4190

AN ACT to amend 1939 PA 280, entitled "An act to protect the welfare of the people of this state; to provide general assistance, hospitalization, infirmary and medical care to poor or unfortunate persons; to provide for compliance by this state with the social security act; to provide protection, welfare and services to aged persons, dependent children, the blind, and the permanently and totally disabled; to administer programs and services for the prevention and treatment of delinquency, dependency and neglect of children; to create a state department of social services; to prescribe the powers and duties of the department; to provide for the interstate and intercounty transfer of dependents; to create county and district departments of social services; to create within certain county departments, bureaus of social aid and certain divisions and offices thereunder; to prescribe the powers and duties of the departments, bureaus and officers; to provide for appeals in certain cases; to prescribe the powers and duties of the state department with respect to county and district departments; to prescribe certain duties of certain other state departments, officers, and agencies; to make an appropriation; to prescribe penalties for the violation of the provisions of this act; and to repeal certain parts of this act on specific dates," (MCL 400.1 to 400.119b) by adding section 5a.

*The People of the State of Michigan enact:*

Sec. 5a. In accordance with section 23g of chapter X of the probate code of 1939, 1939 PA 288, MCL 710.23g, and sections 14e and 14f of 1973 PA 116, MCL 722.124e and 722.124f, the department shall not take an adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide services that conflict with, or provide services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs contained in a written policy, statement of faith, or other document adhered to by the child placing agency.

Enacting section 1. It is the intent of the legislature to protect child placing agencies' free exercise of religion protected by the United States constitution and the state constitution of 1963. This amendatory act is not intended to limit or deny any person's right to adopt a child or participate in foster care.

Enacting section 2. This amendatory act takes effect 90 days after the date it is enacted into law.

Enacting section 3. This amendatory act does not take effect unless all of the following bills of the 98th Legislature are enacted into law:

(a) House Bill No. 4188.

(b) House Bill No. 4189.

This act is ordered to take immediate effect.

......................................................................................
Clerk of the House of Representatives

......................................................................................
Secretary of the Senate

Approved .................................................................................

......................................................................................
Governor

2

# EXHIBIT  4

# Michigan Department of Labor & Economic Growth

## Filing Endorsement

This is to Certify that the CERTIFICATE OF AMENDMENT - CORPORATION

for

CATHOLIC CHARITIES WEST MICHIGAN

ID NUMBER: 877369

received by facsimile transmission on December 21, 2006 is hereby endorsed

Filed on December 22, 2006 by the Administrator.

The document is effective on the date filed, unless a
subsequent effective date within 90 days after
received date is stated in the document.



In testimony whereof, I have hereunto set my
hand and affixed the Seal of the Department,
in the City of Lansing, this 22ND day
of December, 2006.

_Andrew J. Metcalf_, Director

Bureau of Commercial Services

Sent by Facsimile Transmission 06356

12/22/2006 9:21:26 AM   FAXCOM   PAGE 3  OF 4
WARNER NORCROSS & JUDD Fax:6167522500   Dec 21 2006  15:29   P.02

BCS/CD-515 (Rev. 12/05)

### MICHIGAN DEPARTMENT OF LABOR & ECONOMIC GROWTH
### BUREAU OF COMMERCIAL SERVICES

| Date Received | (FOR BUREAU USE ONLY) |
|---|---|

This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.

Name
Jeffrey B. Power, c/o Warner Norcross & Judd LLP
Address
111 Lyon St. N.W., Suite 900

| City | State | Zip Code |
|---|---|---|
| Grand Rapids | MI | 49503-2487 |

EFFECTIVE DATE:

Document will be returned to the name and address you enter above. If left blank document will be mailed to the registered office.

## CERTIFICATE OF AMENDMENT TO THE ARTICLES OF INCORPORATION
### For use by Domestic Profit and Nonprofit Corporations
(Please read information and instructions on the last page)

Pursuant to the provisions of Act 284, Public Acts of 1972 (profit corporations), or Act 162, Public Acts of 1982 (nonprofit corporations), the undersigned corporation executes the following Certificate:

1. The present name of the corporation is:   Secretariat for Social Justice of the Roman Catholic Diocese of Grand Rapids

2. The identification number assigned by the Bureau is:   877-369

3. Article _____ I _____ of the Articles of Incorporation is hereby amended to read as follows:

The name of the corporation is CATHOLIC CHARITIES WEST MICHIGAN.

The first and second subparagraphs of Article II of the Articles of Incorporation are hereby amended to read as follows:

To provide services, in accord with the tradition of Catholic social teaching, to support individuals, families, and communities in their emotional, social and spiritual development with particular concern for those who are poor and vulnerable;

To promote just public social policy, to advocate appropriate legislation within the limits prescribed below, to seek to assure justice to the poor and to the suffering in the distribution of society's resources, and to study the impact of all public policy on the welfare of people, with particular reference to the protection and strengthening of the family role in society;

The third subparagraph of Article II of the Articles of Incorporation is hereby deleted in its entirety.

Article VIII of the Articles of Incorporation is hereby deleted.

12/21/2006  3:26PM

BCS/CD-515 (Rev. 12/05)

## COMPLETE ONLY ONE OF THE FOLLOWING:

**4.** (For amendments adopted by unanimous consent of incorporators before the first meeting of the board of directors or trustees.)

The foregoing amendment to the Articles of Incorporation was duly adopted on the _____ day of _____, in accordance with the provisions of the Act by the unanimous consent of the incorporator(s) before the first meeting of the Board of Directors or Trustees.

Signed this _____ day of _____

_____
(Signature)                                        _____
                                                   (Signature)

_____
(Type or Print Name)                               _____
                                                   (Type or Print Name)

_____
(Signature)                                        _____
                                                   (Signature)

_____
(Type or Print Name)                               _____
                                                   (Type or Print Name)

---

**5.** (For profit and nonprofit corporations whose Articles state the corporation is organized on a stock or on a membership basis.)

The foregoing amendment to the Articles of Incorporation was duly adopted on the _____ day of _____ November _____, 2006 _____, by the shareholders if a profit corporation, or by the shareholders or members if a nonprofit corporation (check one of the following)

☐ at a meeting the necessary votes were cast in favor of the amendment.

☐ by written consent of the shareholders or members having not less than the minimum number of votes required by statute in accordance with Section 407(1) and (2) of the Act if a nonprofit corporation, or Section 407(1) of the Act if a profit corporation. Written notice to shareholders or members who have not consented in writing has been given. (Note: Written consent by less than all of the shareholders or members is permitted only if such provision appears in the Articles of Incorporation.)

☒ by written consent of all the shareholders or members entitled to vote in accordance with section 407(3) of the Act if a nonprofit corporation, or Section 407(2) of the Act if a profit corporation.

☐ by consents given by electronic transmission in accordance with Section 407(3) if a profit corporation.

☐ by the board of a profit corporation pursuant to section 611(2).

| Profit Corporations and Professional Service Corporations | Nonprofit Corporations |
|---|---|
| Signed this _____ day of _____ | Signed this _30th_ day of _November_, 2006 |
| By _____<br>(Signature of an authorized officer or agent) | By _Walter C. Hurley_<br>(Signature of President, Vice-President, Chairperson or Vice-Chairperson) |
| _____<br>(Type or Print Name) | Most Rev. Walter A. Hurley<br>(Type or Print Name) |

1331570-1

12/21/2006   3:26PM

# EXHIBIT  5

**CATHOLIC CHARITIES WEST MICHIGAN**
**STATEMENT OF FAITH**

As .a Catholic organization, Catholic Charities West Michigan will serve children and families through the placement and adoption of children with individuals meeting our sincerely held Catholic social teachings and beliefs and married couples made up of two parents of the opposite sex. Adoptive parents are viewed as resources for children in need of a permanent home. Honesty, mutual respect and trust are essential ingredients in the life-long relationship between birth families and adoptive families.

# EXHIBIT  6

**RECEIVED**

*Michigan Department of Health and Human Services*
*Bureau of Grants and Purchasing (BGP)*
*PO Box 30037, Lansing, MI 48909*
*Or*
*235 S. Grand Avenue, Suite 1201, Lansing, MI 48933*

AUG 2 8 2018

CCP

## CONTRACT NUMBER:  MA180000000915
### Between
## MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES
### And

| CONTRACTOR | | PRIMARY CONTACT | | EMAIL | |
|---|---|---|---|---|---|
| Catholic Charities West Michigan | | Pam Cohn | | Pcohn@ccwestmi.org | |
| CONTRACTOR ADDRESS | | | | | TELEPHONE |
| 40 Jefferson St., SE, Grand Rapids, MI, 49501-4304 | | | | | 616-356-6250 |
| STATE CONTACT | NAME | | TELEPHONE | EMAIL | |
| Contract Administrator | Sarah Goad | | 517-336-4516 | goads@michigan.gov | |
| BGP  Analyst | Bonnie Fineis | | 517-373-4108 | fineisb@mighigan.gov | |

| CONTRACT SUMMARY | | | | |
|---|---|---|---|---|
| SERVICE DESCRIPTION | PAFC19-28003 Placing Agency Foster Care (PAFC) | | | |
| GEOGRAPHIC AREA | Statewide. | | | |
| INITIAL TERM | EFFECTIVE DATE* | EXPIRATION DATE | | AVAILABLE OPTION YEARS |
| 3 years | October 1, 2018 | September 30, 2021 | | 2 |
| MISCELLANEOUS INFORMATION | | | | |
| ESTIMATED CONTRACT VALUE AT TIME OF EXECUTION | | $450,000.00 | | |
| CONTRACT TYPE | Per Diem | | | |

*The effective date of the contract shall be the date listed in the "Effective Date" box above, or the date of Michigan Department of Health and Human Services (MDHHS) signature below, whichever is later.

The undersigned have the lawful authority to bind the Contractor and MDHHS to the terms set forth in this Contract. Section 291 of the fiscal year 2016 Omnibus Budget, PA 84 of 2015, requires verification that all new employees of the Contractor and all new employees of any approved subcontractor, working under this Contract, are legally present to work in the United States. The Contractor shall perform this verification using the E-verify system (http://www.uscis.gov/portal/site/uscis). The Contractor's signature on this Contract is the Contractor's certification that verification has and will be performed. The Contractor's signature also certifies that the Contractor is not an Iran linked business as defined in MCL 129.312.

**FOR THE CONTRACTOR:**
Catholic Charities West Michigan

Contractor

Signature of Director or Authorized Designee
**Chris Slater**
Print Name
**8/27/2018**
Date

**FOR THE STATE:**

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES

Signature of Director or Authorized Designee
Christine H. Sanches
Print Name
09/24/18
Date

Anticipated Total Contract Value: $450,000.00

This Contract will be in effect from the date of MDHHS signature through September 30, 2021. No service will be provided and no costs to the state will be incurred before October 1, 2018, or the effective date of the Contract, whichever is later. Throughout this Contract, the date of MDHHS signature or October 1, 2018, whichever is later, shall be referred to as the begin date.

At the discretion of MDHHS this Contract may be renewed by an amendment not less than 30 days before its expiration. This Contract may be renewed for up to two additional one-year periods.

1. PROGRAM REQUIREMENTS

    1.1. Client Eligibility Criteria

        a. Eligible Clients

        1) Children for whom the family court has issued an order which makes the Michigan Department of Health and Human Services responsible for the child's placement, care and supervision.

            OR

            Children for whom the family court has authorized a placement in the parental home in a Trial Reunification living arrangement.

            The period of time eligible for a Trial Reunification shall not exceed 180 days from the date of the child(ren)'s placement in a parental home. Child(ren) must enter Trial Reunification directly from foster care and the family court must retain jurisdiction with care and custody continuing with MDHHS.

        2) Children for whom the Kent County family court has issued an order which makes the Michigan Department of Health and Human Services responsible for the child's placement, care and supervision and the child has returned home in seven days or less from the removal date.

            OR

            Youth extending or entering/re-entering the Young Adult Voluntary Foster Care Program (YAVFC)-Youth must have been in out-of-home placement after being referred or committed to MDHHS for care and supervision and is currently receiving foster care services and is at least 18 years old, but less than 21 years old or exited foster care/YAVFC

after reaching 18 years old, but less than 21 years old **and** resides in Kent county.

b.  Determination of Eligibility

If MDHHS makes a referral to a child placing agency for foster care case management services pursuant to a contract with the child placing agency, the child placing agency must accept or decline the referral within one hour of receipt of the referral. If a need for placement is imminent, MDHHS may make referrals for placement concurrently to other contracted providers. Contractor may not transfer a foster care case to another child placing agency. After acceptance of a foster care referral, the Contractor may not refer the case back to the Department except for the reasons outlined in the Children's Foster Care Manual (FOM) or upon the written approval of the County Director, the Children's Services Agency Director, or the Deputy Director.

1.2.  Referrals

a.  The Contractor accepts a referral from MDHHS by doing either of the following:

1) Submitting to MDHHS a written Contract to perform the services related to the particular child or particular individuals that the Department referred to the Contractor; or

2) Engaging in any other activity that results in MDHHS being obligated to pay the Contractor for the services related to the particular child or particular individuals that the Department referred to the Contractor.

b.  Upon placement, MDHHS shall provide the Contractor at minimum, with a court order, a Medical Authorization Card (DHS-3762), the Case Referral and Acceptance - Individual Service Contract (DHS-3600) and all known information about the child and family.

1.3.  Legal or Court Related

MDHHS shall involve the Contractor, to the extent allowed by law, in matters relating to any legal or court activities concerning the child while in the Contractor's care. If the Contractor is to be involved in the court proceedings, MDHHS shall provide the Contractor with written reports for court use upon request, subject to confidentiality requirements imposed by statute.

2.  CONTRACTOR RESPONSIBILITIES

2.1.  Email Address

Rev. 10-18

The Contractor authorizes MDHHS to use the contact information below to send Contract related notifications/information. The Contractor shall provide MDHHS with updated contact information if it changes.

Contact email address: Pcohn@ccwestmi.org

2.2. Requests for Information

The Contractor may be required to meet and communicate with MDHHS representatives and from time to time MDHHS may require that the Contractor create reports or fulfill requests for information as necessary to fulfill the MDHHS' obligations under statute and/or Dwayne B. v. Snyder, et al., 2:06-cv-13548, herein referred to as the Implementation, Sustainability, and Exit Plan (ISEP).

The Contractor shall make available to MDHHS copies of any outside reviews, non-redacted FOIA requests, or audits relating to the contracted program.

2.3. Geographic Area

The Contractor shall provide services described herein in the following geographic area:   Statewide

2.4. Licensing Requirements

The MDHHS Division of Child Welfare Licensing (DCWL) is the licensing agency for Child Placing Agencies (CPA).  A license is issued to a certain person or organization at a specific location, is non-transferable, and remains the property of the Department.  Therefore, a child placing agency must be established at a specific location.

The Contractor shall ensure that, for the duration of this Contract, it shall maintain a license for those program areas and services that are provided for in this Contract.  If the Contractor fails to comply with this section, MDHHS may terminate this Contract for default.

The Contractor is licensed to provide service under this Contract under the following license number:     CB280379189

2.5. Location of Facilities

The Contractor shall provide services described herein at the following location(s):

806 Hastings St., Suite R, Traverse City, MI, 49686-3454

Direct foster care services shall be provided in client, relative caregiver, and foster parent homes.

2.6.   Program Focus and Name

Placement Agency Foster Care (PAFC) is a program that provides a comprehensive and coordinated set of activities designed to place and supervise children in out of home placement.

Foster care supervision includes the provision of services as throughout this Contract and when necessary the referral for additional services that will enhance the child's and the family's functioning and ameliorate the conditions that caused the child's removal from parental custody.

Foster care supervision includes developing and implementing a treatment plan and service Contract to comply with the Foster Care Manual which facilitates permanency planning according to the following guidelines:

- Reunification,
- Adoption
- Guardianship
- Permanent Placement with a Fit and Willing Relative.
- Another Planned Permanent Living Arrangement (AAPLA)

2.7.   Provider Numbers

MiSACWIS Provider Number:          21846618

Bridges Provider Number:              179087

2.8.   Credentials

The Contractor shall assure that all staff performing functions under this Contract, including contractor employees, volunteers and/or subcontractors, are appropriately screened, credentialed, and trained in accordance with licensing rule. Additional staff requirements are identified in Section 2.10 d. of this Contract.

2.9.   Compliance Requirements

Except in subsection (h), the Contractor shall comply with the following requirements:

a. The Contractor shall comply with all applicable MDHHS policy in the Children's Foster Care (FOM), Guardianship (GDM), Service Requirements Manual (SRM), Interstate Compact (ICM), Native

American Affairs (NAA) and Adoption (ADM) Manuals and MDHHS policy amendments (including interim policy bulletins).

b. Throughout the term of this Contract, the Contractor shall ensure that it provides all applicable MDHHS policy and MDHHS policy amendments (including interim policy bulletins) and applicable Administrative Codes to social service staff. The Contractor shall ensure that social service staff complies with all applicable requirements.

MDHHS policies, amendments and policy bulletins, are published on the following internet link: http://www.michigan.gov/mdhhs. Administrative Codes are published at on the following internet link: http://michigan.gov/lara/0,4601,7-154-35738_5698-118524--,00.html

c. The Contractor shall comply with the MDHHS non-discrimination statement:

Michigan Department of Health and Human Services (MDHHS) will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs, or disability.

The above statement applies to all MDHHS supervised children, and to all licensed and unlicensed caregivers and families and/or relatives that could potentially provide care or are currently providing care for MDHHS supervised children, including MDHHS supervised children assigned to a contracted agency.

d. The Contractor shall provide services within the framework of Michigan's Child Welfare Practice Model, MiTEAM. The Contractor shall utilize the skills of engagement, assessment, teaming and mentoring in partnering and building relationships with families and children by exhibiting empathy, professionalism, genuineness and respect. Treatment planning shall be from the perspective of family/child centered practice.

e. The contractor shall ensure all directives and services ordered by the court are completed to the satisfaction of the court within the timeframes ordered.

f. The Contractor shall ensure worker participation in the department's federally-required Random Moment Time Study (RMTS) in order to determine the amount of time spent on various activities. Based on these results, MDHHS determines the amount of worker time that can be charged to various funding sources. Failure to ensure workers meet RMTS training requirements and provide timely and accurate RMTS survey responses may result in recoupment of funding or other corrective actions, as set forth in this Contract.

g. The Contractor shall assure the coordination of all services based on an assessment of the parent's needs. The Contractor shall utilize Care Connect 360 (CC360) to assure the coordination and provision of all treatment services required based on an assessment of each child's needs and shall execute and comply with the terms of the CC360 Data Use Contract. Treatment services include, but are not limited to the provision of counseling/therapy for each child. The Contractor shall ensure the provision of all medical, dental and behavioral health services required based on an assessment of each child's needs. The Contractor may utilize Medicaid (or private insurance) reimbursable services to comply with this requirement. If a counseling or therapy service is not available or accessible for each child, the Contractor is responsible for the direct provision of the service.

The Contractor shall designate an individual to act as a point of contact for the Health Liaison Officer (HLO) and forward the individual's name to the Health Analyst within the central office MDHHS Child Welfare Medical Unit. The point of contact shall be familiar with current case assignments and have authority to ensure follow-up by the Contractor's staff.

h. Under 1973, PA 116, as amended by 2015 PA 53, the Contractor has the sole discretion to decide whether to accept or not accept a referral from MDHHS. Nothing in this Contract limits or expands the application of this Public Act.

i. Compliance with MDHHS Implementation, Sustainability, and Exit Plan

The Contractor shall ensure compliance with all applicable provisions and requirements of Dwayne B. v. Snyder, et al., 2:06-cv-13548, Implementation Sustainability and Exit Plan.

j. Prudent Parent Expectations

The Contractor shall ensure prudent parent expectations are followed as outlined in FOM 722-11, Prudent Parent Standard & Delegation of Parental Consent.

k. Caseload Ratios

The Contractor shall maintain the following caseload ratios:

1) Foster care workers will have a caseload assigned to them of no more than thirteen (13) children, as their regular, ongoing caseload. A regular, ongoing caseload will be defined as the cases assigned to a specific worker for ongoing casework responsibility, not cases being temporarily covered for the purposes of worker leave or

departure. Even in cases of temporary coverage, an assigned caseload shall not exceed fifteen (15) children at any time. A mixed caseload comprised of more than one program type shall not exceed the prorated total equal to one full caseload.

2) Foster care/social services supervisors shall supervise no more than five (5) foster care/social services staff at any time.

In addition, PAFC's will work collaboratively with DHHS in the following ways:

1) DHHS and PAFC partners will work with Public Consulting Group (PCG) in completing the establishment of fair rates.
2) DHHS and PAFC's will work collaboratively to establish a joint protocol for an annual rate review process and will engage in said process.

Additional Compliance Provisions

The Contractor shall comply with the provisions of:

a. 1984 Public Act, 114, as amended being M.C.L. 3.711 *et seq.*, Interstate Compact on the Placement of Children.
b. 1975 Public Act 238, as amended, being M.C.L. 722.621 *et seq.*, Child Protection Law.
c. 1982 Public Act 162, as amended, being M.C.L. 450.2101 *et seq.*, Michigan Nonprofit Corporation Act.
d. 1994 Public Act 204, as amended, being M.C.L. 722.921 *et seq.*, Michigan Children's Ombudsman Act.
e. 1973 Public Act 116, as amended, being M.C.L. 722.111 *et seq.*, Michigan Child Care Organization Act.
f. 1939 Public Act 288, Chapter X, being M.C.L. 710.1 *et seq.*, Michigan Adoption Code.
g. 1984 Public Act 203, as amended, being M.C.L. 722.951 *et seq.*, Michigan Foster Care and Adoption Services Act.
h. The Social Security Act as amended by the Multiethnic Placement Act of 1994 (MEPA); Public Law 103-382, and as amended by Section 1808 of the Small Business Job Protection, the Interethnic Adoption Provision (IEAP).
i. The Indian Child Welfare Act (ICWA); Public Law 95-608 being 25 U.S.C. 1901 *et seq.*
j. 1976 Public Act 453, as amended, being M.C.L 37,2101 *et seq.*, Elliott-Larsen Civil Rights Act.
k. Fostering Connections to Success Act of 2008
l. Preventing Sex Trafficking and Strengthening Families Act, Federal PL 113-183
m. Social Security Act, 42 USC 671(a)(20)

n. Federal Bureau of Investigation (FBI), Criminal Justice Information Services (CJIS) Security Policy located on the following link: https://www.fbi.gov/services/cjis/cjis-security-policy-resource-center

o. 2017 Public Acts 246 through 255, Michigan Opioid Laws

Compliance with ICWA Requirements

The Contractor shall provide case management services in accordance with the "Active Efforts" requirements established in the ICWA; Public Law 95-608 being 25 U.S.C 1901 *et seq.* These requirements include but are not limited to the following:

a. Establish an American Indian child as a member of a Tribe in accordance with ICWA and as defined in the MDHHS Native American Affairs (NAA) manual.

b. Provide "Active Efforts" case management services in with in accordance with ICWA and as defined in the NAA manual.

c. Provide placement of American Indian children in accordance with "Placement Priorities" as established in ICWA and defined in the NAA manual.

d. Provide "Expert Witness" testimony in accordance with ICWA and as defined in the NAA manual.

e. Provide services to American Indian families within the context of their culture and ethnicity. Maintaining knowledge in the following:
   1) How culture and rituals influence parenting decisions.
   2) Determine what services and supports will be most effective.
   3) Knowledge and respect of tribal practices.

2.10. Services to be Provided

a. Foster Home Licensing Data Entry

The Contractor shall document all recruitment and licensing activities into the tracking system identified by MDHHS.

b. Service Standards for Trial Reunification

Trial Reunification is a court-ordered placement where the child is returned from an out-of-home placement to the care of the parent or guardian from whom he or she was removed. The child remains under court supervision during the Trial Reunification period with the MDHHS retaining placement care and custody

1) The Contractor shall provide the following services to children in trial reunification:

a) Assist in preparing the parent, child, and caregiver for the transition to trial reunification. See FOM 722-7B.

b) A Family Team Meeting prior to placement of a child in the parental home to develop a transition plan with the parent, caregiver and child, if age appropriate. The Contractor shall have Family Team Meetings quarterly until case closure. See FOM 722-06B.

c) Complete a new Family Assessment of Needs and Strengths, Child Assessment of Needs and Strengths, and Safety Assessment and Safety Plan. See FOM 722-8A, 722-8B and 722-9B.

d) Continue case worker visit expectations as required in FOM 722-6H.

e) Maintain support services until case closure. The Contractor shall document services needed to continue to meet the child's needs and identified providers for such services to provide continuity of services. See FOM 722-7B.

f) Continue assessing and monitoring of the case plan and safety plan.

c. Staff Training
  1) Child Welfare Training:  Requirements

a) The Contractor shall ensure that staff hired or promoted to a foster care social services position complete the Office of Workforce Development and Training (OWDT) foster care Pre-Service Institute (PSI) training within 112 days.

b) Staff transferring to a foster care social service position from another children's services position that has successfully completed the PSI training in that program, shall attend and complete OWDT–foster care private agency Program Specific Transfer Training (PSTT) within six months of assuming the foster care position.

c) The Contractor shall ensure that first line supervisors hired or promoted to a foster care supervisor position complete OWDT foster care New Supervisor Institute (NSI) within 112 days of hire/promotion.

d) Supervisors transferring to a foster care supervisor position that has successfully completed the NSI, shall attend and complete the OWDT foster care NSI PSTT within six months of assuming the foster care supervisor position.

e) Staff who conduct any functions related to the certification of foster homes must attend and pass the five-day class on certifying foster homes, investigating and handling complaints against foster homes.

f) Supervisors who have not attended certification training as a certification staff person are to attend the five-day certification and

complaint investigation training prior to supervising the certification of foster homes.

g) All social service and certification workers must complete a minimum of 32 in-service training hours per calendar year. All first line social service and certification supervisors must complete a minimum of 16 in-service training hours per calendar year.

h) The Contractor shall follow the requirements in MDHHS policy Services Requirements Manual 103 "Staff Qualifications and Training."

2) <u>OWDT: Registration Process</u>

a) The Contractor shall register staff for training through the Learning Management System (LMS). In some cases, OWDT will provide a form to be completed and provided to OWDT, who will then perform the registration function within LMS.

b) The Contractor supervisor and/or the Contractor training facility coordinator can register Contractor staff directly for in-service training. To cancel or change training registration, the Contractor will need to make the changes in the LMS directly, unless the trainee was registered by OWDT. The Contractor will need to contact the help desk at MDHHSTraining@michigan.gov for changes to registrations completed by OWDT.

c) All training completed externally shall be added to the LMS so that it may be included in in-service training hour calculations. The name of the training, a short description, the total number of hours spent in training, and the completion date must be documented in LMS. All qualified training shall be training that improves child welfare practice.

d) Confirmations, with specific details on times and locations, will be emailed to the Contractor/trainee by OWDT at least seven days before the training commences.

3) <u>Training Documentation</u>

The Contractor shall maintain training documentation which verifies registration and successful completion of training. Additionally, the Contractor shall maintain documentation of the completion of required in-service training for both social service staff and social service supervisory staff.

4) <u>Completion of Security Awareness Training (SAT)</u>

The Contractor shall require each employee, subcontractor, subcontractor employee or volunteer who works directly with clients or who is authorized to have access to client fingerprint-based criminal history record information (CHRI) under this Contract to successfully

complete security awareness training (SAT) within six months of appointment to a position with (CHRI) access and every two years thereafter.  Documentation of successful SAT completion is to be located in the personnel record.

Security awareness training is located through the Learning Management System or on the following link: https://dhhs.michigan.gov/course212/Fingerprint_Security_Awareness_Training/story.html

5) In-Service Training
   a)   The Contractor shall ensure that each individual social services staff receives a minimum of 32 hours of qualifying in-service training on an annual basis.
   b)   The Contractor shall ensure that each individual social service supervisor receives a minimum of 16 hours of qualifying in-service training on an annual basis.
   c)   The Contractor shall ensure that each individual certification worker receives a minimum of 32 hours of qualifying in-service training on an annual basis (SRM103).
   d)   The Contractor shall ensure that each individual certification supervisor receives a minimum of 16 hours of qualifying in-service training on an annual basis (SRM 103).

All qualified training shall be training that improves child welfare practice.

d. Relative Licensing

The Contractor may elect to facilitate the licensure of relative caregivers providing care to children in out-of-home placements that are under the direct care and supervision of MDHHS.  Facilitation of licensure includes but is not limited to the following activities:

1) Accept referrals of unlicensed relative caregivers from MDHHS, for possible licensure as a foster family home, based on the Contractor's capacity to complete the licensing process as outlined in foster care policy.

2) On forms provided by MDHHS, and when requested by MDHHS, the Contractor shall report to MDHHS a minimum of monthly on the number and characteristics of unlicensed relative homes and the children in those homes, and on progress in licensing the homes.

e. Adoption and Foster Care Analysis Reporting System Requirements

The Contractor shall enter all child and family information into the Michigan Statewide Automated Child Welfare System (MiSACWIS) to enable MDHHS to comply with Federal Adoption and Foster Care Analysis and Reporting System (AFCARS) reporting requirements. Failure to comply with this reporting requirement shall result in a penalty for the Contractor as specified in Section 3.1 f. of this Contract.

f.  MiTEAM Requirements

1)  The Contractor shall designate a Program Manager, Supervisor or child welfare staff person in each office location to act as a MiTEAM Liaison with MDHHS to:
    a)  Participate in Practice Support Trainings and Practice Support Networking Meetings.
    b)  Convey the MiTEAM Specialist information and activities to agency administration.
    c)  Be responsible for contributing to policy and program development and sustainment.
    d)  Maintain knowledge and expertise of all policies and programs impacting the local office.
    e)  Gather and analyze information to identify local trends where case practice may be negatively impacted by policies, procedures or programs.
    f)  Recommend modifications to policies and procedures that would better assist caseworkers in achieving identified outcomes.
    g)  Consult with their assigned MiTEAM Analyst in MDHHS Central Office.
    h)  Respond to questions and share updates related to MiTEAM.
    i)  Advocate for MiTEAM and the importance of continued growth around caseworker's knowledge and skills to improve safety, permanency and well-being.
    j)  Compile reports completed by supervision, complete MiTEAM Liaison Report and send the report to the assigned MiTEAM Analyst, on the schedule determined by MDHHS.

2)  The Contractor shall ensure that all child welfare caseworkers:
    a)  Complete each training module on the MiTEAM Virtual Learning Site, located at https://michigan.csod.com/client/Michigan/default.aspx
        i.   In the order recommended,
        ii.  Including participation in the Individual Field Application Exercises discussed with their supervisor,
        iii. Complete the caseworker self-assessment exercise as conducted by their supervisor, and
        iv.  Join in the Enhanced MiTEAM Training Cycle activities according to the schedule set by MDHHS.

      v.    Staff hired during the Enhanced MiTEAM Training Cycles shall join in the training as scheduled and develop a plan with their supervisor, to complete missed modules and activities as stated above.

      vi.   For each staff person hired after the Enhanced MiTEAM Cycles have ended, develop a plan to complete modules and activities as stated above.

  b) Apply the MiTEAM competencies and Key Caseworker Activities during everyday contact with team members, including families and professionals.

  c) Have their competencies reviewed by their supervisor using the MiTEAM Fidelity Tool.

3) The Contractor shall ensure that all child welfare supervisors and/or program managers:

  a) Complete each training module on the MiTEAM Virtual Learning Site, located at https://michigan.csod.com/client/Michigan/default.aspx

      i.    In the order recommended, and

      ii.   Join the Enhanced MiTEAM Training Cycle activities according to the schedule set by MDHHS.

  b) Apply the MiTEAM competencies during every day contact with staff and team members, including families and professionals.

  c) Conduct the caseworker self-assessment exercise with each caseworker on their staff.

  d) Ensure each staff person hired during the Enhanced MiTEAM Training Cycles joins the training as scheduled and develop a plan, to complete missed modules and activities as stated above.

  e) Ensure each staff person hired after the Enhanced MiTEAM Training Cycles have ended, develops a plan to complete modules and activities as stated above.

  f) Review competencies as demonstrated by their staff using the MiTEAM Fidelity Tool.

4) The Contractor shall ensure that the child welfare director:

  a) Review each training module on the MiTEAM Virtual Learning Site, located at https://michigan.csod.com/client/michigan/default.aspx

      i.    In the order recommended, and

      ii.   Encourage supervision and staff participation in the Enhanced MiTEAM Training Cycle activities according to the schedule set by MDHHS.

  b) Support the practice of applying MiTEAM competencies during everyday contact with staff and team members, including families and professionals.

Rev. 10-18

2.11.  Key Performance Indicator Outcomes

During the period of this Contract, the Contractor shall work toward the achievement of the Key Performance Indicators (KPI) listed below.   For purposes of the annual contract compliance reviews, compliance with KPIs shall be assessed based on the prior twelve months indicator of the most recent Children's Services Agency – Monthly Management Report in which the Contractors review occurs.

If a Contractor is not meeting the KPIs listed below, the Contractor shall include in its annual assessment and written plan (as required by R 400.12207, Staff Responsibilities) specific activities the Contractor shall complete to demonstrate improvement in the KPI measures.  The Contractor shall submit the written plan to the Contractor's Child Welfare Services and Support Analyst by October 1st of each year.

Official KPI data shall come from MDHHS via MiSACWIS.  The Contractor shall conduct validation activities on an ongoing basis to assure the KPI measures have been entered in MiSACWIS accurately.    The Contractor shall be responsible for ensuring accurate and timely data entry into MiSACWIS.

a.  Medical – Initial

No fewer than 85% of children supervised by the Contractor will have an initial medical examination within 30 days of removal (ISEP Item 6.43).

b.  Medical – Periodic (Well Child)

Following an initial medical examination, at least 95% of children supervised by the Contractor shall receive periodic medical examinations and screenings according to the guidelines set forth by the American Academy of Pediatrics (ISEP Item 6.47).

c.  Medical – Yearly (14 Months)

Following an initial medical examination, at least 95% of children supervised by the Contractor shall receive yearly (up to 14 months from the previous exam) medical examinations and screenings (FOM 801 Policy).

d.  Dental - Initial

No fewer than 90% of children supervised by the Contractor shall have an initial dental examination within 90 days of removal unless the child has had an exam within six months prior to placement or the child is less than four years of age (ISEP Item 6.44).

e. Dental – Yearly

No fewer than 95% of children supervised by the Contractor shall have a dental examination at least every 12 months (FOM 801 Policy).

f. Worker-Child Visits

No fewer than 95% of children supervised by the Contractor will be visited by their assigned worker in accordance with guidelines in the ISEP (ISEP Item 6.39).

g. Worker-Parent Visits

No fewer than 85% of the children supervised by the Contractor with a permanency goal of reunification, the child's caseworker shall have face-to-face contacts with the child's parent(s) in accordance with the guidelines in the ISEP (ISEP Item 6.40).

h. Parent-Child Visits

No fewer than 85% of children supervised by the Contractor with a goal of reunification shall have at least twice-monthly visitation with their parent(s) in accordance with the guidelines in FOM 722-06I Policy.

i. Children's Foster Care Service Plans – Timely Case Plans

No fewer than 95% of children supervised by the Contractor shall have an initial service plan completed within 30 days of entry into foster care and quarterly thereafter in accordance with the guidelines in the ISEP (ISEP Items 6.31 and 6.32).

j. Children's Foster Care Timely Case Service Plan Approvals

No fewer than 95% of children supervised by the Contractor shall have a case service plan approved within 14 days of case worker submission to the supervisor for review (FOM 722-09 Policy).

k. Supervisor Oversight

No fewer than 95% of children supervised by the Contractor shall meet at least monthly with each assigned case worker to review the status and progress of each case on the workers caseload (ISEP Item 6.30)

2.12. Audit Requirements

**Contractor/Vendor Relationship**

This Contract constitutes a contractor/vendor relationship with MDHHS. The Contractor must immediately report to the MDHHS Bureau of Audit any audit findings of fraud, an Going Concern, financial statement misstatements, or accounting irregularities, including noncompliance with provisions of this Contract.

2.13. Financial Audit Requirements

a. Required Audit or Audit Exemption Notice
Contractors must submit to the Department either a Single Audit, Financial Statement Audit, or Audit Exemption Notice as described below. If submitting a Single Audit or Financial Statement Audit, Contractors must also submit a Corrective Action Plan for any audit findings that impact MDHHS-funded programs, and management letter (if issued) with a response:

1) Single Audit
Contractors that are a non-profit organization and that expend $750,000 or more in federal awards during the Contractor's fiscal year, must submit a Single Audit to the Department, regardless of the amount of funding received from the Department. The Single Audit must comply with the requirements of Title 2 Code of Federal Regulations, Subpart F.

2) Financial Statement Audit
Contractors exempt from the Single Audit requirements with fiscal years that receive $750,000.00 or more in **total funding** from the Department in State and Federal grant funding must submit to the Department a Financial Statement Audit prepared in accordance with generally accepted auditing standards (GAAS).

3) Audit Exemption Notice
Contractors exempt from the Single Audit and Financial Statement Audit requirements (1 and 2 above) must submit an Audit Exemption Notice that certifies these exemptions. The template and further instructions are available at http://www.michigan.gov/mdhhs by selecting Inside MDHHS menu, then MDHHS Audit, then Audit Reporting.

b. Due Date and Where to Send
The required audit and any other required submissions (i.e. Corrective Action Plan and management letter with a response), or Audit Exemption Notice must be submitted to the Department within nine months after the end of the Contractor's fiscal year by e-mail to the Department at MDHHS-AuditReports@michigan.gov. The required submissions must be in PDF files and compatible with Adobe Acrobat (read only). The subject line must state the agency name and fiscal year end. The Department reserves the right to request a hard copy of the audit materials if for any reason the electronic submission process is not successful.

Rev. 10-18

c. Penalty

1) If the Contractor does not submit the required Single Audit or Financial Statement Audit, including any management letter and applicable corrective action plans within nine months after the end of the Contractor's fiscal year, the Department may withhold from the current funding an amount equal to five percent of the audit year's contract funding (not to exceed $200,000) until the required filing is received by the Department. The Department may retain the amount withheld as a penalty if delinquency reached 120 days past due. The Department may terminate the contract if the Contractor is 180 days delinquent in meeting the audit requirements.

2) Failure to submit the Audit Exemption Notice, when required, may result in withholding from the current funding an amount equal to one percent of the audit year's funding until the Audit Exemption Notice is received.

d. Other Audits

The Department or federal agencies may also conduct or arrange for "agreed upon procedures" or additional audits to meet their needs.

2.14. Cost Reporting

The Contractor shall submit annual financial cost reports based on the state's fiscal year which begins October 1 and ends September 30 in the following calendar year. The reports shall contain the actual costs incurred by providers in delivering services required in this Contract to MDHHS clients for the reporting period. Costs for non-MDHHS children are not to be included. Reports will be submitted using a template provided by MDHHS. The financial reports shall be submitted annually, and will be due November 30 of each fiscal year. The Contractor must comply with all other program and fiscal reporting procedures as are or may hereinafter be established by MDHHS. Reports shall be submitted electronically to MDHHS-Foster-Care-Audits@michigan.gov with the subject line: PAFC Cost Report.

Failure to meet reporting responsibilities as identified in this Contract may result in MDHHS withholding payments until receipt of annual financial cost report. MDHHS may withhold from current payments an amount equal to five percent of the Contractor's reporting year MDHHS revenue (not to exceed $60,000) until the required filing is received by the Department. MDHHS may retain withheld funds as a penalty if delinquency reaches sixty (60) days past due. MDHHS may terminate the contract if the Contractor is ninety (90) days delinquent in submitting the required annual financial cost report.

2.15. Service Documentation

The Contractor agrees to maintain program records required by MDHHS, program statistical records required by MDHHS, and to produce program narrative and statistical data at times prescribed by, and on forms furnished by, MDHHS.

2.16. Private Agency MiSACWIS

The Contractor shall ensure that private agency staff has access to the Michigan Statewide Automated Child Welfare Information System (MiSACWIS) through a web-based interface, henceforth referred to as the "MiSACWIS application." The Contractor shall ensure that staff follow the MiSACWIS requirements for CPA contracts which are found at http://www.michigan.gov/documents/dhs/Private_Agency_MiSACWIS_for_C PA_Contracts_464663_7.pdf

For all agency assigned cases in MiSACWIS, the Contractor shall enter all case management activities, including payments and all required documentation per policy in MiSACWIS.

2.17. Billing

The Contractor shall submit through the MiSACWIS system the bi-weekly roster for any child in the Contractors care per the instructions within the MiSACWIS system. The billing shall only indicate the units of service provided by the Contractor and shall be submitted to MDHHS within 30 days from the end of the billing period.

No original request for payment submitted by the Contractor more than one year after the close of the two week billing period during which services were provided shall be honored for payment.

When the Contractor's financial records reveal that payment for a child has not been provided by MDHHS within 30 days of receiving all necessary documentation, the Contractor will seek payment resolution by contacting the direct supervisor of the assigned MDHHS worker in writing. Any concerns over a payment authorization or issuance that cannot be resolved within 30 days of the written notice must be reported to the MDHHS County Director for immediate resolution. The Contractor will apprise MDHHS Office of Child Welfare Services and Support of any ongoing, unresolved payment concerns.

2.18. Fees and Other Sources of Funding

The Contractor guarantees that any claims made to MDHHS under this Contract shall not be financed by any source other than MDHHS under the terms of this Contract. If funding is received through any other source, the Contractor agrees

to deduct from the amount billed to MDHHS the greater of either the fee amounts, or the actual costs of the services provided.

The Contractor may not accept reimbursement from a client unless the Contract specifically authorizes such reimbursement in the "Contractor Responsibility" Section. In such case, a detailed fee scale and criteria for charging the fee must be included. If the Contractor accepts reimbursement from a client in accordance with the terms of the Contract, the Contractor shall deduct these fees from billings to MDHHS.

Other third party funding sources, e.g., insurance companies, may be billed for contracted client services. Third party reimbursement shall be considered payment in full unless the third party fund source requires a co-pay, in which case MDHHS may be billed for the amount of the co-pay. No supplemental billing is allowed.

2.19.   Recovery of Funding and Repayment of Debts

a.   Recovery of Funding

If the Contractor fails to comply with requirements as set forth in this Contract, or fails to submit a revised payment request within allotted time frames established by MDHHS in consultation with the Contractor, MDHHS may require the Contractor to reimburse payments made under this Contract to which MDHHS has determined that the Contractor was not entitled. If the Contractor becomes aware of any situation involving payments received under this Contract to which the Contractor was not entitled, the overpayment amount must be repaid to MDHHS within 30 days of the Contractor becoming aware. The Contractor is liable for any cost incurred by MDHHS in the recovery of any funding.

Upon notification by MDHHS that repayment is required, or upon any other awareness of an overpayment to the Contractor, the Contractor shall make payment directly to MDHHS within 30 days or MDHHS may withhold future payments made under this or any other Contract(s), between MDHHS and the Contractor.

If the Contractor fails to: (1) correct noncompliance activities identified by MDHHS, (2) submit revised billings as requested as part of a Corrective Action Plan when required; or (3) remit overpayments or make arrangements to have the overpayments deducted from future payments within 30 days, such failure shall constitute grounds to terminate immediately any or all of MDHHS'. Contracts with the Contractor. MDHHS shall also report noncompliance of the Contractor to Michigan's Department of Technology, Management and Budget. Such report may result in the Contractor's debarment from further contracts with the state of Michigan.

b. Repayment of Other Amounts due MDHHS

By entering into this Contract, the Contractor agrees to honor all prior repayment Contracts established by MDHHS with the Contractor or Contractor's predecessors. In the absence of a repayment Contract for amounts due MDHHS, the Contractor agrees to make monthly payments to MDHHS at an amount not less than 5% of any outstanding balance and to begin on the date this Contract is executed. If any of these required payments are made more than 30 days past the due date, MDHHS may reduce or withhold future payments made under this or any other Contract(s) between MDHHS and the Contractor.

The payment reduction will be made either at the amount originally established in the repayment Contract or at an amount not less than 5% of any outstanding balance effective on the date this Contract is executed.

## 2.20 Child Protection Law Reporting Requirements

a. The Contractor shall ensure that all employees who have reasonable cause to suspect child abuse or neglect shall report any suspected abuse or neglect of a child in care to MDHHS for investigation as required by Public Acts of 1975, Act Number 238.
b. Failure of the Contractor or its employees to report suspected abuse or neglect of a child to MDHHS shall result in an immediate investigation to determine the appropriate corrective action up to and including termination of the contract.
c. Failure of the Contractor or its employees to report suspected child abuse or neglect two or more times within a one-year period shall result in a review of the contract agency's violations by a designated Administrative Review Team, which shall include the Director of CSA and the Director of DCWL or its successor agency, that shall consider mitigating and aggravating circumstances to determine the appropriate corrective action up to and included license revocation and contract termination.

## 2.21 The Division of Child Welfare Licensing (DCWL)

DCWL shall be responsible for review of the Contractor's compliance with the Contract and any court orders, via an Annual Compliance Review (ACR) and Special Investigations. DCWL may review, analyze and comment on all activities covered within the terms of the Contract or court order. If the ACR or Special Investigation reveals that the Contractor has not complied with the requirements of this Contract or court order, the following procedures shall be implemented:

Rev. 10-18

a.   DCWL shall notify the Contractor of the Contract or court noncompliance. This notification shall occur verbally during an exit conference, and be followed with a written report of the findings. The Contractor may request a meeting to discuss and examine the identified Contract or court noncompliance.

b.   Following the identification of the Contract or court noncompliance, DCWL will request the Contractor submit a Corrective Action Plans (CAP) to DCWL within 15 days of receiving the written report of findings.

c.   After the Contractor's CAP has been reviewed and approved by DCWL, the Contractor's compliance with the CAP shall be reviewed in accordance with time frames established by DCWL in the written notification of acceptance of the CAP.

d.   Based on the severity or repeated nature of cited violations, a recommendation may be made by DCWL at any time to place a moratorium on new placements with the contractor or to cancel the contract. If either recommendation is made, a meeting will be convened with the director of the contracted agency, the division director of DCWL and the CSA director or designee to provide the contractor with the opportunity to provide documented information on why the moratorium or cancellation of the contract should not occur.

e.   If a moratorium on new placements is put into place, it shall be for a minimum of 90 days to allow the contractor to remedy cited violations and comply with any agreed on CAP. If the cited violations are not corrected during the period of the moratorium or additional serious violations are cited, consideration shall be given to cancellation of the agency's contract. Final decisions regarding the cancellation of a contract shall be made by the CSA director.

2.22   Corrective Action Requirements

If a program review by MDHHS reveals a lack of compliance with the requirements of this Contract, the Contractor shall:

a.   Meet with MDHHS to discuss the noncompliance.

b.   Prepare a corrective action plan within 30 days of receiving MDHHS' written findings.

c.   Achieve compliance within 60 days of receipt of MDHHS' approval of the corrective action plan (unless other time frames are agreed to in writing by MDHHS) or MDHHS may terminate this Contract, subject to the standard contract terms.

2.23   Criminal Background Check

Rev. 10-18

As a condition of this Contract, the Contractor certifies that the Contractor shall, prior to any individual performing work under this Contract, conduct or cause to be conducted for each new employee, employee, subcontractor, subcontractor employee or volunteer who works directly with:

a. Clients under this Contract, or who has access to client information, an Internet Criminal History Access Tool (ICHAT) check and a National and State Sex Offender Registry check.

   Information about ICHAT can be found at http://apps.michigan.gov/ichat.

   The Michigan Public Sex Offender Registry web address is http://www.mipsor.state.mi.us.

   The National Sex Offender Public Website address is http://www.nsopw.gov.

b. Children under this Contract, a Central Registry (CR) check.

   Information about CR can be found at http://www.michigan.gov/mdhhs/0,5885,7-339-73971_7119_50648_48330-180331--,00.html

   The Contractor shall require each employee, subcontractor, subcontractor employee or volunteer who works directly with clients or who has access to client information, under this Contract to timely notify the Contractor in writing of criminal convictions (felony or misdemeanor) and/or pending felony charges or placement on the Central Registry as a perpetrator.

   Additionally, the Contractor shall require each new employee, employee, subcontractor, subcontractor employee or volunteer who works directly with clients under this Contract or who has access to client information and who has not resided or lived in Michigan for each of the previous ten (10) years to sign a waiver attesting to the fact that they have never been convicted of a felony or identified as a perpetrator, or if they have, the nature and recency of the felony.

   The Contractor further certifies that the Contractor shall not submit claims for or assign to duties under this Contract, any employee, subcontractor, subcontractor employee, or volunteer based on a determination by the Contractor that the results of a positive ICHAT and/or a CR response or reported criminal felony conviction or perpetrator identification make the individual ineligible to provide the services.

   The Contractor must have a written policy describing the criteria on which its determinations shall be made and must document the basis for

each determination. As indicated in CPA Licensing Rule R400.12212 the Contractor may consider the recency and type of crime when making a determination. Failure to comply with this provision may be cause for immediate cancellation of this Contract.

If MDHHS determines that an individual provided services under this Contract for any period prior to completion of the required checks as described above, MDHHS may require repayment of that individual's salary, fringe benefits, and all related costs of employment for the period that the required checks had not been completed.

3.   MDHHS RESPONSIBILITIES

3.1.   Payments

MDHHS shall open and process payment within 30 days of placement, with payment authorization effective the date of the child's placement with the Contractor.

a.   The entire rate paid to the Contractor for board and care, clothing and allowance shall be paid by the Contractor to the foster families providing the family foster care.

b.   The Contractor's administrative rate(s) for services provided under this Contract shall be:

Bridges Provider Number        179087
MiSACWIS Provider Number       21846618

| Service Code | Per Diem Rate | Effective Date |
| --- | --- | --- |
| 780 | $ 46.20 | 10-1-17 |
| 782 (IL) | $ 46.20 | 10-1-17 |
| TR | $ 46.20 | 10-1-17 |
| 0838 | *$2.50 | 10-1-17 |

Boiler Plate 515
(BP 515) Admin Rate        $46.20        10-1-18

*The above rate is only to be used for American Indian Children

The contractor will receive reimbursement subject to appropriations for relative licensure as outlined in that years State fiscal appropriation.

If a Contractor does not submit the financial cost reports as described in Section 2., CONTRACTOR RESPONSIBILITIES, the per diem

Rev. 10-18

administrative rate shall be reduced by $3.00 until contractor becomes compliant with the reporting requirements.

c. The Contractor shall be paid for family foster care services specified in this Contract at a board and care rate established by MDHHS. A determination of care rate may be established by MDHHS in accordance with the FOM when extraordinary care or expense is required of the foster parent. Special rates must have the approval of the Director of MDHHS' local office responsible for the supervision of the child for whom foster care is provided.

d. Payment for additional service costs not included in the per diem rate may be authorized in accordance with the FOM.

When the Contractor's financial records reveal that a payment for a child has not been provided by MDHHS within 90 days of their acceptance of the child for case management services, the Contractor will contact the MDHHS County Director in writing seeking payment resolution. The Contractor shall apprise MDHHS of any concerns over a payment amount that cannot be reconciled at the staff level within 90 days.

e. Upon placement, MDHHS shall ensure that the child(ren) has adequate clothing as defined by the Clothing Inventory Checklist (DHS-3377) or shall reimburse the Contractor up to the approved limit allowed for clothing.

f. Inability of MDHHS to comply with the federal reporting requirements of AFCARS due to failure of the Contractor to fulfill AFCARS related reporting requirements shall result in a three percent reduction in the Contractor's administrative rate for the six month period subsequent to the due date of the AFCARS report to the Federal government.

g. Foster Care Training Payments

Payments will be made for eligible training which commenced after January 1, 2012.

A payment will be made to the Contractor for each staff that completes training and passes competency tests as required in the Implementation, Sustainability and Exit Plan according to the following schedule:

1) Completion of the Child Welfare Caseworker Training
Payment will be $6,000.00 total, calculated on a per diem basis, for completion of OWDT-PSI that includes a minimum of 9 weeks of competency-based classroom and field training if the caseworker passes the competency evaluation within 16 weeks of hire.

2) Completion of the Child Welfare Certificate (CWC) Training

Payment will be $3,000.00 total, calculated on a per diem basis, for completion of the OWDT-CWC that includes a minimum of five weeks of competency-based classroom and field training if the caseworker certified certificate holder passes the competency evaluation.

3) Completion of the Child Welfare Supervisor Training
Payment will be $1,500.00 total, calculated on a per diem basis, for completion of the Supervisor Training that includes a minimum of one week within 90 days of hire/promotion, if the supervisor passes the competency evaluation.

**All Supervisors hired on or after January 1, 2017 must complete the Supervisor Training and pass the competency evaluation.**

4) Completion of the Child Welfare Transfer Training
The two-week foster care PSTT shall be completed within six months of hire. Payment will be $2,800.00 for the completion of the foster care PSTT training. The training is the same as the Foster are Core Training for Foster Care caseworkers. If a supervisor has completed this training as a caseworker since April 1, 2006, the training does not need to be repeated.

h. For all Contractor staff hired on or after May 1, 1998 attending required OWDT-PSI, CWC-PSI, PSTT, PRIDE and supervisor training, MDHHS-OWDT shall reimburse the Contractor at the Contractor's normal rate of reimbursement or State rates, whichever is less for staff trainee expenditures incurred as part of OWDT attendance. MDHHS-OWDT does not cover travel reimbursement for in-service training. Travel reimbursement shall be limited to lodging, mileage, parking and bridge toll with the following conditions:

1) For each trainee who attends the training session, MDHHS shall reimburse the Contractor up to five nights (Sunday night through Thursday night) lodging per week if lodging expense is incurred. If training continues for two consecutive weeks or longer and the cost of lodging is less than the mileage cost to travel to and from the Contractor's facility over the intervening weekend, the Contractor may request the director of OWDT in advance for a travel exception for weekend lodging.

2) For each mile of travel to a OWDT training session closest to the Contractor's site, MDHHS shall reimburse the Contractor for mileage to and from the training and the trainee's assigned work location or home, whichever is closer. The applicable State rate for mileage shall be the lesser of the Contractor's prevailing rate or the State's standard rate.

Rev. 10-18

3) Parking shall be reimbursed at one-time daily parking or continuous daily metered parking, documented with a receipt.

4) MDHHS shall not reimburse travel costs for Contractor staff who attend more than one session (i.e., are required to repeat attendance due to absence or failure to successfully complete a session) without prior approval from DCWL. Refer to the OWDT web site for current reimbursement information for OWDT training at http://www.michigan.gov/mdhhs/0,5885,7-339-71551_11120_74572---,00.html

## Classroom Training Payment

1) The Contractor must submit a signed and dated agency letterhead memo attached to the MDHHS-5602 Payment Voucher that includes the following information:

   a) Worker name
   b) Training, type, i.e. PSST, PSI etc.
   c) Training dates (time span in training)
   d) Amount of reimbursement requested.
   e) A copy of the transcript reflecting the completion of the training for each foster care worker and supervisor covered by the payment voucher. This is required before accounting will issue payment.
   f) Memo signed by senior management; not the individual who attended training.

2) The information must be submitted electronically to: MDHHS-FederalComplianceDivision@michigan.gov. The subject line shall read: Training Payment.

## Training Travel Reimbursement

1) The Contractor must submit:
   a) Certification letter on agency letterhead signed and dated by senior management to include:
      • Agency Federal ID Number/SIGMA Vendor Number
      • Exact trainee name as registered in the Learning Management System
      • Exact class name
      • Beginning and ending travel dates
      • Amount of reimbursement requested
   b) OWDT travel expense worksheet or agency created travel expense sheet.
   c) MapQuest printouts for each travel route. Submit the first page of the printout only – Page 1 – with total mileage traveled.

PAGE 27 of 56

    d)    All original receipts.
    e)    Transcripts showing the training completed.

2)    Please submit the above information by email to:

    MDHHS-OWDTtrainingvouchers@michigan.gov

    or by US Mail to:

    Ingham County MDHHS/OWDT
    Attention: Travel Reimbursement
    PO Box 30088
    5303 S. Cedar Street – Building 3
    Lansing, MI 48911

i.    The Contractor shall be paid for Trial Reunifications services specified in the Contract not to exceed 180 days from the child's placement in the parental home.

    1)    The Contractor must submit the following on a monthly basis:
        a)    A completed MDHHS-5602 Payment Request
        b)    A case listing that contains the following child identifying information:
            • Placing Agency Provider ID
            • Agency Name
            • MiSACWIS log ID if known
            • Child last name
            • Child first name
            • Recipient ID
            • Foster Care case number
            • Billing start date
            • Billing end date
            • Number of days to pay
            • American Indian Y/N
            • Date of court order commencing the Trial Reunification
            • Date the foster care case was dismissed by the court and/or
            • Date the child reentered a foster care placement

    2)    The information must be submitted electronically to:    MDHHS-trialreunificationpayments@michigan.gov.

j.    <u>BP 515 Additional Administrative Rate</u>

    BP 515 Additional Administrative Rate reimbursements must be made outside the MiSACWIS system and be tracked by the Kent County DHHS office.

Rev. 10-18

MDHHS will verify and process payment to accounting for payment.

The Contractor must submit an invoice monthly for BP 515 Additional Administrative services for:

1) Youth in Young Adult Voluntary Foster Care Youth and/or children in care seven days or less **and** placed in a non-paid living arrangement or child caring institution.

Payment Process

Each month the Contractor shall electronically submit a case listing on an Excel spreadsheet prepared by the Contractor that contains the following information:

a) MiSACWIS provider ID
b) Bridges provider ID
c) Agency Name
d) Child last name
e) Child first name
f) Child date of birth
g) MiSACWIS person ID
h) Legal Status
i) Fund source during time of payment period
j) Living arrangement of youth for which additional admin is requested
k) Billing start\date
l) Billing end date
m) Number of days to pay

Please submit the requested information electronically to: DHS-KENTPayments@michigan.gov

The subject line shall read: (Agency Name/Billing Month) BP 515 Additional Administrative Rate

k. The costs of all services provided under this Contract are included in the above rate(s) unless otherwise noted in this Contract.

3.2. Performance Evaluation and Monitoring

The services provided by the Contractor under this Contract shall be evaluated and assessed at least annually by MDHHS on the basis of the criteria outlined in Section 2.11.

MDHHS shall perform contract monitoring through activities such as:

    a. Auditing expenditure reports.
    b. Conducting on-site monitoring.
    c. Conducting Interim or Renewal Licensing Studies and reports
    d. Reviewing and analyzing written plans and reports.

## 4. STANDARD TERMS

### 4.1 Duties of Contractor

Contractor must perform the services and provide the deliverables described in Sections 1 and 2 (the "Contract Activities"). An obligation to provide delivery of any commodity is considered a service and is an Contract Activity.

Contractor must furnish all labor, equipment, materials, and supplies necessary for the performance of the Contract Activities, and meet operational standards, unless otherwise specified in Section 2.10 – Services to be Provided.

Contractor must:

a. Perform the Contract Activities in a timely, professional, safe, and workmanlike manner consistent with standards in the trade, profession, or industry;
b. Meet or exceed the performance and operational standards, and specifications of this Contract;
c. Provide all Contract Activities in good quality, with no material defects;
d. Not interfere with MDHHS's operations;
e. Obtain and maintain all necessary licenses, permits or other authorizations necessary for the performance of this Contract;
f. Cooperate with MDHHS, including MDHHS's quality assurance personnel, and any third party to achieve the objectives of this Contract;
g. Return to MDHHS any State-furnished equipment or other resources in the same condition as when provided when no longer required for this Contract;
h. Not make any media releases without prior written authorization from MDHHS;
i. Assign to MDHHS any claims resulting from state or federal antitrust violations to the extent that those violations concern materials or services supplied by third parties toward fulfillment of this Contract;
j. Comply with all State physical and IT security policies and standards which will be made available upon request; and
k. Provide MDHHS priority in performance of this Contract except as mandated by federal disaster response requirements.

Any breach under this provision is considered a material breach.

Rev. 10-18

Contractor must also be clearly identifiable while on State property by wearing identification issued by the State, and clearly identify themselves whenever making contact with the State.

4.2    Notices

All notices and other communications required or permitted under this Contract must be in writing and will be considered given and received: (a) when verified by written receipt if sent by courier; (b) when actually received if sent by mail without verification of receipt; or (c) when verified by automated receipt or electronic logs if sent by facsimile or email.

4.3    Reserved

4.4    Reserved

4.5    Reserved

4.6    Insurance Requirements

Contractor must maintain the insurances identified below and is responsible for all deductibles. All required insurance must:

a. Protect the State from claims that may arise out of, are alleged to arise out of, or result from Contractor's or a subcontractor's performance;
b. Be primary and non-contributing to any comparable liability insurance (including self-insurance) carried by the State; and
c. Be provided by a company with an A.M. Best rating of "A" or better and a financial size of VII or better.

| Required Limits Insurance Type | Additional Requirements |
|---|---|
| **Commercial General Liability Insurance** | |
| Minimal Limits: $1,000,000 Each Occurrence Limit $1,000,000 Personal & Advertising Injury Limit $2,000,000 General Aggregate Limit $2,000,000 Products/Completed Operations  Deductible Maximum: $50,000 Each Occurrence | Contractor must have their policy endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds using endorsement CG 20 10 11 85, or both CG 2010 07 04 and CG 2037 07 04.  If the contractor will deal with |

| | children, schools, or the cognitively impaired, coverage must not have exclusions or limitations related to sexual abuse and molestation liability. |
|---|---|
| **Umbrella or Excess Liability Insurance** | |
| Minimal Limits: $4,000,000 General Aggregate | Contractor must have their policy endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds. |
| **Automobile Liability Insurance** | |
| Minimal Limits: $1,000,000 Per Occurrence | Contractor must have their policy: (1) endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds; and (2) include Hired and Non-Owned Automobile coverage. |
| **Workers' Compensation Insurance** | |
| Minimal Limits: Coverage according to applicable laws governing work activities. | Waiver of subrogation, except where waiver is prohibited by law. |
| **Employers Liability Insurance** | |
| Minimal Limits: $500,000 Each Accident $500,000 Each Employee by Disease $500,000 Aggregate Disease. | |
| **Privacy and Security Liability (Cyber Liability) Liability Insurance** | |

Rev. 10-18

| Minimal Limits:<br>$1,000,000 Each Occurrence<br>$1,000,000 Annual Aggregate | Contractor must have their policy: (1) endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds; and (2) cover information security and privacy liability, privacy notification costs, regulatory defense and penalties, and website media content liability. |
|---|---|

If any of the required policies provide claims-made coverage, the Contractor must:

a. Provide coverage with a retroactive date before the effective date of the Contract or the beginning of Contract Activities;
b. Maintain coverage and provide evidence of coverage for at least three years after completion of the Contract Activities; and
c. If coverage is canceled or not renewed, and not replaced with another claims-made policy form with a retroactive date prior to the Contract effective date, Contractor must purchase extended reporting coverage for a minimum of three years after completion of work.

Contractor must:

a. Provide insurance certificates to the Contract Administrator, containing the Contract or purchase order number, at Contract formation and within 20 calendar days of the expiration date of the applicable policies;
b. Require that subcontractors maintain the required insurances contained in this Section;
c. Notify the Contract Administrator within five business days if any insurance is cancelled; and
d. Waive all rights against the State for damages covered by insurance. Failure to maintain the required insurance does not limit this waiver.

Contractors who are self-insured must provide the following:

a. Proof of self-insurance from the Michigan Department of Insurance and Financial Services for auto liability.
b. Proof of self-insurance from the Michigan Department of Licensing and Regulatory Affairs for worker's compensation and employer's liability.
c. A copy of their most recent, independently audited financial statements.

This Section is not intended to and is not to be construed in any manner as waiving, restricting or limiting the liability of either party for any obligations under this Contract (including any provisions hereof requiring Contractor to indemnify, defend and hold harmless the State).

**4.7** Reserved

**4.8** Extended Purchasing Program

This contract is extended to MiDEAL members. MiDEAL members include local units of government, school districts, universities, community colleges, and nonprofit hospitals. A current list of MiDEAL members is available at www.michigan.gov/mideal. Upon written Contract between MDHHS and Contractor, this Contract may also be extended to: (a) State of Michigan employees and (b) other states (including governmental subdivisions and authorized entities).

If extended, Contractor must supply all Contract Activities at the established Contract prices and terms. MDHHS reserves the right to impose an administrative fee and negotiate additional discounts based on any increased volume generated by such extensions.

Contractor must submit invoices to, and receive payment from, extended purchasing program members on a direct and individual basis.

**4.9** Independent Contractor

Contractor is an independent contractor and assumes all rights, obligations and liabilities set forth in this Contract. Contractor, its employees, and agents will not be considered employees of MDHHS. No partnership or joint venture relationship is created by virtue of this Contract. Contractor, and not MDHHS, is responsible for the payment of wages, benefits and taxes of Contractor's employees and any subcontractors. Prior performance does not modify Contractor's status as an independent contractor.

**4.10** Subcontracting

Contractor may not delegate any of its obligations under this Contract without the prior written approval of MDHHS. Contractor must notify MDHHS prior to the proposed delegation, and provide MDHHS any information it requests to determine whether the delegation is in its best interest. If approved, Contractor must:

   a. Be the sole point of contact regarding all contractual matters, including payment and charges for all Contract Activities;
   b. Make all payments to the subcontractor; and

    c. Incorporate the terms and conditions contained in this Contract in any subcontract with a subcontractor.

Contractor remains responsible for the completion of the Contract Activities, compliance with the terms of this Contract, and the acts and omissions of the subcontractor. MDHHS, in its sole discretion, may require the replacement of any subcontractor.

## 4.11 Staffing

MDHHS's Contract Administrator may require Contractor to remove or reassign personnel by providing a notice to Contractor.

## 4.12 Reserved

## 4.13 Assignment

Contractor may not assign this Contract to any other party without the prior approval of MDHHS. Upon notice to Contractor, MDHHS, in its sole discretion, may assign in whole or in part, its rights or responsibilities under this Contract to any other party. If MDHHS determines that a novation of this Contract to a third party is necessary, Contractor will agree to the novation and provide all necessary documentation and signatures.

## 4.14 Change of Control

Contractor will notify, at least 90 calendar days before the effective date, MDHHS of a change in Contractor's organizational structure or ownership. For purposes of this Contract, a change in control means any of the following:

    a. A sale of more than 50% of Contractor's stock;
    b. A sale of substantially all of Contractor's assets;
    c. A change in a majority of Contractor's board members;
    d. Consummation of a merger or consolidation of Contractor with any other entity;
    e. A change in ownership through a transaction or series of transactions; or
    f. The board (or the stockholders) approves a plan of complete liquidation.

A change of control does not include any consolidation or merger effected exclusively to change the domicile of Contractor, or any transaction or series of transactions principally for bona fide equity financing purposes.

In the event of a change of control, Contractor must require the successor to assume this Contract and all of its obligations under this Contract.

Rev. 10-18

4.15 Reserved

4.16 Acceptance

Contract Activities are subject to inspection and testing by MDHHS within 30 calendar days of MDHHS's receipt of them ("State Review Period"), unless otherwise provided in Section 2.10 – Services to be Provided. If the Contract Activities are not fully accepted by MDHHS, MDHHS will notify Contractor by the end of the State Review Period that either: (a) the Contract Activities are accepted, but noted deficiencies must be corrected; or (b) the Contract Activities are rejected. If MDHHS finds material deficiencies, it may: (i) reject the Contract Activities without performing any further inspections; (ii) demand performance at no additional cost; or (iii) terminate this Contract in accordance with Section 4.23, Termination for Cause.

Within 10 business days from the date of Contractor's receipt of notification of acceptance with deficiencies or rejection of any Contract Activities, Contractor must cure, at no additional cost, the deficiency and deliver unequivocally acceptable Contract Activities to MDHHS. If acceptance with deficiencies or rejection of the Contract Activities impacts the content or delivery of other non-completed Contract Activities, the parties' respective Program Managers must determine an agreed to number of days for re-submission that minimizes the overall impact to this Contract. However, nothing herein affects, alters, or relieves Contractor of its obligations to correct deficiencies in accordance with the time response standards set forth in this Contract.

If Contractor is unable or refuses to correct the deficiency within the time response standards set forth in this Contract, MDHHS may cancel the order in whole or in part. MDHHS, or a third party identified by MDHHS, may perform the Contract Activities and recover the difference between the cost to cure and the Contract price plus an additional 10% administrative fee.

4.17 Reserved

4.18 Reserved

4.19 Reserved

4.20 Terms of Payment

Invoices must conform to the requirements communicated from time-to-time by MDHHS. All undisputed amounts are payable within 45 days of MDHHS's receipt. Contractor may only charge for Contract Activities performed as specified in Section 2.10 – Services to be Provided. Invoices must include an itemized statement of all charges. MDHHS is exempt from State sales tax

for direct purchases and may be exempt from federal excise tax, if Services purchased under this Contract are for MDHHS's exclusive use. Notwithstanding the foregoing, all prices are inclusive of taxes, and Contractor is responsible for all sales, use and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any federal, state, or local governmental entity on any amounts payable by MDHHS under this Contract.

MDHHS has the right to withhold payment of any disputed amounts until the parties agree as to the validity of the disputed amount. MDHHS will notify Contractor of any dispute within a reasonable time. Payment by MDHHS will not constitute a waiver of any rights as to Contractor's continuing obligations, including claims for deficiencies or substandard Contract Activities. Contractor's acceptance of final payment by MDHHS constitutes a waiver of all claims by Contractor against MDHHS for payment under this Contract, other than those claims previously filed in writing on a timely basis and still disputed.

MDHHS will only disburse payments under this Contract through Electronic Funds Transfer (EFT). Contractor must register with the State at http://www.michigan.gov/SIGMAVSS to receive electronic fund transfer payments. If Contractor does not register, MDHHS is not liable for failure to provide payment. Without prejudice to any other right or remedy it may have, MDHHS reserves the right to set off at any time any amount then due and owing to it by Contractor against any amount payable by MDHHS to Contractor under this Contract.

### 4.21  Reserved

### 4.22  Stop Work Order

MDHHS may suspend any or all activities under this Contract at any time. MDHHS will provide Contractor a written stop work order detailing the suspension. Contractor must comply with the stop work order upon receipt. Within 90 calendar days, or any longer period agreed to by Contractor, MDHHS will either: (a) issue a notice authorizing Contractor to resume work, or (b) terminate this Contract or purchase order. MDHHS will not pay for Contract Activities, Contractor's lost profits, or any additional compensation during a stop work period.

### 4.23  Termination for Cause

MDHHS may terminate this Contract for cause, in whole or in part, if Contractor, as determined by MDHHS:

a. Endangers the value, integrity, or security of any location, data, or personnel;
b. Becomes insolvent, petitions for bankruptcy court proceedings, or has an involuntary bankruptcy proceeding filed against it by any creditor;
c. Engages in any conduct that may expose MDHHS to liability;
d. Breaches any of its material duties or obligations; or
e. Fails to cure a breach within the time stated in a notice of breach.

Any reference to specific breaches being material breaches within this Contract will not be construed to mean that other breaches are not material.

If MDHHS terminates this Contract under this Section, MDHHS will issue a termination notice specifying whether Contractor must: (a) cease performance immediately, or (b) continue to perform for a specified period. If it is later determined that Contractor was not in breach of this Contract, the termination will be deemed to have been a Termination for Convenience, effective as of the same date, and the rights and obligations of the parties will be limited to those provided in Section 4.24, Termination for Convenience.

MDHHS will only pay for amounts due to Contractor for Contract Activities accepted by MDHHS on or before the date of termination, subject to MDHHS's right to set off any amounts owed by the Contractor for MDHHS's reasonable costs in terminating this Contract. The Contractor must pay all reasonable costs incurred by MDHHS in terminating this Contract for cause, including administrative costs, attorneys' fees, court costs, transition costs, and any costs MDHHS incurs to procure the Contract Activities from other sources.

## 4.24  Termination for Convenience

MDHHS may immediately terminate this Contract in whole or in part without penalty and for any reason, including but not limited to, appropriation or budget shortfalls. The termination notice will specify whether Contractor must: (a) cease performance of the Contract Activities immediately, or (b) continue to perform the Contract Activities in accordance with Section 4.25, Transition Responsibilities. If MDHHS terminates this Contract for convenience, MDHHS will pay all reasonable costs, as determined by MDHHS, for MDHHS approved Transition Responsibilities.

The Contractor may terminate this Contract upon 30 days written notice to MDHHS at any time prior to the completion of the Contract period.

## 4.25  Transition Responsibilities

Upon termination or expiration of this Contract for any reason, Contractor must, for a period of time specified by MDHHS (not to exceed 120 calendar

days), provide all reasonable transition assistance requested by MDHHS, to allow for the expired or terminated portion of the Contract Activities to continue without interruption or adverse effect, and to facilitate the orderly transfer of such Contract Activities to MDHHS or its designees. Such transition assistance may include, but is not limited to:

a. Continuing to perform the Contract Activities at the established Contract rates;
b. Taking all reasonable and necessary measures to transition performance of the work, including all applicable Contract Activities, training, equipment, software, leases, reports and other documentation, to MDHHS or MDHHS's designee;
c. Taking all necessary and appropriate steps, or such other action as MDHHS may direct, to preserve, maintain, protect, or return to MDHHS all materials, data, property, and confidential information provided directly or indirectly to Contractor by any entity, agent, vendor, or employee of MDHHS;
d. Transferring title in and delivering to MDHHS, at MDHHS's discretion, all completed or partially completed deliverables prepared under this Contract as of the Contract termination date; and
e. Preparing an accurate accounting from which MDHHS and Contractor may reconcile all outstanding accounts (collectively, "Transition Responsibilities").

This Contract will automatically be extended through the end of the transition period.

4.26 <u>General Indemnification</u>

Contractor must defend, indemnify and hold the State, its departments, divisions, agencies, offices, commissions, officers, and employees harmless, without limitation, from and against any and all actions, claims, losses, liabilities, damages, costs, attorney fees, and expenses (including those required to establish the right to indemnification), arising out of or relating to:

a. Any breach by Contractor (or any of Contractor's employees, agents, subcontractors, or by anyone else for whose acts any of them may be liable) of any of the promises, Contracts, representations, warranties, or insurance requirements contained in this Contract;
b. Any infringement, misappropriation, or other violation of any intellectual property right or other right of any third party;
c. Any bodily injury, death, or damage to real or tangible personal property occurring wholly or in part due to action or inaction by Contractor (or any of Contractor's employees, agents, subcontractors, or by anyone else for whose acts any of them may be liable); and

d. Any acts or omissions of Contractor (or any of Contractor's employees, agents, subcontractors, or by anyone else for whose acts any of them may be liable).

MDHHS will notify Contractor in writing if indemnification is sought; however, failure to do so will not relieve Contractor, except to the extent that Contractor is materially prejudiced. Contractor must, to the satisfaction of MDHHS, demonstrate its financial ability to carry out these obligations.

MDHHS is entitled to: (i) regular updates on proceeding status; (ii) participate in the defense of the proceeding; (iii) employ its own counsel; and to (iv) retain control of the defense if MDHHS deems necessary. Contractor will not, without MDHHS's written consent (not to be unreasonably withheld), settle, compromise, or consent to the entry of any judgment in or otherwise seek to terminate any claim, action, or proceeding. To the extent that any State employee, official, or law may be involved or challenged, MDHHS may, at its own expense, control the defense of that portion of the claim.

Any litigation activity on behalf of the State, or any of its subdivisions under this Section, must be coordinated with the Department of Attorney General. An attorney designated to represent MDHHS may not do so until approved by the Michigan Attorney General and appointed as a Special Assistant Attorney General.

4.27  Infringement Remedies

If, in either party's opinion, any piece of equipment, software, commodity, or service supplied by Contractor or its subcontractors, or its operation, use or reproduction, is likely to become the subject of a copyright, patent, trademark, or trade secret infringement claim, Contractor must, at its expense:

a. Procure for MDHHS the right to continue using the equipment, software, commodity, or service, or if this option is not reasonably available to Contractor,
b. Replace or modify the same so that it becomes non-infringing; or
c. Accept its return by MDHHS with appropriate credits to MDHHS against Contractor's charges and reimburse MDHHS for any losses or costs incurred as a consequence of MDHHS ceasing its use and returning it.

4.28  Limitation of Liability and Disclaimer of Damages

In no event will the state's aggregate liability to contractor under this contract, regardless of the form of action, whether in contract, tort, negligence, strict liability or by statute or otherwise, for any claim related to or arising under this contract, exceed the maximum amount of fees payable under this

Rev. 10-18

contract. MDHHS is not liable for consequential, incidental, indirect, or special damages, regardless of the nature of the action.

4.29 Disclosure of Litigation, or Other Proceeding

Contractor must notify MDHHS within 14 calendar days of receiving notice of any litigation, investigation, arbitration, or other proceeding (collectively, "Proceeding") involving Contractor, a subcontractor, or an officer or director of Contractor or subcontractor, that arises during the term of this Contract, including:

a. A criminal Proceeding;
b. A parole or probation Proceeding;
c. A Proceeding under the Sarbanes-Oxley Act;
d. A civil Proceeding involving:
   1) A claim that might reasonably be expected to adversely affect Contractor's viability or financial stability; or
   2) A governmental or public entity's claim or written allegation of fraud; or
e. A Proceeding involving any license that Contractor is required to possess in order to perform under this Contract.

4.30 Reserved

4.31 State Data

a. Ownership. MDHHS's data ("**State Data**," which will be treated by Contractor as Confidential Information) includes:

   1) MDHHS's data collected, used, processed, stored, or generated as the result of the Contract Activities;
   2) Personally identifiable information ("PII") collected, used, processed, stored, or generated as the result of the Contract Activities, including, without limitation, any information that identifies an individual, such as an individual's social security number or other government-issued identification number, date of birth, address, telephone number, biometric data, mother's maiden name, email address, credit card information, or an individual's name in combination with any other of the elements here listed; and,
   3) Personal health information ("PHI") collected, used, processed, stored, or generated as the result of the Contract Activities, which is defined under the Health Insurance Portability and Accountability Act (HIPAA) and its related rules and regulations. State Data is and will remain the sole and exclusive property of MDHHS and all right, title, and interest in the same is reserved by MDHHS.

This Section survives the termination of this Contract.

b. <u>Contractor Use of State Data</u>.  Contractor is provided a limited license to State Data for the sole and exclusive purpose of providing the Contract Activities, including a license to collect, process, store, generate, and display State Data only to the extent necessary in the provision of the Contract Activities.  Contractor must:

1) Keep and maintain State Data in strict confidence, using such degree of care as is appropriate and consistent with its obligations as further described in this Contract and applicable law to avoid unauthorized access, use, disclosure, or loss;

2) Use and disclose State Data solely and exclusively for the purpose of providing the Contract Activities, such use and disclosure being in accordance with this Contract, any applicable Statement of Work, and applicable law; and

3) Not use, sell, rent, transfer, distribute, or otherwise disclose or make available State Data for Contractor's own purposes or for the benefit of anyone other than MDHHS without MDHHS's prior written consent.

This Section survives the termination of this Contract.

c. <u>Extraction of State Data</u>.  Contractor must, within five business days of MDHHS's request, provide MDHHS, without charge and without any conditions or contingencies whatsoever (including but not limited to the payment of any fees due to Contractor), an extract of the State Data in the format specified by MDHHS.

d. <u>Backup and Recovery of State Data</u>.  Unless otherwise specified in Section 2.5 – Services to be Delivered, Contractor is responsible for maintaining a backup of State Data and for an orderly and timely recovery of such data.  Unless otherwise described in Section 2.10 – Services to be Provided, Contractor must maintain a contemporaneous backup of State Data that can be recovered within two hours at any point in time.

e. <u>Loss or Compromise of Data</u>.  In the event of any act, error or omission, negligence, misconduct, or breach on the part of Contractor that compromises or is suspected to compromise the security, confidentiality, or integrity of State Data or the physical, technical, administrative, or organizational safeguards put in place by Contractor that relate to the protection of the security, confidentiality, or integrity of State Data, Contractor must, as applicable:

1) Notify MDHHS as soon as practicable but no later than 24 hours of becoming aware of such occurrence;

2) Cooperate with MDHHS in investigating the occurrence, including making available all relevant records, logs, files, data reporting, and other materials required to comply with applicable law or as otherwise required by MDHHS;

3) In the case of PII or PHI, at MDHHS's sole election, (i) with the approval and assistance of MDHHS notify the affected individuals who comprise the PII or PHI as soon as practicable but no later than is required to comply with applicable law, or, in the absence of any legally required notification period, within five calendar days of the occurrence; or (ii) reimburse MDHHS for any costs in notifying the affected individuals;

4) In the case of PII, provide third-party credit and identity monitoring services to each of the affected individuals who comprise the PII for the period required to comply with applicable law, or, in the absence of any legally required monitoring services, for no less than 24 months following the date of notification to such individuals;

5) Perform or take any other actions required to comply with applicable law as a result of the occurrence;

6) Pay for any costs associated with the occurrence, including but not limited to any costs incurred by MDHHS in investigating and resolving the occurrence, including reasonable attorney's fees associated with such investigation and resolution;

7) Without limiting Contractor's obligations of indemnification as further described in this Contract, indemnify, defend, and hold harmless MDHHS for any and all claims, including reasonable attorneys' fees, costs, and incidental expenses which may be suffered by, accrued against, charged to, or recoverable from MDHHS in connection with the occurrence;

8) Be responsible for recreating lost State Data in the manner and on the schedule set by MDHHS without charge to MDHHS; and,

9) Provide to MDHHS a detailed plan within 10 calendar days of the occurrence describing the measures Contractor will undertake to prevent a future occurrence.

Notification to affected individuals, as described above, must comply with applicable law, be written in plain language, not be tangentially used for any solicitation purposes, and contain, at a minimum: name and contact information of Contractor's representative; a description of the nature of the loss; a list of the types of data involved; the known or approximate date of the loss; how such loss may affect the affected individual; what steps Contractor has taken to protect the affected individual; what steps the affected individual can take to protect himself or herself; contact information for major credit card reporting agencies; and, information regarding the credit and identity monitoring services to be provided by Contractor. MDHHS will have the option to review and approve any notification sent to affected individuals prior to its delivery. Notification to any other party, including but not limited to public media outlets, must be reviewed and approved by MDHHS in writing prior to its dissemination.

Rev. 10-18

This Section survives termination or expiration of this Contract.

4.32  Non-Disclosure of Confidential Information

The parties acknowledge that each party may be exposed to or acquire communication or data of the other party that is confidential, privileged communication not intended to be disclosed to third parties.  The provisions of this Section survive the termination of this Contract.

a.  Meaning of Confidential Information.  For the purposes of this Contract, the term **"Confidential Information"** means all information and documentation of a party that:

1) Has been marked "confidential" or with words of similar meaning, at the time of disclosure by such party;
2) If disclosed orally or not marked "confidential" or with words of similar meaning, was subsequently summarized in writing by the disclosing party and marked "confidential" or with words of similar meaning; and,
3) Should reasonably be recognized as confidential information of the disclosing party.

The term "Confidential Information" does not include any information or documentation that was:

1) Subject to disclosure under the Michigan Freedom of Information Act (FOIA);
2) Already in the possession of the receiving party without an obligation of confidentiality;
3) Developed independently by the receiving party, as demonstrated by the receiving party, without violating the disclosing party's proprietary rights;
4) Obtained from a source other than the disclosing party without an obligation of confidentiality; or,
5) Publicly available when received, or thereafter became publicly available (other than through any unauthorized disclosure by, through, or on behalf of, the receiving party).

For purposes of this Contract, in all cases and for all matters, State Data is deemed to be Confidential Information.

b.  Obligation of Confidentiality.  The parties agree to hold all Confidential Information in strict confidence and not to copy, reproduce, sell, transfer, or otherwise dispose of, give or disclose such Confidential Information to third parties other than employees, agents, or subcontractors of a party who have a need to know in connection with this Contract or to use such Confidential Information for any purposes whatsoever other than the performance of this Contract.  The parties agree to advise and require

their respective employees, agents, and subcontractors of their obligations to keep all Confidential Information confidential. Disclosure to a subcontractor is permissible where:

1) Use of a subcontractor is authorized under this Contract;
2) The disclosure is necessary or otherwise naturally occurs in connection with work that is within the subcontractor's responsibilities; and
3) Contractor obligates the subcontractor in a written contract to maintain MDHHS's Confidential Information in confidence.

At MDHHS's request, any employee of Contractor or any subcontractor may be required to execute a separate Contract to be bound by the provisions of this Section.

c. <u>Cooperation to Prevent Disclosure of Confidential Information.</u> Each party must use its best efforts to assist the other party in identifying and preventing any unauthorized use or disclosure of any Confidential Information. Without limiting the foregoing, each party must advise the other party immediately in the event either party learns or has reason to believe that any person who has had access to Confidential Information has violated or intends to violate the terms of this Contract and each party will cooperate with the other party in seeking injunctive or other equitable relief against any such person.

d. <u>Remedies for Breach of Obligation of Confidentiality.</u> Each party acknowledges that breach of its obligation of confidentiality may give rise to irreparable injury to the other party, which damage may be inadequately compensable in the form of monetary damages. Accordingly, a party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies which may be available, to include, in the case of MDHHS, at the sole election of MDHHS, the immediate termination, without liability to MDHHS, of this Contract or any Statement of Work corresponding to the breach or threatened breach.

e. <u>Surrender of Confidential Information upon Termination.</u> Upon termination of this Contract or a Statement of Work, in whole or in part, each party must, within five calendar days from the date of termination, return to the other party any and all Confidential Information received from the other party, or created or received by a party on behalf of the other party, which are in such party's possession, custody, or control; provided, however, that Contractor must return State Data to MDHHS following the timeframe and procedure described further in this Contract. Should Contractor or MDHHS determine that the return of any Confidential Information is not feasible, such party must destroy the Confidential Information and must certify the same in writing within five calendar days from the date of

termination to the other party. However, MDHHS's legal ability to destroy Contractor data may be restricted by its retention and disposal schedule, in which case Contractor's Confidential Information will be destroyed after the retention period expires.

4.33 Data Privacy and Information Security

a. Undertaking by Contractor. Without limiting Contractor's obligation of confidentiality as further described, Contractor is responsible for establishing and maintaining a data privacy and information security program, including physical, technical, administrative, and organizational safeguards, that is designed to:

1) Ensure the security and confidentiality of the State Data;
2) Protect against any anticipated threats or hazards to the security or integrity of the State Data;
3) Protect against unauthorized disclosure, access to, or use of the State Data;
4) Ensure the proper disposal of State Data; and
5) Ensure that all employees, agents, and subcontractors of Contractor, if any, comply with all of the foregoing. In no case will the safeguards of Contractor's data privacy and information security program be less stringent than the safeguards used by MDHHS, and Contractor must at all times comply with all applicable State IT policies and standards, which are available to Contractor upon request.

b. Audit by Contractor. No less than annually, Contractor must conduct a comprehensive independent third-party audit of its data privacy and information security program and provide such audit findings to MDHHS.

c. Right of Audit by the State. Without limiting any other audit rights of MDHHS, MDHHS has the right to review Contractor's data privacy and information security program prior to the commencement of Contract Activities and from time to time during the term of this Contract. During the providing of the Contract Activities, on an ongoing basis from time to time and without notice, MDHHS, at its own expense, is entitled to perform, or to have performed, an on-site audit of Contractor's data privacy and information security program. In lieu of an on-site audit, upon request by MDHHS, Contractor agrees to complete, within 45 calendar days of receipt, an audit questionnaire provided by MDHHS regarding Contractor's data privacy and information security program.

d. Audit Findings. Contractor must implement any required safeguards as identified by MDHHS or by any audit of Contractor's data privacy and information security program.

    e. <u>State's Right to Termination for Deficiencies</u>. MDHHS reserves the right, at its sole election, to immediately terminate this Contract or a Statement of Work without limitation and without liability if MDHHS determines that Contractor fails or has failed to meet its obligations under this Section.

4.34 <u>Reserved</u>

4.35 <u>Reserved</u>

4.36 <u>Records Maintenance, Inspection, Examination, and Audit</u>

MDHHS or its designee may audit Contractor to verify compliance with this Contract. Contractor must retain, and provide to MDHHS or its designee and the auditor general upon request, all financial and accounting records related to this Contract through the term of this Contract and for four years after the latter of termination, expiration, or final payment under this Contract or any extension ("**Audit Period**"). If an audit, litigation, or other action involving the records is initiated before the end of the Audit Period, Contractor must retain the records until all issues are resolved.

Within 10 calendar days of providing notice, MDHHS and its authorized representatives or designees have the right to enter and inspect Contractor's premises or any other places where Contract Activities are being performed, and examine, copy, and audit all records related to this Contract. Contractor must cooperate and provide reasonable assistance. If any financial errors are revealed, the amount in error must be reflected as a credit or debit on subsequent invoices until the amount is paid or refunded. Any remaining balance at the end of this Contract must be paid or refunded within 45 calendar days.

This Section applies to Contractor, any parent, affiliate, or subsidiary organization of Contractor, and any subcontractor that performs Contract Activities in connection with this Contract.

4.37 <u>Warranties and Representations</u>

Contractor represents and warrants:

    a. Contractor is the owner or licensee of any Contract Activities that it licenses, sells, or develops and Contractor has the rights necessary to convey title, ownership rights, or licensed use;
    b. All Contract Activities are delivered free from any security interest, lien, or encumbrance and will continue in that respect;
    c. The Contract Activities will not infringe the patent, trademark, copyright, trade secret, or other proprietary rights of any third party;

d. Contractor must assign or otherwise transfer to MDHHS or its designee any manufacturer's warranty for the Contract Activities;

e. The Contract Activities are merchantable and fit for the specific purposes identified in this Contract;

f. The Contract signatory has the authority to enter into this Contract;

g. All information furnished by Contractor in connection with this Contract fairly and accurately represents Contractor's business, properties, finances, and operations as of the dates covered by the information, and Contractor will inform MDHHS of any material adverse changes;

h. All information furnished and representations made in connection with the award of this Contract is true, accurate, and complete, and contains no false statements or omits any fact that would make the information misleading and that;

i. Contractor is neither currently engaged in nor will engage in the boycott of a person based in or doing business with a strategic partner as described in 22 USC 8601 to 8606

A breach of this Section is considered a material breach of this Contract, which entitles MDHHS to terminate this Contract under Section 4.23, Termination for Cause.

4.38  Conflicts and Ethics

Contractor will uphold high ethical standards and is prohibited from:

a. Holding or acquiring an interest that would conflict with this Contract;

b. Doing anything that creates an appearance of impropriety with respect to the award or performance of this Contract;

c. Attempting to influence or appearing to influence any State employee by the direct or indirect offer of anything of value; or

d. Paying or agreeing to pay any person, other than employees and consultants working for Contractor, any consideration contingent upon the award of this Contract.

Contractor must immediately notify MDHHS of any violation or potential violation of these standards. This Section applies to Contractor, any parent, affiliate, or subsidiary organization of Contractor, and any subcontractor that performs Contract Activities in connection with this Contract.

4.39  Compliance with Laws

Contractor must comply with all federal, state and local laws, rules and regulations.

4.40  Reserved

4.41 <u>Reserved</u>

4.42 <u>Nondiscrimination</u>

Under the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., and the Persons with Disabilities Civil Rights Act, 1976 PA 220, MCL 37.1101, et seq., Contractor and its subcontractors agree not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, marital status, or mental or physical disability. Breach of this covenant is a material breach of this Contract.

4.43 <u>Unfair Labor Practice</u>

Under MCL 423.324, MDHHS may void any Contract with a Contractor or subcontractor who appears on the Unfair Labor Practice register compiled under MCL 423.322.

4.44 <u>Governing Law</u>

This Contract is governed, construed, and enforced in accordance with Michigan law, excluding choice-of-law principles, and all claims relating to or arising out of this Contract are governed by Michigan law, excluding choice-of-law principles. Any dispute arising from this Contract must be resolved in Michigan Court of Claims. Contractor consents to venue in Ingham County, and waives any objections, such as lack of personal jurisdiction or forum non conveniens. Contractor must appoint agents in Michigan to receive service of process.

4.45 <u>Non-Exclusivity</u>

Nothing contained in this Contract is intended nor will be construed as creating any requirements contract with Contractor. This Contract does not restrict the State or its agencies from acquiring similar, equal, or like Contract Activities from other sources.

4.46 <u>Force Majeure</u>

Neither party will be in breach of this Contract because of any failure arising from any disaster or acts of god that are beyond their control and without their fault or negligence. Each party will use commercially reasonable efforts to resume performance. Contractor will not be relieved of a breach or delay caused by its subcontractors. If immediate performance is necessary to

ensure public health and safety, MDHHS may immediately contract with a third party.

### 4.47 Dispute Resolution

The parties will endeavor to resolve any Contract dispute in accordance with this provision. The parties must submit the dispute to a senior executive if unable to resolve the dispute within 15 business days. The parties will continue performing while a dispute is being resolved, unless the dispute precludes performance. A dispute involving payment does not preclude performance.

Litigation to resolve the dispute will not be instituted until after the dispute has been elevated to the parties' senior executive and either concludes that resolution is unlikely, or fails to respond within 15 business days. The parties are not prohibited from instituting formal proceedings: (a) to avoid the expiration of statute of limitations period; (b) to preserve a superior position with respect to creditors; or (c) where a party makes a determination that a temporary restraining order or other injunctive relief is the only adequate remedy. This Section does not limit MDHHS's right to terminate this Contract.

### 4.48 Media Releases

News releases (including promotional literature and commercial advertisements) pertaining to the Contract or project to which it relates must not be made without prior written MDHHS approval, and then only in accordance with the explicit written instructions of MDHHS.

### 4.49 Website Incorporation

MDHHS is not bound by any content on Contractor's website unless expressly incorporated directly into this Contract.

### 4.50 Entire Contract

This Contract is the entire Contract of the parties related to the Contract Activities. This Contract supersedes and replaces all previous understandings and Contracts between the parties for the Contract Activities.

### 4.51 Severability

If any part of this Contract is held invalid or unenforceable, by any court of competent jurisdiction, that part will be deemed deleted from this Contract and the severed part will be replaced by agreed upon language that achieves

Rev. 10-18

the same or similar objectives.  The remaining Contract will continue in full force and effect.

### 4.52 Waiver

Failure to enforce any provision of this Contract will not constitute a waiver.

### 4.53 Survival

The provisions of this Contract that impose continuing obligations, including warranties and representations, termination, transition, insurance coverage, indemnification, and confidentiality, will survive the expiration or termination of this Contract.

### 4.54 Contract Modification

This Contract may not be amended except by signed Contract between the parties.  Notwithstanding the foregoing, no subsequent Statement of Work or amendment executed after the effective date will be construed to amend this Contract unless it specifically states its intent to do so and cites the section or sections amended.

The Contractor shall, upon request of MDHHS and receipt of a proposed amendment, amend this Contract, if and when required in the opinion of MDHHS, due to the revision of federal or state laws or regulations.

### 4.55 Reserved

### 4.56 Certification Regarding Debarment, Suspension, and Other Responsibility Matters

Assurance is hereby given to MDHHS that the Contractor will comply with Federal Regulation, 2 CFR part 180 and certifies to the best of its knowledge and belief that it, its employees and its subcontractors:

a. Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of federal benefits by a state or federal court, or voluntarily excluded from covered transactions by any federal or state department or agency;

b. Have not within a three-year period preceding this Contract been convicted of or had civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

c. Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state, or local) with commission of any of the offenses enumerated in section 2, and;

d. Have not within a three-year period preceding this Contract had one or more public transactions (federal, state or local) terminated for cause or default.

Where the parties are unable to certify to any of the statements in this certification, the Contractor shall attach an explanation to this Contract.

The Contractor certifies to the best of its knowledge that within the past three years, the Contractor has not;

a. Failed to substantially perform a state contract, Contract, or subcontract according to its terms, conditions, and specifications within specified time limits.

b. Refused to provide information or documents required by a contract or Contract including, but not limited to information or documents necessary for monitoring contract performance.

c. Failed to respond to requests for information regarding contract or Contract compliance, or accumulated repeated substantiated complaints regarding performance of a contract or Contract.

d. Failed to perform a state contract, Contract, or subcontract in a manner consistent with any applicable state or federal law, rule, regulation, order, or decree.

The Contractor shall include Section 4.56 (Certification Regarding Debarment, Suspension, and Other Responsibility Matters) language as written above in all subcontracts with other parties.

The Contractor shall require each primary subcontractor, whose subcontract will exceed $25,000, to disclose to the Contractor, in writing, whether at the time of the award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the state of Michigan. The Contractor shall then inform MDHHS of the subcontractor's status and reasons for the Contractor's decision to use such subcontractor, if the Contractor so decides.

If it is determined that the Contractor knowingly rendered an erroneous certification under this provision, in addition to the other remedies available to the state, MDHHS may immediately terminate this Contract.

If the state finds that grounds to debar exist, it shall send notice to the Contractor of proposed debarment indicating the grounds for proposed debarment and the procedures for requesting a hearing. If the Contractor does not respond with a written request for a hearing within 20 calendar days, the state shall issue the

Rev. 10-18

decision to debar without a hearing. The debarment period may be of any length up to eight years.

## 5. ADDENDUM – FEDERAL PROVISIONS

The provisions in this addendum may apply if the purchase will be paid for in whole or in part with funds obtained from the federal government. If any provision below is not required by federal law for this Contract, then it does not apply and must be disregarded. If any provision below is required to be included in this Contract by federal law, then the applicable provision applies and the language is not negotiable. If any provision below conflicts with the State's terms and conditions, including any attachments, schedules, or exhibits to the State's Contract, the provisions below take priority to the extent a provision is required by federal law; otherwise, the order of precedence set forth in the Contract applies. Hyperlinks are provided for convenience only; broken hyperlinks will not relieve Contractor from compliance with the law.

### A. Federally Assisted Construction Contracts

If this contract is a **"federally assisted construction contract"** as defined in 41 CRF Part 60-1.3, and except as otherwise may be provided under 41 CRF Part 60, then during performance of this Contract, the Contractor agrees as follows:

(1) The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall include, but not be limited to the following:

Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this nondiscrimination clause.

(2) The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin.

(3) The Contractor will not discharge or in any other manner discriminate against any employee or applicant for employment because such employee or applicant has inquired about, discussed, or disclosed the compensation of the employee or applicant or another employee or applicant. This provision shall not apply to instances in which an employee who has access to the compensation information of other employees or applicants as a part of such employee's essential job functions discloses the

compensation of such other employees or applicants to individuals who do not otherwise have access to such information, unless such disclosure is in response to a formal complaint or charge, in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or is consistent with the Contractor's legal duty to furnish information.

(4) The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the said labor union or workers' representatives of the Contractor's commitments under this section, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(5) The Contractor will comply with all provisions of <u>Executive Order 11246</u> of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(6) The Contractor will furnish all information and reports required by <u>Executive Order 11246</u> of September 24, 1965, and by rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the administering agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(7) In the event of the Contractor's noncompliance with the nondiscrimination clauses of this contract or with any of the said rules, regulations, or orders, this Contract may be canceled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Government contracts or federally assisted construction contracts in accordance with procedures authorized in <u>Executive Order 11246</u> of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in <u>Executive Order 11246</u> of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(8) The Contractor will include the portion of the sentence immediately preceding paragraph (1) and the provisions of paragraphs (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of <u>Executive Order 11246</u> of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the administering agency may direct as a means of enforcing such provisions, including sanctions for noncompliance:

Provided, however, that in the event a Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the administering agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

**B. Davis-Bacon Act (Prevailing Wage)**

If applicable, the Contractor (and its subcontractors) for **prime construction contracts in excess of $2,000 must comply with** the Davis-Bacon Act (40 USC 3141-3148) as supplemented by Department of Labor regulations (29 CFR Part 5, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction").

### C. Copeland "Anti-Kickback" Act

If applicable, the Contractor must comply with the Copeland "Anti-Kickback" Act (40 USC 3145), as supplemented by Department of Labor regulations (29 CFR Part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"), which prohibits the Contractor and subrecipients from inducing, by any means, any person employed in the construction, completion, or repair of public work, to give up any part of the compensation to which he or she is otherwise entitled.

### D. Contract Work Hours and Safety Standards Act

If the Contract is **in excess of $100,000 and involves the employment of mechanics or laborers**, the Contractor must comply with 40 USC 3702 and 3704, as supplemented by Department of Labor regulations (29 CFR Part 5), as applicable.

### E. Rights to Inventions Made Under a Contract or Agreement

If the Contract is funded by a federal "funding agreement" as defined under 37 CFR §401.2 (a) and the recipient or subrecipient wishes to enter into a contract with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the recipient or subrecipient must comply with 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any implementing regulations issued by the awarding agency.

### F. Clean Air Act

If this Contract is **in excess of $150,000,** the Contractor must comply with all applicable standards, orders, and regulations issued under the Clean Air Act (42 USC 7401-7671q) and the Federal Water Pollution Control Act (33 USC 1251-1387). Violations must be reported to the federal awarding agency and the regional office of the Environmental Protection Agency.

### G. Debarment and Suspension

A "contract award" (see 2 CFR 180.220) must not be made to parties listed on the government-wide exclusions in the System for Award Management (SAM), in

Rev. 10-18

accordance with the OMB guidelines at 2 CFR 180 that implement Executive Orders 12549 (3 CFR part 1986 Comp., p. 189) and 12689 (3 CFR part 1989 Comp., p. 235), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549.

### H. Byrd Anti-Lobbying Amendment

If this Contract **exceeds $100,000**, bidders and the Contractor must file the certification required under 31 USC 1352.

### I. Procurement of Recovered Materials

Under 2 CFR 200.322, a non-Federal entity that is a state agency or agency of a political subdivision of a state **and its contractors** must comply with section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. The requirements of Section 6002 include procuring only items designated in guidelines of the Environmental Protection Agency (EPA) at 40 CFR part 247 that contain the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, where the purchase price of the item exceeds $10,000 or the value of the quantity acquired during the preceding fiscal year exceeded $10,000; procuring solid waste management services in a manner that maximizes energy and resource recovery; and establishing an affirmative procurement program for procurement of recovered materials identified in the EPA guidelines.

Rev. 10-18

# EXHIBIT  7

**State of Michigan**
**Department of Health and Human Services**
**Bureau of Purchasing (BOP)**
**PO Box 30037, Lansing, MI 48909**
*Or*
**235 S. Grand Avenue, Suite 1201, Lansing, MI 48933**

Received

SEP − 7 2016

Bureau of Purchasing

### AGREEMENT NUMBER:  A17-61001
#### Between
### THE STATE OF MICHIGAN
### DEPARTMENT OF HEALTH AND HUMAN SERVICES
#### And

| CONTRACTOR | | PRIMARY CONTACT | EMAIL | |
|---|---|---|---|---|
| Catholic Charities West Michigan | | Terry Walsh | twalsh@ccwestmi.org | |
| CONTRACTOR ADDRESS | | | | TELEPHONE |
| 360 S. Division, Suite 3A, Grand Rapids, MI 49503-4501 | | | | 616-243-9122 |
| STATE CONTACT | NAME | | TELEPHONE | EMAIL |
| Contract Administrator | Cathe Hoover | | 517-241-8817 | hooverc3@michigan.gov |
| OCP Analyst | Dawn Akers | | 517-335-6366 | akersd@michigan.gov |

| AGREEMENT SUMMARY | | | |
|---|---|---|---|
| SERVICE DESCRIPTION | Adoption | | |
| GEOGRAPHIC AREA | Statewide | | |
| INITIAL TERM | EFFECTIVE DATE* | EXPIRATION DATE | AVAILABLE OPTION YEARS |
| 3 years | October 1, 2016 | September 30, 2019 | 2, one year options |
| MISCELLANEOUS INFORMATION | | | |
| ESTIMATED AGREEMENT VALUE AT TIME OF EXECUTION | | $450,000.00 | |
| AGREEMENT TYPE | Unit Rate | | |

*The effective date of this Agreement shall be the date listed in the "Effective Date" box above, or the date of Michigan Department of Health and Human Services (MDHHS) signature below, whichever is later.

The undersigned have the lawful authority to bind the Contractor and MDHHS to the terms set forth in this Agreement. Section 291 of the fiscal year 2016 Omnibus Budget, PA 84 of 2015, requires verification that all new employees of the Contractor and all new employees of any approved subcontractor, working under this Agreement, are legally present to work in the United States. The Contractor shall perform this verification using the E-verify system (http://www.uscis.gov/portal/site/uscis). The Contractor's signature on this Agreement is the Contractor's certification that verification has and will be performed. The Contractor's signature also certifies that the Contractor is not an Iran linked business as defined in MCL 129.312.

| **FOR THE CONTRACTOR:** | **FOR THE STATE:** |
|---|---|
| | MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES |
| Catholic Charities West Michigan | |
| *[signature]* Contractor | *[signature]* |
| Signature of Director or Authorized Designee | Signature of Director or Authorized Designee |
| Terrence L. Walsh, Jr., MBA, MSW | Kim Stephen |
| Print Name | Print Name |
| 9/1/16 | 9-27-16 |
| Date | Date |

This Agreement will be in effect from the date of MDHHS signature through September 30, 2019. No service will be provided and no costs to the state will be incurred before October 1, 2016, or the effective date of the Agreement, whichever is later. Throughout this Agreement, the date of MDHHS signature or October 1, 2016, whichever is later, shall be referred to as the begin date.

| Agreement Period | | | Amount |
|---|---|---|---|
| Begin date | through | September 30, 2019 | $450,000.00 |
| Total Amount: | | | $450,000.00 |

1.  PROGRAM REQUIREMENTS

    1.1.  Client Eligibility Criteria

        a.  The Contractor shall perform activities for Michigan permanent wards that are Title IV-E funded and Michigan Children's Institute (MCI) wards for which adoption is the plan or for children from a participating Inter-State Compact (ICPC) state's child welfare system that has been referred for adoption services to Michigan through ICPC. Any exceptions to this criteria must be approved by the MDHHS Central Office Adoption Program Manager.

        b.  Determination of Eligibility

            Determination of eligibility will be made by MDHHS.

    1.2.  Referral Process

        a.  Adoption referrals are initiated by MDHHS. Contractors may not transfer adoption cases to another child placing agency. After acceptance of an adoption referral, the Contractor may not transfer the case back to the Department, except upon the written approval of the County Director, the Children's Services Agency Director, or the Deputy Director.

            If MDHHS makes a referral to a child placing agency for adoption services pursuant to a contract with the child placing agency, the child placing agency must accept or decline the referral within seven working days of receipt of the referral from foster care. Any reasons given for declining a referral may be documented in MiSACWIS.

        b.  At the time of referral to a private agency, MDHHS shall provide that agency with a referral packet as prescribed in Section 210 of the Adoption Services Manual (ADM 210).

        c.  When an eligible child is photo-listed on MARE and the Contractor notifies

the local MDHHS county office that the Contractor has a studied and approved available family, MDHHS shall send a copy of the case file to the Contractor within ten (10) working days of receipt of notification.

2.   CONTRACTOR RESPONSIBILITIES

2.1.   Email Address

The Contractor authorizes MDHHS to use the contact information below to send Agreement related notifications/information. The Contractor shall provide MDHHS with updated contact information if it changes.

Contact email address: twalsh@ccwestmi.org

2.2   Requests for Information

The Contractor may be required to meet and communicate with MDHHS representatives and from time to time MDHHS may require that the Contractor create reports or fulfill requests for information as necessary to fulfill the MDHHS' obligations under statute and/or Dwayne B. v. Snyder, et al., 2:06-cv-13548, herein referred to as the Implementation, Sustainability, and Exit Plan (ISEP).

The Contractor shall make available to MDHHS copies of any outside reviews, non-redacted FOIA requests, or audits relating to the contracted program.

2.3   Geographic Area

The Contractor shall provide services described herein in the following geographic area:   Statewide

2.4   Licensing Requirements

The MDHHS Division of Child Welfare Licensing (DCWL) is the licensing agency for Child Placing Agencies (CPA).  A license is issued to a certain person or organization at a specific location, is non-transferable, and remains the property of the Department.  Therefore, a child placing agency must be established at a specific location.

The Contractor shall ensure that, for the duration of this agreement, it shall maintain a license for those program areas and services that are provided for in this Agreement. If the Contractor fails to comply with this section, MDHHS may terminate this Agreement for default.

The Contractor is licensed to provide service under this agreement under the following license number: CB610201023

Rev. 4-16

2.5.   Location of Facilities

The Contractor shall provide services described herein at the following location(s):

1095 Third Street, #125, Muskegon, MI 49441-1976

2.6   Program Focus and Statement

The Contractor shall perform activities for Michigan permanent wards that are Title IV-E funded and Michigan Children's Institute (MCI) wards for which adoption is the plan or for children from a participating Inter-State Compact (ICPC) state's child welfare system that has been referred for adoption services to Michigan through ICPC.

Reimburse licensed child placing agencies through a current MDHHS adoption contract at specific rates for the legal placement and finalization of an adoption for an eligible child. Per diem payments for cases referred to the contractor by MDHHS for adoption services can be charged a maximum of $3000.00 per child. The total amount paid for the per diem rate is deducted from the applicable placement rate when the child is placed by the court in an adoptive home. Reimbursement for contract agency staff's successful completion of applicable training provided by the Office of Workforce Development and Training is included.

The Contractor shall provide MDHHS with copies of their Adoption Program Statement. The program statement shall comply with the requirements of MDHHS Division of Child Welfare Licensing standards and MDHHS policy. The Contractor shall inform MDHHS of any changes made to the program statement at any point during the term of this Agreement and provide copies of the new statement to MDHHS within 60 days.

2.7   Reserved

2.8.   Credentials

The Contractor shall assure that appropriately credentialed or trained staff under its control, including Contractor employees and/or subcontractors, shall perform functions under this Agreement.

2.9   Compliance Requirements

Except as stated in e. below, the Contractor shall comply with the following requirements:

a.   The Contractor shall comply with all applicable MDHHS policy and MDHHS policy amendments including fingerprint-based criminal history policy. M D H H S   policies and MDHHS policy amendments/bulletins are published on the following internet link: http://www.michigan.gov/mdhhs-manuals.

b.   Throughout the terms of this Agreement, the Contractor shall  ensure that it provides all applicable MDHHS policy and MDHHS policy amendments to social service staff. The Contractor shall ensure that social service staff complies with all applicable requirements.

c.   The Contractor shall comply with the MDHHS non-discrimination statement:

Michigan Department of Health and Human Services (MDHHS) will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs or disability.

The above statement applies to all applications filed for adoption of MDHHS supervised children, including MDHHS supervised children assigned to a contracted agency.

d.   The Contractor accepts a referral from MDHHS under this Agreement by doing either of the following:

1)   Submitting to MDHHS a written agreement to perform the services related to the particular child or particular individuals that the Department referred to the Contractor, or

2)   Engaging in any other activity that results in MDHHS being obligated to  pay the Contractor for the services related to the particular child or particular individuals that the Department referred to the Contractor.

e.   Under 1973 PA 116, as amended by 2015 PA 53, the Contractor has the sole discretion to decide whether to accept or not accept a referral from MDHHS. Nothing in this Agreement limits or expands the application of the Public Act.

Adoption referrals are initiated by MDHHS. Contractors may not transfer adoption cases to another child placing agency. After acceptance of an adoption referral, the Contractor may not transfer the case back to the Department, except upon the written approval of the County Director, the Children's Services Agency Director, or the Deputy Director.

If MDHHS makes a referral to a child placing agency for adoption services pursuant to a contract with the child placing agency, the child

Rev. 4-16

placing agency must accept or decline the referral within seven working days of receipt of the referral from foster care. Any reasons given for declining a referral may be documented in MiSACWIS.

f.   The contractor shall ensure all directives and services ordered by the court are completed to the satisfaction of the court within the timeframes ordered.

g.   The Contractor shall participate in random moment time studies (RMTS). An RMTS is a process where participants are emailed short surveys and asked to indicate what they were doing at an assigned time. The time study is required to determine the amount of time spent on various activities. Based on these results, MDHHS determines the amount that can be charged to various funding sources.

h.   Compliance with MDHHS Implementation, Sustainability, and Exit Plan

The Contractor shall ensure compliance with all applicable provisions and requirements of Dwayne B. v. Snyder, et al., 2:06-cv-13548, Implementation Sustainability and Exit Plan.

i.   Additional Compliance Provisions

1)   1984 Public Act, 114, as amended, being M.C.L. 3.711 *et seq.*, Interstate Compact on the Placement of Children.
2)   1939 Public Act 288, Chapter X, being M.C.L. 710.1 *et seq.*, Michigan Adoption Code.
3)   1984 Public Act 203, as amended, being M.C.L. 722.951 *et seq.*, Michigan Foster Care and Adoption Services Act.
4)   The Social Security Act as amended by the Multiethnic Placement Act of 1994 (MEPA); Public Law 103-382, and as amended by Section 1808 of the Small Business Job Protection, the Interethnic Adoption Provision (IEAP).
5)   The Indian Child Welfare Act (ICWA); Public Law 95-608 being 25 U.S.C. 1901 *et seq.*
6)   P.L. 110–351, known as the Fostering Connections to Success and Increasing Adoptions Act of 2008.
7)   Social Security Act, 42 USC 671(a)(20)
8)   Federal Bureau of Investigation (FBI), Criminal Justice Information Services (CJIS) Security Policy located on the following link: https://**www.fbi.gov**/about-us/**cjis/cjis-security-policy**-resource-center

2.10   Services to be Provided

a. General Adoption Responsibilities

1)   Place the child for adoption under the provisions of this Agreement or

assist in the child's placement by another private agency or MDHHS local office.

2) The Contractor that has the identified adoptive family shall be the agency to perform adoptive activities including: placement, case management, supervision and court related requirements.

3) When the Contractor has an identified adoptive family for a child under supervision of another agency the Contractor shall work cooperatively with the child's agency in coordinating and sharing responsibility for pre- placement activities and associated costs for transportation and other case services.

4) When a placement for adoption disrupts or a finalized adoption dissolves within eighteen (18) months of the date of the order for placement or finalization the Contractor shall be, unless ordered or directed otherwise by the Court or M D H H S , responsible to provide full adoption services for the child/youth as detailed in this contract. The responsible contractor is defined as the Contractor that had adoption planning responsibilities for the child when the initial adoption placement occurred.  The exception shall be in a contested case where a child is placed in an adoptive home against the recommendation of the contractor.

5) Provide guidance to the child's foster parent in preparation of the child for adoption or in facilitating a transfer of the child's attachment to the adoptive parents.

6) In instances where the child's agency has performed pre-placement activities for the adoptive family's agency, the adoptive family's agency shall provide the child's agency with a copy of the court order placing the child in the adoptive home within thirty (30) working days, after receipt of said order.

7) The Contractor shall develop plans for the effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements for waiting children. This shall include photo listing on the MARE website, networking with other private agencies in determining availability of resource families and other recruitment activities that are statewide and national in nature. The Contractor shall respond to and actively work with, prospective adoptive parents outside of the State of Michigan.

8) The Contractor shall maintain documentation of completion of the above listed requirements in the child's adoption case file for review by MDHHS.

b.  Adoption, Recruitment, Orientation and Training

1)  The Contractor shall develop and implement a plan for adoptive home recruitment, retention, and support consistent with the MDHHS DCWL Licensing Standards specific to the Contractor's license specified in Section 2.4.

2)  The Contractor shall provide adoption recruitment activities in collaboration with other private agencies and MDHHS local offices to focus on children registered on Michigan Adoption Resource Exchange (MARE).

3)  The Contractor shall work cooperatively with other contracted adoption agencies, MDHHS and trained adoptive parents to provide orientation and training. It is recommended that adoptive parent peer mentors be matched to prospective and new adoptive parents. The Contractor shall retain in the case record verification of training provided to the adoptive family including but not limited to:

    a. Type of training provided
    b. Date training provided
    c. Subject material covered during training

4)  The Contractor shall involve youth in the planning and organizing of adoption recruitment events.

5)  The Contractor shall develop supports for children and youth moving to permanency through adoption. Best practice research indicates that support groups, peer mentors, informational sessions and individual counseling are effective tools. Developing appropriate rituals and recognition for the transitions experienced shall be part of the adoption process.

6)  The Contractor shall be responsible for providing information to the prospective adoptive parent(s) regarding the adoption assistance programs on behalf of all children available for adoption. If the Contractor fails to provide information, fails to apply for adoption assistance or finalizes an adoption prior to the execution of an adoption assistance agreement, and it is later determined that the child was eligible for adoption assistance, the Contractor shall be responsible for providing financial support to the family equal to the adoption assistance amount and eligible Medicaid coverage, from the time the family makes the request for the re-determination of eligibility and the date MDHHS determines that an error occurred based on the Contractor's failure to inform or apply for adoption assistance.

c. MARE Related Responsibilities

The Contractor shall cooperate with MARE related activities and responsibilities, as detailed in this document including but not limited to:

1) The Contractor shall appropriately inform and prepare children concerning the process of photo listing. Children shall be adequately attired and well groomed. Adequately attired is defined as that which a parent would provide for their child in a school photo. The Contractor is responsible for securing photography services and may request coupons or assistance from the MARE office. The Contractor is responsible for facilitating transportation to key photo sites and supervision of the child (ren) during the process.

2) The Contractor shall, as appropriate to the child's ability, involve youth over age nine (9) in developing individual recruitment materials and narratives for MARE photo listing.

3) The Contractor must submit a copy of the Order Placing Child after Consent and the Order of Adoption to the MARE office within ten (10) working days of issuance by the court.

4) Upon determination by the Contractor that the MARE potential family 'match' is appropriate, the child and family agencies shall begin the process towards adoption within ten (10) working days.

5) The Contractor shall provide a written brochure (developed by MARE) to adoptive families regarding their right to be included in the MARE prospective family registry and provide an explanation of this process during orientation. This brochure and information shall again be provided to the prospective family during the formal training process.

6) The Contractor shall ensure all age appropriate youth available for adoption have knowledge of and access to the MARE newsletter for youth.

7) The Contractor shall notify MARE no less than quarterly of planned adoption related events, scheduled or tentatively scheduled for the next quarter. These activities shall include but are not limited to orientation, training dates, workshops, adoption fairs, recruitment activities, post adoption support activities and guest speakers. The Contractor will indicate if the events are open to the public or limited to a specific audience and any costs for family participation.

8) If the local court is participating, the Contractor shall cooperate with MARE during planning and implementation of National Adoption Day activities and regionally based adoption events.

9) The Contractor shall ensure MARE staff has access to case records, the child, child's worker, and other material or persons necessary for the development and updating of the child's MARE file and recruitment material.

10) The Contractor shall submit the completed Disruption/Dissolution survey to MARE within thirty (30) days of receipt of the survey from MARE.

11) The Contractor shall provide to MARE by October 30th of each year the following:

    a. The address of all offices.
    b. Names, telephone numbers and email addresses of all adoption workers and supervisors.
    c. Types of services provided by the Contractor.

12) The Contractor shall ensure that a supervisor attends the regionally based MARE sessions on changes to MARE processes and services. This individual shall then be responsible to disseminate MARE information and material to appropriate agency staff.

d. Caseload Tracking and Reporting

The Contractor shall report to MDHHS caseload ratios for social services supervisors, social service staff and licensing staff in a format and within timeframes as determined by MDHHS.

e. Staff Training

1) Pre-Service Institute: Requirements

The Contractor shall ensure that staff transferring to an adoption social service position from another children's services position that has successfully completed the Office of Workforce Development and Training (OWDT) Pre-Service Institute (PSI) training in that program, shall attend and complete    Adoption Program Specific Transfer Training (PSTT) within six months of assuming the adoption position.

2) OWDT Registration Process

    a) The Contractor shall register all staff required to attend training by each individual staff member through the Learning Management System.
    b) The Contractor supervisor and/or the Contractor training facility coordinator can register Contractor staff online for any training. To

cancel or change training registration, the Contractor will need to directly contact OWDT by telephone or email.

c) Confirmations, with specific details on times and locations, will be emailed to the Contractor/trainee by MDHHS at least seven days before the training commences.

3) Training Documentation

The Contractor shall maintain training documentation which verifies registration and successful completion of training.  Additionally, the Contractor shall maintain documentation of the completion of required in-service training for both social service staff and social service supervisory staff.

4) Completion of Security Awareness Training (SAT)

The Contractor shall require each employee, subcontractor, subcontractor employee or volunteer who works directly with clients or who is authorized to have access to client fingerprint-based criminal history record information (CHRI) under this Agreement to successfully complete security awareness training (SAT) within six months of appointment to a position with (CHRI) access and every two years thereafter.  Documentation of successful SAT completion is to be located in the personnel record.

Security awareness training is located through the Learning Management System or on the following link: http://www.michigan.gov/mdhhs/0,5885,7-339-71551_11120_74572—.00.html

2.11   Expected Performance Outcomes

During the Agreement, the Contractor shall demonstrate measurable progress toward the achievement of the outcomes listed below:

a. Fewer than 5% of placements for adoption will end in disruption.

b. Fewer than 5% of finalized adoptions will end in dissolution.

c. By September 30, 2017, not less than 80% of the number of children with a goal of adoption that are legally free for adoption on September 30, 2016 shall have adoptions finalized.

d. By September 30, 2017, not less than 80% of the number of children with a goal of adoption that are legally free for adoption on September 30, 2016 will have the adoption petition filed with the court.

Rev. 4-16

2.12   Audit Requirements

**Contractor/Vendor Relationship**

This Agreement constitutes a contractor/vendor relationship with MDHHS..

The Contractor must immediately report to the MDHHS Bureau of Audit, Reimbursement and Quality Assurance accounting irregularities including noncompliance with provisions of this Agreement.

2.13.   Financial Audit Requirements

   a.   Required Audit or Notification Letter
   Contractors must submit to the Department either a Single Audit, Financial Statement Audit, or Audit Status Notification Letter as described below.  If submitting a Single Audit or Financial Statement Audit, Contractors must also submit a Corrective Action Plan for any audit findings that impact MDHHS-funded programs, and management letter (if issued) with a response.

   1)  Single Audit
   Contractors that are a non-profit organization and that expend $750,000 or more in federal awards during the Contractor's fiscal year, must submit a Single Audit to the Department, regardless of the amount of funding received from the Department. The Single Audit must comply with the requirements of Title 2 Code of Federal Regulations, Subpart F.

   2)  Financial Statement Audit
   Contractors exempt from the Single Audit requirements with fiscal years that receive $500,000 or more in **total funding** from the Department in State and Federal grant funding must submit to the Department a Financial Statement Audit prepared in accordance with generally accepted auditing standards (GAAS).

   3)  Audit Status Notification Letter
   Contractors exempt from the Single Audit and Financial Statement Audit requirements (1 and 2 above) must submit an Audit Status Notification Letter that certifies these exemptions.   The template Audit Status Notification Letter and further instructions are available at http://www.michigan.gov/mdhhs by selecting Inside MDHHS menu, then MDHHS Audit, then Audit Reporting.

   b.  Due Date and Where to Send
   The required audit and any other required submissions (i.e. Corrective Action Plan and management letter with a response), or Audit Status Notification Letter must be submitted to the Department within nine months after the end of the Contractor's fiscal year  by e-mail to the Department at MDHHS-

AuditReports@michigan.gov.   The required submissions must be in PDF files and compatible with Adobe Acrobat (read only).  The subject line must state the agency name and fiscal year end.  The Department reserves the right to request a hard copy of the audit materials if for any reason the electronic submission process is not successful.

c. Penalty
   Failure to meet reporting responsibilities as identified in this agreement may result in delay or withholding of future payments.

d. Other Audits
   The Department or federal agencies may also conduct or arrange for "agreed upon procedures" or additional audits to meet their needs.

2.14. Cost Reporting

The Contractor shall submit annual financial cost reports based on the state's fiscal year which begins October 1 and ends September 30 in the following calendar year.  The reports shall contain the actual costs incurred by providers in delivering services required in this agreement to MDHHS clients for the reporting period.  Costs for non-MDHHS children are not to be included.  Reports will be submitted using a template provided by MDHHS.  The financial reports shall be submitted annually, and will be due November 30 of each fiscal year.  The Contractor must comply with all other program and fiscal reporting procedures as are or may hereinafter be established by MDHHS.  Reports shall be submitted electronically to MDHHS-Foster-Care-Audits@michigan.gov with the subject line:   Adoption Actual Cost Report.   Failure to meet reporting responsibilities as identified in this agreement may result in delay or withholding of future payments.

2.15. Service Documentation

The Contractor agrees to maintain program records required by MDHHS, program statistical records required by MDHHS, and to produce program narrative and statistical data at times prescribed by, and on forms furnished by, MDHHS.

2.16. Private Agency MiSACWIS

The Contractor shall ensure that private agency staff has access to the Michigan Statewide Automated Child Welfare Information System (MiSACWIS) through a web-based interface, henceforth referred to as the "MiSACWIS application."  The contractor shall ensure that staff follow the MiSACWIS requirements for CPA         contracts        which        are        found        at http://www.michigan.gov/documents/dhs/Private_Agency_MiSACWIS_for_C PA_Contracts_464663_7.pdf

For all agency assigned cases in MiSACWIS, the Contractor shall enter all case management activities, including payments and all required documentation per policy in MiSACWIS.

2.17. Billing

The Contractor shall maintain a record system that documents the total number of units of service as defined in this Agreement and delivered during the term of this Agreement.  These records shall also document the specific units billed to MDHHS under this Agreement.

The Contractor shall submit a DHS-1582A to:

Michigan Department of Health and Human Services
Office of Child Welfare Policy and Programs
Suite 514 PO Box 30037
Lansing, MI 48909

The DHS-1582A shall indicate the title of the service provided and the pre adoptive and adoptive name, case number and date of birth of the child served. The DHS-1582A and any subsequent corrections must be completed and received in the Office of Child Welfare Policy and Programs within 120 days of the date of the placement or finalization, whichever is applicable, as those terms are defined in Section I(M)(2-3) of this Agreement.

a.   Billing for all designated services including: per diem, placement, finalization, permanency, and disruptions require a copy of the Order Terminating Parental Rights (Permanent Court Ward/Commitment), the signed DHS3600 for cases referred on or after May 2016, or earlier if applicable, and with the exception of per diems, the signed and dated documentation by the court (DHS 5308 or petition date stamped from the court) verifying the date that the court has accepted the adoption petition and support documentation .

b.   The MARE rates require a copy of the MARE photo listing and the subsequent MARE "Hold" document.

c.   The Residential rate requires a copy of the discharge summary from the residential facility and a copy of the placement record including placement with the prospective adoptive parent prior to filling the petition.

d.   Billing for finalizations requires a copy of the Order of Adoption.

e.   Billing for delayed referrals must include a copy of the Contractors acceptance form with the referral date and statement by MDHHS that includes the child's commitment date. The referral form must be signed

by a MDHHS representative and must have "Delayed Referral" designated on the payment voucher.

f.   Billing for placement requires a copy of the referral/acceptance form (signed DHS 3600 for cases referred on or after May 2016, or earlier if applicable), Order Terminating Parental Rights and the Order Placing Child.

g.   Disruptions require an Ex Parte Order, or order dismissing, a copy of the initial placement order, initial commitment order, documentation verifying the medical condition of the family member if appropriate, a copy of the placement check and agency disruption report.

h.   Legal Risk–Order Placing Child Filed: In cases where a birth parent, individually or through an attorney, has filed a petition to appeal the termination of parental rights, the Contractor shall submit a DHS-1582A requesting payment (placement and finalization). The Contractor must also submit a photocopy of the Claim, filed in conformity with MCR 7.203.

i.   When billing for the per diem, each payment voucher shall be child specific. Attached to the initial payment voucher the following documents must be included: the DHS-3600 (for Adoption Services) with the date of acceptance indicated, the signed agreement of intent to adopt by a relative or identified family (for matched cases only) and verification from MARE that a complete photo listing or a complete "hold" registration was submitted on the case.   The Contractor shall identify in Box 13 of the payment voucher the number of days covered, date range, and the number of per diem billings submitted on behalf of the child.

j.   When requesting an exception to the payment rate, it is the responsibility of the Contractor to demonstrate that requests for adoption assistance eligibility determination or MCI consent delayed the adoption placement. If the delay was caused by submission of incomplete paperwork or a lack of response to requests for information, the consideration for exception will be denied. There is a thirty (30) day standard of promptness for adoption assistance eligibility determinations and MCI regular and expedited consent requests and a ninety (90) day standard of promptness for MCI consent requests on competing parties.   If information is missing, incomplete, or unclear and needing follow-up, the standard of promptness timeframe will not begin until all needed information is available for review, including legal documents and information needed to fulfill policy requirements.  The Adoption Payment Exception Request, DHS 832 form must be submitted with the completed DHS-1582A.

k.   The ICPC rate(s) require copies of the ICPC referral, DHS-3600 (for Adoption Services), adoptive family home study, adoption supervision

Rev. 4-16

reports (if applicable), Order Terminating Parental Rights (Permanent Court Ward/Commitment), Adoption Petition documentation and Order of Adoption, if applicable.

I.   Billings for competing parties, in which the case would be eligible for a rate less than the Baseline rate and the Contractor is requesting the Baseline rate, requires the Contractor to submit a Competing Party Rate Exception Request (DHHS-5445) and copies of the case acceptance documentation, dates of the initial inquiry, adoption application and DHS-4809 from each competing party and copies of the assessment for each competing party.

### 2.18.   Fees and Other Sources of Funding

The Contractor guarantees that any claims made to MDHHS under this Agreement shall not be financed by any source other than MDHHS under the terms of this Agreement. If funding is received through any other source, the Contractor agrees to deduct from the amount billed to MDHHS the greater of either the fee amounts, or the actual costs of the services provided.

The Contractor may not accept reimbursement from a client unless the Agreement specifically authorizes such reimbursement in the "Contractor Responsibility" Section. In such case, a detailed fee scale and criteria for charging the fee must be included. If the Contractor accepts reimbursement from a client in accordance with the terms of the Agreement, the Contractor shall deduct these fees from billings to MDHHS.

Other third party funding sources, e.g., insurance companies, may be billed for contracted client services. Third party reimbursement shall be considered payment in full unless the third party fund source requires a co-pay, in which case MDHHS may be billed for the amount of the co-pay. No supplemental billing is allowed.

### 2.19.   Recoupment of Funding and Repayment of Debts

a.   Recoupment of Funding

If the Contractor fails to comply with requirements as set forth in this Agreement, or fails to submit a revised |DHS-3469 |payment request within allotted time frames established by MDHHS in consultation with the Contractor, MDHHS may, at its discretion, recoup or require the Contractor to reimburse payments made under this Agreement which MDHHS has determined that the Contractor has been overpaid. The Contractor is liable for any cost incurred by MDHHS in the recoupment of any funding.

Upon notification by MDHHS that repayment is required, the Contractor shall make payment directly to MDHHS within 30 days or MDHHS may withhold

Rev. 4-16

current or future payments made under this or any other agreements, current or future, between MDHHS and the Contractor.

If the Contractor fails to: (1) correct noncompliance activities identified by MDHHS, (2) submit revised billings as requested as part of a corrective action plan when required; or (3) remit overpayments or make arrangements to have the overpayments deducted from future payments within 30 days, such failure shall constitute grounds to terminate immediately any or all of MDHHS' agreements with the Contractor. MDHHS shall also report noncompliance of the Contractor to Michigan's Department of Technology, Management and Budget. Such report may result in the Contractor's debarment from further contracts with the state of Michigan.

b. Repayment of Debts and Other Amounts due MDHHS

By entering into this Agreement, the Contractor agrees to honor all prior repayment agreements established by MDHHS with the Contractor or Contractor's predecessors. If the Contractor has an outstanding debt due to MDHHS but does not have a repayment agreement, the Contractor agrees to make monthly payments to MDHHS at an amount not less than 5% of any outstanding balance and to begin on the date this Agreement is executed.

If the Contractor fails to honor prior repayment agreements, or the Contractor fails to begin repayment on an obligation due MDHHS that is not subject to a repayment agreement, MDHHS will initiate the administrative process to reduce payments to the Contractor under this Agreement to recoup the debt. The payment reduction will be made at the amount originally established in the repayment agreement or at an amount not less than 5% of any outstanding balance effective on the date this Agreement is executed.

2.20. Child Protection Law Reporting Requirements

a. The Contractor shall ensure that all employees who have reasonable cause to suspect child abuse or neglect shall report any suspected abuse or neglect of a child in care to MDHHS for investigation as required by Public Acts of 1975, Act Number 238.

b. Failure of the Contractor or its employees to report suspected abuse or neglect of a child to MDHHS shall result in an immediate investigation to determine the appropriate corrective action up to and including termination of the contract.

c. Failure of the Contractor or its employees to report suspected child abuse or neglect two or more times within a one-year period shall result in a review of the contract agency's violations by a designated

Administrative Review Team, which shall include the Director of CSA and the Director of DCWL or its successor agency, that shall consider mitigating and aggravating circumstances to determine the appropriate corrective action up to and included license revocation and contract termination.

2.21   The Division of Child Welfare Licensing (DCWL)

DCWL shall be responsible for review of the Contractor's compliance with the Agreement and any court orders, via an Annual Compliance Review (ACR) and Special Investigations.   DCWL may review, analyze and comment on all activities covered within the terms of the Agreement or court order.  If the ACR or Special Investigation reveals that the Contractor has not complied with the requirements of this Agreement or court order, the following procedures shall be implemented:

a.   DCWL shall notify the Contractor of the Agreement or court noncompliance.   This notification shall occur verbally during an exit conference, and be followed with a written report of the findings.   The Contractor may request a meeting to discuss and examine the identified Agreement or court noncompliance.

b.   Following the identification of the Agreement or court noncompliance, DCWL will request the Contractor submit a Corrective Action Plans (CAP) to DCWL within 15 days of receiving the written report of findings.

c.   After the Contractor's CAP has been reviewed and approved by DCWL, the Contractor's compliance with the CAP shall be reviewed in accordance with time frames established by DCWL in the written notification of acceptance of the CAP.

d.   Based on the severity or repeated nature of cited violations, a recommendation may be made by DCWL at any time to place a moratorium on new placements with the contractor or to cancel the contract.  If either recommendation is made, a meeting will be convened with the director of the contracted agency, the division director of DCWL and the CSA director or designee to provide the contractor with the opportunity to provide documented information on why the moratorium or cancellation of the contract should not occur.

e.   If a moratorium on new placements is put into place, it shall be for a minimum of 90 days to allow the contractor to remedy cited violations and comply with any agreed on CAP.  If the cited violations are not corrected during the period of the moratorium or additional serious violations are cited, consideration shall be given to cancellation of the agency's contract.

Rev. 4-16

Final decisions regarding the cancellation of a contract shall be made by the CSA director.

2.22    Corrective Action Requirements

If a program review by MDHHS reveals a lack of compliance with the requirements of this Agreement, the Contractor shall:

a.    Meet with MDHHS to discuss the noncompliance.

b.    Prepare a corrective action plan within 30 days of receiving MDHHS' written findings.

c.    Achieve compliance within 60 days of receipt of MDHHS' approval of the corrective action plan (unless other time frames are agreed to in writing by MDHHS) or MDHHS may terminate this Agreement, subject to the standard contract terms.

2.23.   Criminal Background Check

As a condition of this Agreement, the Contractor certifies that the Contractor shall, prior to any individual performing work under this Agreement, conduct or cause to be conducted for each new employee, employee, subcontractor, subcontractor employee or volunteer who works directly with:

a.    Clients under this Agreement, or who has access to client information, an Internet Criminal History Access Tool (ICHAT) check and a National and State Sex Offender Registry check.

Information about ICHAT can be found at http://apps.michigan.gov/ichat.

The Michigan Public Sex Offender Registry web address is http://www.mipsor.state.mi.us.

The National Sex Offender Public Website address is http://www.nsopw.gov.

b.    Children under this Agreement, a Central Registry (CR) check.

Information about CR can be found at http://www.mi.gov/MDHHS/0,1607,7-124-5452_7119_48330-180331–,00.html.

The Contractor shall require each employee, subcontractor, subcontractor employee or volunteer who works directly with clients or who has access to client information, under this Agreement to timely notify

the Contractor in writing of criminal convictions (felony or misdemeanor) and/or pending felony charges or placement on the Central Registry as a perpetrator.

Additionally, the Contractor shall require each new employee, employee, subcontractor, subcontractor employee or volunteer who works directly with clients under this Agreement or who has access to client information and who has not resided or lived in Michigan for each of the previous ten (10) years to sign a waiver attesting to the fact that they have never been convicted of a felony or identified as a perpetrator, or if they have, the nature and recency of the felony.

The Contractor further certifies that the Contractor shall not submit claims for or assign to duties under this Agreement, any employee, subcontractor, subcontractor employee, or volunteer based on a determination by the Contractor that the results of a positive ICHAT and/or a CR response or reported criminal felony conviction or perpetrator identification make the individual ineligible to provide the services.

The Contractor must have a written policy describing the criteria on which its determinations shall be made and must document the basis for each determination. The Contractor may consider the recency and type of crime when making a determination. Failure to comply with this provision may be cause for immediate cancellation of this Agreement. In addition, the Contractor must further have a written policy regarding acceptable screening practices of new staff members and volunteers who have direct access to clients and/or client's personal information, which serve to protect the organization and its clients that is clearly defined. The Contractor must also assure that any subcontractors have both of these written policies.

If MDHHS determines that an individual provided services under this Agreement for any period prior to completion of the required checks as described above, MDHHS may require repayment of that individual's salary, fringe benefits, and all related costs of employment for the period that the required checks had not been completed.

## 3. MDHHS RESPONSIBILITIES

### 3.1. Payment

MDHHS shall make payments to the Contractor pursuant to MCL 17.51-17.57 and State of Michigan Financial Management Guide, Part II-Accounting and

Rev. 4-16

Financial Reporting, Chapter 25, Section 100, "Prompt Payment for Goods and Services."

a.  MDHHS shall make the following payments to the Contractor:

| Rate Category | Placement | Finalization | Permanency |
|---|---|---|---|
| Early Adoption  Level 2 | $6,900 | $3,450 | $1,150 |
| Early Adoption  Level 1 | $6,000 | $3,000 | $1,000 |
| Baseline | $5,400 | $2,700 | $900 |
| Late Adoption  Level 1 | $4,800 | $2,400 | $800 |
| Late Adoption  Level 2 | $4,200 | $2,100 | $700 |
| Late Adoption  Level 3 | $3,000 | $1,500 | $500 |
| MARE | $12,240 | $6,120 | $2,040 |
| Residential | $7,980 | $3,990 | $1,330 |
| In-State Transfer Services | $3,000 | | |
| Inter-State Existing Services | $3,000 | | |
| Inter-State New Services | $3,500 | | |
| Inter-State     Transfer     from another ICPC  participating  state  through ICPC  (non-Michigan   ward)   – Adoptive Home Study Denial | $2000 | | |
| Inter-State     Transfer     from another ICPC  participating  state  through ICPC  (non-Michigan   ward)   – Adoptive Home Study Approval | $2000 | | |
| Inter-State     Transfer     from another ICPC  participating  state  through ICPC  (non-Michigan   ward)   – Adoption     Supervision     with applicable reports | $500 at Placement $500 at Finalization | | |

b.  Per Diem Payments

For each child where the adoption case is referred to the Contractor by MDHHS, the Contractor shall receive payment of $20.00 per diem for each day of adoptive services from acceptance of the case (DHS 3600 for cases referred on or after October 2016, or earlier if applicable) to the date of the signed documentation from the court (DHS 5308 or petition date stamped by the court) verifying that the court has accepted the petition and support documentation, or for one hundred fifty (150) days, whichever comes first. The maximum per diem payment amount per child is $3,000.

Rev. 4-16

For adoption cases referred on or after October 2016, the Contractor may bill for the full per diem amount of $3,000 and must include verification from MARE that either a complete photo listing or a complete hold registration was submitted to MARE on the case. In the event that the Contractor receives the full per diem amount on a case which is not assigned to the Contractor for 150 days, the Contractor will be responsible for repayment of the per diem at a rate of $20.00 for each day in which they received a per diem payment and were no longer assigned to the case.

Payment of the initial placement rate: the total of all per diem payments for each child shall be deducted from the applicable placement rate to be paid.

c. Adoption Training Payments

The Contractor must submit the following with the completed DHS-1582A to the Office of Child Welfare Policy and Programs in central office:

1) A copy of the transcript reflecting the completion of the CWTI pre-service training for each adoption worker.

2) A statement confirming that 50% of the adoption worker's caseload will be children in the MDHHS foster care system.

d. Placement Disruption

Payment after Placement for adoptions ending in disruption will only be made in the following cases:

1) Disruption Due to Medical Condition of Prospective Family Member: If the adoptive family experiences a documented chronic medical condition requiring long term care or a condition anticipated to result in the death of a family member after the adoptive placement of a child, the Contractor shall be eligible for a per-diem rate. The payment shall be a portion of the appropriate rate for finalization, which shall be established by dividing the duration (number of days) of the adoptive placement until disruption by 182 days. The disruption rate shall not exceed the rate that would have otherwise been paid had finalization occurred.

2) Death of an Adoptive Child: In cases where a child dies between order placing in the adoptive home and the final order of adoption, the Contractor shall be eligible for a per-diem from the date of placement to the date of death (unless cause of death is determined to be neglect or abuse) not to exceed the rate that would have otherwise been paid had finalization occurred.

3) Disruption after Order Placing Child in the adoptive home: When the

disruption order is issued more than 182 days from the date of the order placing the child in the adoptive home, the Contractor shall be paid the full finalization rate.

4) Disruption of Placement Determined by MCI Superintendent: In a case where the child is placed in a home based on the decision of the MCI Superintendent, against the recommendation of the Contractor, the Contractor shall be eligible for a per-diem rate. The payment shall be a portion of the appropriate rate for finalization, which shall be established by dividing the duration (number of days) of the adoptive placement until disruption by 182 days. The disruption rate shall not exceed the rate that would have otherwise been paid had finalization occurred. Payment for subsequent placements will not reflect a disruption.

e. Adoption Dissolution

MDHHS shall recover, from the Contractor, the Permanency Unit Rate for adoptions that end in dissolution within 182 days of issuance of an Order of Adoption.

f. Payment – Re-Placement of Child after Disruption by Same Contractor

Re-placement of child photo listed on MARE or from a Residential facility:

Subsequent adoptive placement and finalization by the same Contractor (that placed the child in the disrupted/dissolved home) for a child previously reimbursed at one of the MARE rates or the Residential rate, shall not exceed the Baseline rate for a second adoptive placement/finalization. The maximum rate for any re-placement of a child photo listed on MARE or from a Residential facility beyond the second placement shall not exceed the Late Adoption Penalty Level 3 rate if paid to the same Contractor.

Re-placement by the same Contractor of a child under any rate other than a MARE or Residential rate shall not exceed the Baseline rate.

Exceptions may be made to the re-placement rate. The Contractor must submit documentation of efforts that were required to prepare a child for subsequent placement and the recruitment of an adoptive family. Submit request for exceptions to the Adoption Analyst in MDHHS Central Office and stipulate the rate requested.

g. Unit Definitions

1) Unit Title: Per Diem Payments
For each child where the adoption case is referred to the Contractor by MDHHS , the Contractor shall receive payment of $20.00 per diem for

each day of adoptive services from acceptance of the case (signed DHS 3600 for cases referred on or after October 2016, or earlier if applicable) to date of the signed documentation from the court (DHS 5308 or petition date stamped from the court) verifying that the court has accepted the adoption petition and support documentation, or for one hundred fifty (150) days, whichever comes first. The maximum per diem payment amount per child is $3,000.

The total amount paid for the per diem rate will be deducted from the applicable placement rate when the child is placed for adoption.

The Contractor must submit the Individual Service Agreement (DHS-3600) (for Adoption Services) with the date of acceptance indicated and the completed Adoption Payment Voucher (DHS-1582A).

For adoption cases referred on or after October 2016, the Contractor may bill for the full per diem amount of $3,000 and must include verification from MARE that either a complete photo listing or a complete hold registration was submitted to MARE on the case. In the event that the Contractor receives the full per diem amount on a case which is not assigned to the Contractor for 150 days, the Contractor will be responsible for repayment of the per diem at a rate of $20.00 for each day in which they received a per diem payment and were no longer assigned to the case.

2) Unit Title: Placement
All unit definitions below are based on the length of time from the receipt of the written order from the court terminating all parental rights or, the date on which the DHS-3600 is fully executed, whichever is later; to the date of the signed documentation from the court (DHS 5308 or petition or petition date stamped from the court) verifying that the court has accepted the adoption petition and support documentation.

If the child's goal changes from adoption to another goal and then changes back to the goal of adoption, the Contractor must obtain a new DHS-3600 for adoption services for the updated goal of adoption.

The Contractor must submit the Order Terminating Parental Rights, signed and dated documentation from the court (DHS 5308 or petition date stamped from the court) verifying the date that the court has accepted the adoption petition and support documentation, the Adoption Petition documentation and the Acceptance of Case Transfer documents (DHS3600) if applicable.  The document indicating the date of acceptance must be signed by a MDHHS representative as verification. If there was a per diem payment for the case prior to

Rev. 4-16

placement the Contractor must note "per diem billed" in box 13 of the DHS-1582A.

3) Unit Title: Finalization
Unit Definition: One unit equals receipt of an Order of Adoption for a child for whom a Placement rate was paid.

4) Unit Title: Permanency
Unit Definition: One unit equals an adoption that does not end in dissolution within 182 days of the issuance of an Order of Adoption. The Permanency Unit Rate shall be paid at the same time as the Finalization Unit Rate. The Contractor will be responsible for repayment of the Permanency Unit Rate for those cases for which the adoption ended in dissolution.

5) Unit Title: Baseline
Unit Definition: The DHS 5308 or Adoption Petition documentation or Order Placing Child is signed and dated by the court more than two hundred ten (210) days, but two hundred forty (240) or fewer days after the date of placement as defined in Subsection 3.1. g. ii above.

6) Unit Title: Early Adoption - Level 1
Unit Definition: The DHS 5308 or Adoption Petition documentation or Order Placing Child is signed by the court more than one hundred fifty (150) but two hundred ten (210) or fewer days after the date of placement as defined in Subsection 3.1. g. ii above.

7) Unit Title: Early Adoption - Level 2
Unit Definition: The DHS 5308 or Adoption Petition documentation or Order Placing Child is signed and dated by the court one hundred fifty (150) or fewer days after the date of placement as defined in Subsection 3.1. g. ii above.

8) Unit Title: Late Adoption - Level 1
Unit Definition: The DHS 5308 or Adoption Petition documentation or Order Placing Child is signed and dated by the court more than two hundred forty (240) days, but three hundred (300) or fewer days after the date of placement as defined in Subsection 3.1. g. ii above.

9) Unit Title: Late Adoption - Level 2
Unit Definition: The DHS 5308 or Adoption Petition documentation or Order Placing Child is signed and dated by the court more than three hundred (300) days, but three hundred sixty (360) or fewer days after the date of placement as defined in Subsection 3.1. g. ii above.

10) Unit Title: Late Adoption - Level 3

Unit Definition: The Adoption Petition documentation or Order Placing Child is signed and dated by the court more than three hundred sixty (365) days after the date of placement as defined in Subsection 3.1. g. ii above.

11) Unit Title:  MARE
Unit Definition: The Order Placing Child is signed and dated by the court for a child who has been registered for photo listing on MARE.

The Contractor is not eligible for the MARE rate if the Contractor photo lists the child. The exception to allow for payment of the MARE rate to the supervising agency requires the Contractor to submit a written request verifying that the child was photo listed for six (6) months and documentation must be provided to demonstrate the family is a newly approved recruited family and the following conditions are true:

a.  The identified family is not a relative or foster parent to the adoptive child.
b,  The identified family has either not previously provided care for the child or has previously provided care and during the time that the child was photo listed had indicated in writing that they were not interested in adopting the child. The written document from the family must be submitted with the MARE payment request.

The Contractor is eligible for the MARE rate if the child's foster care case remains with M D H H S  and, at the time of referral, there was no identified adoptive resource. The Contractor must register the child for photo listing within 30 days of acceptance of the case if no adoptive resource has been identified. If the Contractor applies for the MARE rate there must be a written explanation of why the adoptive family was not identified as a potential adoptive resource within the first 30 days after acceptance of the case.

12) Unit Title:  Residential
Unit Definition: The Order Placing Child is signed and dated by the court for a child who has been placed in residential care (defined as staffed institutional care, not including foster group homes) and the child is under the Contractor's supervision for Adoption Services.

13) Unit Title:  MARE and Residential Rate with Pre-placement
Unit Definition: When a child photo-listed with MARE or in a Residential facility is placed into a prospective adoptive home through a foster care placement to allow for a period of adjustment and supervision (prior to petition to place for adoption), the reimbursement for the appropriate rate shall be calculated based on the date the pre-placement began.

The MARE, and Residential Rate will be applied when the court signs the Order Placing Child within two hundred seventy (270) days of placing the child in the home for foster care services.

14) Unit Title: In-State Transfer Services
Unit Definition: The Contractor completes satisfactory services requested for pre-placement activities for a child under the supervision of the Contractor and referred for adoptive placement to another contractor or MDHHS local office. The MDHHS monitor for the foster care case shall define satisfactory services.

15) Unit Title: Interstate Existing Services
Unit Definition: A child under the adoption services supervision of the Contractor is referred for adoptive placement through a private or public agency in the state where the adoptive family resides and the child has previously been placed with the family through Interstate foster/relative care prior to termination of parental rights and assignment of an adoption worker.

16) Unit Title: Interstate New Services
Unit Definition: A child under the adoption services supervision of the Contractor is referred for adoptive placement through a private or public agency in the state where the adoptive family resides and the child has not been placed with the family through Interstate foster/relative care prior to termination of parental rights and assignment of an adoption worker.

17) Unit Title: ICPC Referred from Other U.S. States
A child under the child welfare system of another ICPC participating state is referred to Michigan for adoption services through ICPC. DHS-3600 (for Adoption Services) is required from the local Michigan county.

18) Unit Title: Competing Parties
More than one party is interested in adopting a particular child or sibling group and is assessed by the contractor in one of the following formats: Preliminary Adoptive Family Assessment, BCAL 3130 Initial Foster Home/Adoption Evaluation, or DHS 612, Adoptive Family Assessment Addendum. The rate paid on a competing parties' case shall not fall below the "Baseline" rate category, unless an agency has failed to act according to the timeframes outlined in policy.

h.   Adoption Training Payments

A payment will be made to the Contractor for each staff that completes adoption training and passes competency tests as required:

1)   Completion of the Caseworker Training

Payment will be $6,000 for completion of a MDHHS Pre-Service Institute training that includes a total of nine weeks of competency-based classroom and field training within 16 weeks of hire.

2)   Completion of the Child Welfare Certificate (CWC) Training

Payment will be a maximum of $3,000, calculated on an actual cost reimbursement basis, for completion of the    Office of Workforce Development and Training (OWDT)-CWC training. This training includes a minimum of five weeks of competency-based classroom, and field training if the caseworker certificate holder passes the competency evaluation.

3)   Completion of the Child Welfare Supervisor Training.

Payment will be a maximum of $1500, calculated on an actual cost reimbursement basis for completion of the Supervisor Training. This includes a minimum of one week of training within 90 days of hire/promotion if the supervisor passes the competency-based evaluation including the written exam through OWDT.

All supervisors hired on or after January 1, 2017 must complete the Supervisor Training and pass the competency evaluation.

4)   Completion of the adoption Program Specific Transfer Training (PSTT) within 6 months of hire.

Payment will be a maximum of $2,800, calculated on an actual cost reimbursement basis for completion of the adoption PSTT training. This training is the same as the Adoption Core Training for adoption caseworkers. If a supervisor has completed this training as a caseworker since April 1, 2006, the training does not need to be repeated. If a supervisor has not completed this training since April 1, 2006, they need to complete this PSTT Training within 6 months of hire.

3.2.   <u>Performance Evaluation and Monitoring</u>

The services provided by the Contractor under this Agreement shall be evaluated and assessed at least annually by MDHHS on the basis of the criteria outlined in Section 2.11.

MDHHS shall perform contract monitoring through activities such as:

a. Auditing expenditure reports.

      b.  Conducting on-site monitoring.
      c.  Reviewing and analyzing reports.

4.    STANDARD TERMS

4.1   Duties of Contractor

Contractor must perform the services and provide the deliverables described in Section 2.10 – Services to be Provided (the "Agreement Activities").  An obligation to provide delivery of any commodity is considered a service and is an Agreement Activity.

Contractor must furnish all labor, equipment, materials, and supplies necessary for the performance of the Agreement Activities, and meet operational standards, unless otherwise specified in Section 2.10 – Services to be Provided.

Contractor must:

a. Perform the Agreement Activities in a timely, professional, safe, and workmanlike manner consistent with standards in the trade, profession, or industry;
b. Meet or exceed the performance and operational standards, and specifications of this Agreement;
c. Provide all Agreement Activities in good quality, with no material defects;
d. Not interfere with MDHHS's operations;
e. Obtain and maintain all necessary licenses, permits or other authorizations necessary for the performance of this Agreement;
f. Cooperate with MDHHS, including MDHHS's quality assurance personnel, and any third party to achieve the objectives of this Agreement;
g. Return to MDHHS any State-furnished equipment or other resources in the same condition as when provided when no longer required for this Agreement;
h. Not make any media releases without prior written authorization from MDHHS;
i. Assign to MDHHS any claims resulting from state or federal antitrust violations to the extent that those violations concern materials or services supplied by third parties toward fulfillment of this Agreement;
j. Comply with all State physical and IT security policies and standards which will be made available upon request; and
k. Provide MDHHS priority in performance of this Agreement except as mandated by federal disaster response requirements.

Any breach under this provision is considered a material breach.

Contractor must also be clearly identifiable while on State property by wearing identification issued by the State, and clearly identify themselves whenever making contact with the State.

4.2 Notices

All notices and other communications required or permitted under this Agreement must be in writing and will be considered given and received: (a) when verified by written receipt if sent by courier; (b) when actually received if sent by mail without verification of receipt; or (c) when verified by automated receipt or electronic logs if sent by facsimile or email.

4.3 Reserved

4.4 Reserved

4.5 Performance Guarantee

Contractor must at all times have financial resources sufficient, in the opinion of MDHHS, to ensure performance of this Agreement and must provide proof upon request. MDHHS may require a performance bond if, in the opinion of MDHHS, it will ensure performance of this Agreement.

4.6 Insurance Requirements

Contractor must maintain the insurances identified below and is responsible for all deductibles. All required insurance must:

a. Protect the State from claims that may arise out of, are alleged to arise out of, or result from Contractor's or a subcontractor's performance;
b. Be primary and non-contributing to any comparable liability insurance (including self-insurance) carried by the State; and
c. Be provided by a company with an A.M. Best rating of "A" or better and a financial size of VII or better.

| Insurance Type | Additional Requirements |
|---|---|
| **Commercial General Liability Insurance** | |
| Minimal Limits:<br>$1,000,000 Each Occurrence Limit<br>$1,000,000 Personal & Advertising Injury Limit<br>$2,000,000 General Aggregate Limit<br>$2,000,000 Products/Completed Operations | Contractor must have their policy endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds using endorsement CG 20 10 11 85, or |

| | |
|---|---|
| Deductible Maximum:<br>$50,000 Each Occurrence | both CG 2010 07 04 and CG 2037 07 04.<br><br>If the contractor will deal with children, schools, or the cognitively impaired, coverage must not have exclusions or limitations related to sexual abuse and molestation liability. |
| **Automobile Liability Insurance** | |
| Minimal Limits:<br>$1,000,000 Per Occurrence | Contractor must have their policy: (1) endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds; and (2) include Hired and Non-Owned Automobile coverage. |
| **Workers' Compensation Insurance** | |
| Minimal Limits:<br>Coverage according to applicable laws governing work activities. | Waiver of subrogation, except where waiver is prohibited by law. |
| **Employers Liability Insurance** | |
| Minimal Limits:<br>$500,000 Each Accident<br>$500,000 Each Employee by Disease<br>$500,000 Aggregate Disease. | |
| **Privacy and Security Liability (Cyber Liability) Liability Insurance** | |

| | |
|---|---|
| Minimal Limits:<br>$1,000,000 Each Occurrence<br>$1,000,000 Annual Aggregate | Contractor must have their policy: (1) endorsed to add "the State of Michigan, its departments, divisions, agencies, offices, commissions, officers, employees, and agents" as additional insureds; and (2) cover information security and privacy liability, privacy notification costs, regulatory defense and penalties, and website media content liability. |

If any of the required policies provide claims-made coverage, the Contractor must:

a. Provide coverage with a retroactive date before the effective date of the Agreement or the beginning of Agreement Activities;
b. Maintain coverage and provide evidence of coverage for at least three years after completion of the Agreement Activities; and
c. If coverage is canceled or not renewed, and not replaced with another claims-made policy form with a retroactive date prior to the Agreement effective date, Contractor must purchase extended reporting coverage for a minimum of three years after completion of work.

Contractor must:

a. Provide insurance certificates to the Contract Administrator, containing the agreement or purchase order number, at Agreement formation and within 20 calendar days of the expiration date of the applicable policies;
b. Require that subcontractors maintain the required insurances contained in this Section;
c. Notify the Contract Administrator within five business days if any insurance is cancelled; and
d. Waive all rights against the State for damages covered by insurance. Failure to maintain the required insurance does not limit this waiver.

Contractors who are self-insured must provide the following:

a. Proof of self-insurance from the Michigan Department of Insurance and Financial Services for auto liability.
b. Proof of self-insurance from the Michigan Department of Licensing and Regulatory Affairs for worker's compensation and employer's liability.
c. A copy of their most recent, independently audited financial statements.

This Section is not intended to and is not to be construed in any manner as waiving, restricting or limiting the liability of either party for any obligations under this Agreement (including any provisions hereof requiring Contractor to indemnify, defend and hold harmless the State).

4.7  Reserved

4.8  Extended Purchasing Program

Upon written agreement between MDHHS and the Contractor, this Agreement may be extended to: (a) MiDEAL members, (b) other states (including governmental subdivisions and authorized entities), or (c) State of Michigan employees. MiDEAL members include local units of government, school districts, universities, community colleges, and nonprofit hospitals. A current list of MiDEAL members is available at www.michigan.gov/mideal.

If extended, Contractor must supply all Agreement Activities at the established Agreement prices and terms, and MDHHS reserves the right to impose an administrative fee and negotiate additional discounts based on any increased volume generated by such extensions.

Contractor must submit invoices to, and receive payment from, extended purchasing program members on a direct and individual basis.

4.9  Independent Contractor

Contractor is an independent contractor and assumes all rights, obligations and liabilities set forth in this Agreement. Contractor, its employees, and agents will not be considered employees of MDHHS. No partnership or joint venture relationship is created by virtue of this Agreement. Contractor, and not MDHHS, is responsible for the payment of wages, benefits and taxes of Contractor's employees and any subcontractors. Prior performance does not modify Contractor's status as an independent contractor.

4.10 Subcontracting

Contractor may not delegate any of its obligations under this Agreement without the prior written approval of MDHHS. Contractor must notify MDHHS prior to the proposed delegation, and provide MDHHS any information it requests to determine whether the delegation is in its best interest.  If approved, Contractor must:

a. Be the sole point of contact regarding all contractual matters, including payment and charges for all Agreement Activities;
b. Make all payments to the subcontractor; and

c.Incorporate the terms and conditions contained in this Agreement in any subcontract with a subcontractor.

Contractor remains responsible for the completion of the Agreement Activities, compliance with the terms of this Agreement, and the acts and omissions of the subcontractor. MDHHS, in its sole discretion, may require the replacement of any subcontractor.

4.11 Staffing

MDHHS's Contract Administrator may require Contractor to remove or reassign personnel by providing a notice to Contractor.

4.12 Reserved

4.13 Assignment

Contractor may not assign this Agreement to any other party without the prior approval of MDHHS. Upon notice to Contractor, MDHHS, in its sole discretion, may assign in whole or in part, its rights or responsibilities under this Agreement to any other party. If MDHHS determines that a novation of this Agreement to a third party is necessary, Contractor will agree to the novation and provide all necessary documentation and signatures.

4.14 Change of Control

Contractor will notify, at least 90 calendar days before the effective date, MDHHS of a change in Contractor's organizational structure or ownership. For purposes of this Agreement, a change in control means any of the following:

a.A sale of more than 50% of Contractor's stock;
b.A sale of substantially all of Contractor's assets;
c.A change in a majority of Contractor's board members;
d.Consummation of a merger or consolidation of Contractor with any other entity;
e.A change in ownership through a transaction or series of transactions; or
f.The board (or the stockholders) approves a plan of complete liquidation.

A change of control does not include any consolidation or merger effected exclusively to change the domicile of Contractor, or any transaction or series of transactions principally for bona fide equity financing purposes.

In the event of a change of control, Contractor must require the successor to assume this Agreement and all of its obligations under this Agreement.

4.15 Reserved

4.16 Acceptance

Agreement Activities are subject to inspection and testing by MDHHS within 30 calendar days of MDHHS's receipt of them ("State Review Period"), unless otherwise provided in Section 2.10 – Services to be Provided. If the Agreement Activities are not fully accepted by MDHHS, MDHHS will notify Contractor by the end of the State Review Period that either: (a) the Agreement Activities are accepted, but noted deficiencies must be corrected; or (b) the Agreement Activities are rejected. If MDHHS finds material deficiencies, it may: (i) reject the Agreement Activities without performing any further inspections; (ii) demand performance at no additional cost; or (iii) terminate this Agreement in accordance with Section 4.23, Termination for Cause.

Within 10 business days from the date of Contractor's receipt of notification of acceptance with deficiencies or rejection of any Agreement Activities, Contractor must cure, at no additional cost, the deficiency and deliver unequivocally acceptable Agreement Activities to MDHHS. If acceptance with deficiencies or rejection of the Agreement Activities impacts the content or delivery of other non-completed Agreement Activities, the parties' respective Program Managers must determine an agreed to number of days for re-submission that minimizes the overall impact to this Agreement. However, nothing herein affects, alters, or relieves Contractor of its obligations to correct deficiencies in accordance with the time response standards set forth in this Agreement.

If Contractor is unable or refuses to correct the deficiency within the time response standards set forth in this Agreement, MDHHS may cancel the order in whole or in part. MDHHS, or a third party identified by MDHHS, may perform the Agreement Activities and recover the difference between the cost to cure and the Agreement price plus an additional 10% administrative fee.

4.17 Reserved

4.18 Reserved

4.19 Reserved

4.20 Terms of Payment

Invoices must conform to the requirements communicated from time-to-time by MDHHS. All undisputed amounts are payable within 45 days of MDHHS's receipt. Contractor may only charge for Agreement Activities performed as

specified in Section 2.10 – Services to be Provided.  Invoices must include an itemized statement of all charges.  MDHHS is exempt from State sales tax for direct purchases and may be exempt from federal excise tax, if Services purchased under this Agreement are for MDHHS's exclusive use. Notwithstanding the foregoing, all prices are inclusive of taxes, and Contractor is responsible for all sales, use and excise taxes, and any other similar taxes, duties and charges of any kind imposed by any federal, state, or local governmental entity on any amounts payable by MDHHS under this Agreement.

MDHHS has the right to withhold payment of any disputed amounts until the parties agree as to the validity of the disputed amount.  MDHHS will notify Contractor of any dispute within a reasonable time.  Payment by MDHHS will not constitute a waiver of any rights as to Contractor's continuing obligations, including claims for deficiencies or substandard Agreement Activities. Contractor's acceptance of final payment by MDHHS constitutes a waiver of all claims by Contractor against MDHHS for payment under this Agreement, other than those claims previously filed in writing on a timely basis and still disputed.

MDHHS will only disburse payments under this Agreement through Electronic Funds Transfer (EFT).  Contractor must register with the State at http://www.michigan.gov/cpexpress to receive electronic fund transfer payments.  If Contractor does not register, MDHHS is not liable for failure to provide payment.

Without prejudice to any other right or remedy it may have, MDHHS reserves the right to set off at any time any amount then due and owing to it by Contractor against any amount payable by MDHHS to Contractor under this Agreement.

4.21  Reserved

4.22  Stop Work Order

MDHHS may suspend any or all activities under this Agreement at any time. MDHHS will provide Contractor a written stop work order detailing the suspension.  Contractor must comply with the stop work order upon receipt. Within 90 calendar days, or any longer period agreed to by Contractor, MDHHS will either: (a) issue a notice authorizing Contractor to resume work, or (b) terminate this Agreement or purchase order.  MDHHS will not pay for Agreement Activities, Contractor's lost profits, or any additional compensation during a stop work period.

4.23  Termination for Cause

MDHHS may terminate this Agreement for cause, in whole or in part, if Contractor, as determined by MDHHS:

a. Endangers the value, integrity, or security of any location, data, or personnel;
b. Becomes insolvent, petitions for bankruptcy court proceedings, or has an involuntary bankruptcy proceeding filed against it by any creditor;
c. Engages in any conduct that may expose MDHHS to liability;
d. Breaches any of its material duties or obligations; or
e. Fails to cure a breach within the time stated in a notice of breach.

Any reference to specific breaches being material breaches within this Agreement will not be construed to mean that other breaches are not material.

If MDHHS terminates this Agreement under this Section, MDHHS will issue a termination notice specifying whether Contractor must: (a) cease performance immediately, or (b) continue to perform for a specified period. If it is later determined that Contractor was not in breach of this Agreement, the termination will be deemed to have been a Termination for Convenience, effective as of the same date, and the rights and obligations of the parties will be limited to those provided in Section 4.24, Termination for Convenience.

MDHHS will only pay for amounts due to Contractor for Agreement Activities accepted by MDHHS on or before the date of termination, subject to MDHHS's right to set off any amounts owed by the Contractor for MDHHS's reasonable costs in terminating this Agreement. The Contractor must pay all reasonable costs incurred by MDHHS in terminating this Agreement for cause, including administrative costs, attorneys' fees, court costs, transition costs, and any costs MDHHS incurs to procure the Agreement Activities from other sources.

### 4.24  Termination for Convenience

MDHHS may immediately terminate this Agreement in whole or in part without penalty and for any reason, including but not limited to, appropriation or budget shortfalls. The termination notice will specify whether Contractor must: (a) cease performance of the Agreement Activities immediately, or (b) continue to perform the Agreement Activities in accordance with Section 4.25, Transition Responsibilities. If MDHHS terminates this Agreement for convenience, MDHHS will pay all reasonable costs, as determined by MDHHS, for MDHHS approved Transition Responsibilities.

The Contractor may terminate this Agreement upon 30 days written notice to MDHHS at any time prior to the completion of the Agreement period.

4.25  Transition Responsibilities

Upon termination or expiration of this Agreement for any reason, Contractor must, for a period of time specified by MDHHS (not to exceed 90 calendar days), provide all reasonable transition assistance requested by MDHHS, to allow for the expired or terminated portion of the Agreement Activities to continue without interruption or adverse effect, and to facilitate the orderly transfer of such Agreement Activities to MDHHS or its designees.   Such transition assistance may include, but is not limited to:

a. Continuing to perform the Agreement Activities at the established Agreement rates;
b. Taking all reasonable and necessary measures to transition performance of the work, including all applicable Agreement Activities, training, equipment, software, leases, reports and other documentation, to MDHHS or MDHHS's designee;
c. Taking all necessary and appropriate steps, or such other action as MDHHS may direct, to preserve, maintain, protect, or return to MDHHS all materials, data, property, and confidential information provided directly or indirectly to Contractor by any entity, agent, vendor, or employee of MDHHS;
d. Transferring title in and delivering to MDHHS, at MDHHS's discretion, all completed or partially completed deliverables prepared under this Agreement as of the Agreement termination date; and
e. Preparing an accurate accounting from which MDHHS and Contractor may reconcile all outstanding accounts (collectively, "Transition Responsibilities").

This Agreement will automatically be extended through the end of the transition period.

4.26  General Indemnification

Contractor must defend, indemnify and hold the State, its departments, divisions, agencies, offices, commissions, officers, and employees harmless, without limitation, from and against any and all actions, claims, losses, liabilities, damages, costs, attorney fees, and expenses (including those required to establish the right to indemnification), arising out of or relating to:

a. Any breach by Contractor (or any of Contractor's employees, agents, subcontractors, or by anyone else for whose acts any of them may be liable) of any of the promises, agreements, representations, warranties, or insurance requirements contained in this Agreement;
b. Any infringement, misappropriation, or other violation of any intellectual property right or other right of any third party;

Rev. 4-16

c. Any bodily injury, death, or damage to real or tangible personal property occurring wholly or in part due to action or inaction by Contractor (or any of Contractor's employees, agents, subcontractors, or by anyone else for whose acts any of them may be liable); and

d. Any acts or omissions of Contractor (or any of Contractor's employees, agents, subcontractors, or by anyone else for whose acts any of them may be liable).

MDHHS will notify Contractor in writing if indemnification is sought; however, failure to do so will not relieve Contractor, except to the extent that Contractor is materially prejudiced. Contractor must, to the satisfaction of MDHHS, demonstrate its financial ability to carry out these obligations.

MDHHS is entitled to: (i) regular updates on proceeding status; (ii) participate in the defense of the proceeding; (iii) employ its own counsel; and to (iv) retain control of the defense if MDHHS deems necessary. Contractor will not, without MDHHS's written consent (not to be unreasonably withheld), settle, compromise, or consent to the entry of any judgment in or otherwise seek to terminate any claim, action, or proceeding. To the extent that any State employee, official, or law may be involved or challenged, MDHHS may, at its own expense, control the defense of that portion of the claim.

Any litigation activity on behalf of the State, or any of its subdivisions under this Section, must be coordinated with the Department of Attorney General. An attorney designated to represent MDHHS may not do so until approved by the Michigan Attorney General and appointed as a Special Assistant Attorney General.

4.27 Infringement Remedies

If, in either party's opinion, any piece of equipment, software, commodity, or service supplied by Contractor or its subcontractors, or its operation, use or reproduction, is likely to become the subject of a copyright, patent, trademark, or trade secret infringement claim, Contractor must, at its expense:

a. Procure for MDHHS the right to continue using the equipment, software, commodity, or service, or if this option is not reasonably available to Contractor,

b. Replace or modify the same so that it becomes non-infringing; or

c. Accept its return by MDHHS with appropriate credits to MDHHS against Contractor's charges and reimburse MDHHS for any losses or costs incurred as a consequence of MDHHS ceasing its use and returning it.

4.28 Limitation of Liability

MDHHS is not liable for consequential, incidental, indirect, or special damages, regardless of the nature of the action.

4.29  Disclosure of Litigation, or Other Proceeding

Contractor must notify MDHHS within 14 calendar days of receiving notice of any litigation, investigation, arbitration, or other proceeding (collectively, "Proceeding") involving Contractor, a subcontractor, or an officer or director of Contractor or subcontractor, that arises during the term of this Agreement, including:

a. A criminal Proceeding;
b. A parole or probation Proceeding;
c. A Proceeding under the Sarbanes-Oxley Act;
d. A civil Proceeding involving:
    1) A claim that might reasonably be expected to adversely affect Contractor's viability or financial stability; or
    2) A governmental or public entity's claim or written allegation of fraud; or
e. A Proceeding involving any license that Contractor is required to possess in order to perform under this Agreement.

4.30  Reserved

4.31  State Data

a. Ownership.   MDHHS's data ("**State Data**," which will be treated by Contractor as Confidential Information) includes:

    1) MDHHS's data collected, used, processed, stored, or generated as the result of the Agreement Activities;
    2) Personally identifiable information ("PII") collected, used, processed, stored, or generated as the result of the Agreement Activities, including, without limitation, any information that identifies an individual, such as an individual's social security number or other government-issued identification number, date of birth, address, telephone number, biometric data, mother's maiden name, email address, credit card information, or an individual's name in combination with any other of the elements here listed; and,
    3) Personal health information ("PHI") collected, used, processed, stored, or generated as the result of the Agreement Activities, which is defined under the Health Insurance Portability and Accountability Act (HIPAA) and its related rules and regulations.  State Data is and will remain the sole and exclusive property of MDHHS and all right, title, and interest in the same is reserved by MDHHS.

This Section survives the termination of this Agreement.

b.Contractor Use of State Data.  Contractor is provided a limited license to State Data for the sole and exclusive purpose of providing the Agreement Activities, including a license to collect, process, store, generate, and display State Data only to the extent necessary in the provision of the Agreement Activities.  Contractor must:

1)Keep and maintain State Data in strict confidence, using such degree of care as is appropriate and consistent with its obligations as further described in this Agreement and applicable law to avoid unauthorized access, use, disclosure, or loss;

2)Use and disclose State Data solely and exclusively for the purpose of providing the Agreement Activities, such use and disclosure being in accordance with this Agreement, any applicable Statement of Work, and applicable law; and

3)Not use, sell, rent, transfer, distribute, or otherwise disclose or make available State Data for Contractor's own purposes or for the benefit of anyone other than MDHHS without MDHHS's prior written consent.

This Section survives the termination of this Agreement.

c.Extraction of State Data.  Contractor must, within five business days of MDHHS's request, provide MDHHS, without charge and without any conditions or contingencies whatsoever (including but not limited to the payment of any fees due to Contractor), an extract of the State Data in the format specified by MDHHS.

d.Backup and Recovery of State Data.  Unless otherwise specified in Section 2.5 – Services to be Delivered, Contractor is responsible for maintaining a backup of State Data and for an orderly and timely recovery of such data. Unless otherwise described in Section 2.10 – Services to be Provided, Contractor must maintain a contemporaneous backup of State Data that can be recovered within two hours at any point in time.

e.Loss of Data.  In the event of any act, error or omission, negligence, misconduct, or breach that compromises or is suspected to compromise the security, confidentiality, or integrity of State Data or the physical, technical, administrative, or organizational safeguards put in place by Contractor that relate to the protection of the security, confidentiality, or integrity of State Data, Contractor must, as applicable:

1)Notify MDHHS as soon as practicable but no later than 24 hours of becoming aware of such occurrence;

2)Cooperate with MDHHS in investigating the occurrence, including making available all relevant records, logs, files, data reporting, and other materials required to comply with applicable law or as otherwise required by MDHHS;

3)In the case of PII or PHI, at MDHHS's sole election, (i) notify the affected individuals who comprise the PII or PHI as soon as practicable but no later than is required to comply with applicable law, or, in the absence of any legally required notification period, within five calendar days of the occurrence; or (ii) reimburse MDHHS for any costs in notifying the affected individuals;

4)In the case of PII, provide third-party credit and identity monitoring services to each of the affected individuals who comprise the PII for the period required to comply with applicable law, or, in the absence of any legally required monitoring services, for no less than 24 months following the date of notification to such individuals.

5)Perform or take any other actions required to comply with applicable law as a result of the occurrence;

6)Without limiting Contractor's obligations of indemnification as further described in this Agreement, indemnify, defend, and hold harmless MDHHS for any and all claims, including reasonable attorneys' fees, costs, and expenses incidental thereto, which may be suffered by, accrued against, charged to, or recoverable from MDHHS in connection with the occurrence;

7)Be responsible for recreating lost State Data in the manner and on the schedule set by MDHHS without charge to MDHHS; and,

8)Provide to MDHHS a detailed plan within 10 calendar days of the occurrence describing the measures Contractor will undertake to prevent a future occurrence.

Notification to affected individuals, as described above, must comply with applicable law, be written in plain language, and contain, at a minimum: name and contact information of Contractor's representative; a description of the nature of the loss; a list of the types of data involved; the known or approximate date of the loss; how such loss may affect the affected individual; what steps Contractor has taken to protect the affected individual; what steps the affected individual can take to protect himself or herself; contact information for major credit card reporting agencies; and, information regarding the credit and identity monitoring services to be provided by Contractor.

This Section survives the termination of this Agreement.

4.32  Non-Disclosure of Confidential Information

The parties acknowledge that each party may be exposed to or acquire communication or data of the other party that is confidential, privileged communication not intended to be disclosed to third parties. The provisions of this Section survive the termination of this Agreement.

a. Meaning of Confidential Information. For the purposes of this Agreement, the term "**Confidential Information**" means all information and documentation of a party that:

1) Has been marked "confidential" or with words of similar meaning, at the time of disclosure by such party;
2) If disclosed orally or not marked "confidential" or with words of similar meaning, was subsequently summarized in writing by the disclosing party and marked "confidential" or with words of similar meaning; and,
3) Should reasonably be recognized as confidential information of the disclosing party.

The term "Confidential Information" does not include any information or documentation that was:

1) Subject to disclosure under the Michigan Freedom of Information Act (FOIA);
2) Already in the possession of the receiving party without an obligation of confidentiality;
3) Developed independently by the receiving party, as demonstrated by the receiving party, without violating the disclosing party's proprietary rights;
4) Obtained from a source other than the disclosing party without an obligation of confidentiality; or,
5) Publicly available when received, or thereafter became publicly available (other than through any unauthorized disclosure by, through, or on behalf of, the receiving party).

For purposes of this Agreement, in all cases and for all matters, State Data is deemed to be Confidential Information.

b. Obligation of Confidentiality. The parties agree to hold all Confidential Information in strict confidence and not to copy, reproduce, sell, transfer, or otherwise dispose of, give or disclose such Confidential Information to third parties other than employees, agents, or subcontractors of a party who have a need to know in connection with this Agreement or to use such Confidential Information for any purposes whatsoever other than the performance of this Agreement. The parties agree to advise and require their respective employees, agents, and subcontractors of their obligations to keep all Confidential Information confidential. Disclosure to a subcontractor is permissible where:

1) Use of a subcontractor is authorized under this Agreement;
2) The disclosure is necessary or otherwise naturally occurs in connection with work that is within the subcontractor's responsibilities; and
3) Contractor obligates the subcontractor in a written contract to maintain MDHHS's Confidential Information in confidence.

Rev. 4-16

At MDHHS's request, any employee of Contractor or any subcontractor may be required to execute a separate agreement to be bound by the provisions of this Section.

c. Cooperation to Prevent Disclosure of Confidential Information. Each party must use its best efforts to assist the other party in identifying and preventing any unauthorized use or disclosure of any Confidential Information. Without limiting the foregoing, each party must advise the other party immediately in the event either party learns or has reason to believe that any person who has had access to Confidential Information has violated or intends to violate the terms of this Agreement and each party will cooperate with the other party in seeking injunctive or other equitable relief against any such person.

d. Remedies for Breach of Obligation of Confidentiality. Each party acknowledges that breach of its obligation of confidentiality may give rise to irreparable injury to the other party, which damage may be inadequately compensable in the form of monetary damages. Accordingly, a party may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies which may be available, to include, in the case of MDHHS, at the sole election of MDHHS, the immediate termination, without liability to MDHHS, of this Agreement or any Statement of Work corresponding to the breach or threatened breach.

e. Surrender of Confidential Information upon Termination. Upon termination of this Agreement or a Statement of Work, in whole or in part, each party must, within five calendar days from the date of termination, return to the other party any and all Confidential Information received from the other party, or created or received by a party on behalf of the other party, which are in such party's possession, custody, or control; provided, however, that Contractor must return State Data to MDHHS following the timeframe and procedure described further in this Agreement. Should Contractor or MDHHS determine that the return of any Confidential Information is not feasible, such party must destroy the Confidential Information and must certify the same in writing within five calendar days from the date of termination to the other party. However, MDHHS's legal ability to destroy Contractor data may be restricted by its retention and disposal schedule, in which case Contractor's Confidential Information will be destroyed after the retention period expires.

4.33 Data Privacy and Information Security

a. Undertaking by Contractor. Without limiting Contractor's obligation of confidentiality as further described, Contractor is responsible for

establishing and maintaining a data privacy and information security program, including physical, technical, administrative, and organizational safeguards, that is designed to:

1) Ensure the security and confidentiality of the State Data;
2) Protect against any anticipated threats or hazards to the security or integrity of the State Data;
3) Protect against unauthorized disclosure, access to, or use of the State Data;
4) Ensure the proper disposal of State Data; and
5) Ensure that all employees, agents, and subcontractors of Contractor, if any, comply with all of the foregoing. In no case will the safeguards of Contractor's data privacy and information security program be less stringent than the safeguards used by MDHHS, and Contractor must at all times comply with all applicable State IT policies and standards, which are available to Contractor upon request.

b. Audit by Contractor.  No less than annually, Contractor must conduct a comprehensive independent third-party audit of its data privacy and information security program and provide such audit findings to MDHHS.

c. Right of Audit by the State.  Without limiting any other audit rights of MDHHS, MDHHS has the right to review Contractor's data privacy and information security program prior to the commencement of Agreement Activities and from time to time during the term of this Agreement.  During the providing of the Agreement Activities, on an ongoing basis from time to time and without notice, MDHHS, at its own expense, is entitled to perform, or to have performed, an on-site audit of Contractor's data privacy and information security program.  In lieu of an on-site audit, upon request by MDHHS, Contractor agrees to complete, within 45 calendar days of receipt, an audit questionnaire provided by MDHHS regarding Contractor's data privacy and information security program.

d. Audit Findings.  Contractor must implement any required safeguards as identified by MDHHS or by any audit of Contractor's data privacy and information security program.

e. State's Right to Termination for Deficiencies.  MDHHS reserves the right, at its sole election, to immediately terminate this Agreement or a Statement of Work without limitation and without liability if MDHHS determines that Contractor fails or has failed to meet its obligations under this Section.

4.34  Reserved

4.35  Reserved

4.36  Records Maintenance, Inspection, Examination, and Audit

MDHHS or its designee may audit Contractor to verify compliance with this Agreement. Contractor must retain, and provide to MDHHS or its designee and the auditor general upon request, all financial and accounting records related to this Agreement through the term of this Agreement and for four years after the latter of termination, expiration, or final payment under this Agreement or any extension ("**Audit Period**"). If an audit, litigation, or other action involving the records is initiated before the end of the Audit Period, Contractor must retain the records until all issues are resolved.

Within 10 calendar days of providing notice, MDHHS and its authorized representatives or designees have the right to enter and inspect Contractor's premises or any other places where Agreement Activities are being performed, and examine, copy, and audit all records related to this Agreement. Contractor must cooperate and provide reasonable assistance. If any financial errors are revealed, the amount in error must be reflected as a credit or debit on subsequent invoices until the amount is paid or refunded. Any remaining balance at the end of this Agreement must be paid or refunded within 45 calendar days.

This Section applies to Contractor, any parent, affiliate, or subsidiary organization of Contractor, and any subcontractor that performs Agreement Activities in connection with this Agreement.

4.37  Warranties and Representations

Contractor represents and warrants:

a. Contractor is the owner or licensee of any Agreement Activities that it licenses, sells, or develops and Contractor has the rights necessary to convey title, ownership rights, or licensed use;
b. All Agreement Activities are delivered free from any security interest, lien, or encumbrance and will continue in that respect;
c. The Agreement Activities will not infringe the patent, trademark, copyright, trade secret, or other proprietary rights of any third party;
d. Contractor must assign or otherwise transfer to MDHHS or its designee any manufacturer's warranty for the Agreement Activities;
e. The Agreement Activities are merchantable and fit for the specific purposes identified in this Agreement;
f. The Agreement signatory has the authority to enter into this Agreement;
g. All information furnished by Contractor in connection with this Agreement fairly and accurately represents Contractor's business, properties, finances, and operations as of the dates covered by the information, and Contractor will inform MDHHS of any material adverse changes; and

h.All information furnished and representations made in connection with the award of this Agreement is true, accurate, and complete, and contains no false statements or omits any fact that would make the information misleading.

A breach of this Section is considered a material breach of this Agreement, which entitles MDHHS to terminate this Agreement under Section 4.23, Termination for Cause.

### 4.38 Conflicts and Ethics

Contractor will uphold high ethical standards and is prohibited from:

a.Holding or acquiring an interest that would conflict with this Agreement;
b.Doing anything that creates an appearance of impropriety with respect to the award or performance of this Agreement;
c.Attempting to influence or appearing to influence any State employee by the direct or indirect offer of anything of value; or
d.Paying or agreeing to pay any person, other than employees and consultants working for Contractor, any consideration contingent upon the award of this Agreement.

Contractor must immediately notify MDHHS of any violation or potential violation of these standards.  This Section applies to Contractor, any parent, affiliate, or subsidiary organization of Contractor, and any subcontractor that performs Agreement Activities in connection with this Agreement.

### 4.39 Compliance with Laws

Contractor must comply with all federal, state and local laws, rules and regulations.

### 4.40 Reserved

### 4.41 Reserved

### 4.42 Nondiscrimination

Under the Elliott-Larsen Civil Rights Act, 1976 PA 453, MCL 37.2101, et seq., and the Persons with Disabilities Civil Rights Act, 1976 PA 220, MCL 37.1101, et seq., Contractor and its subcontractors agree not to discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, marital status, or mental or physical disability. Breach of this covenant is a material breach of this Agreement.

4.43  Unfair Labor Practice

Under MCL 423.324, MDHHS may void any Agreement with a Contractor or subcontractor who appears on the Unfair Labor Practice register complied under MCL 423.322.

4.44  Governing Law

This Agreement is governed, construed, and enforced in accordance with Michigan law, excluding choice-of-law principles, and all claims relating to or arising out of this Agreement are governed by Michigan law, excluding choice-of-law principles.  Any dispute arising from this Agreement must be resolved in Michigan Court of Claims.  Contractor consents to venue in Ingham County, and waives any objections, such as lack of personal jurisdiction or forum non conveniens.  Contractor must appoint agents in Michigan to receive service of process.

4.45  Non-Exclusivity

Nothing contained in this Agreement is intended nor will be construed as creating any requirements contract with Contractor.  This Agreement does not restrict the State or its agencies from acquiring similar, equal, or like Agreement Activities from other sources.

4.46  Force Majeure

Neither party will be in breach of this Agreement because of any failure arising from any disaster or acts of god that are beyond their control and without their fault or negligence.   Each party will use commercially reasonable efforts to resume performance. Contractor will not be relieved of a breach or delay caused by its subcontractors.  If immediate performance is necessary to ensure public health and safety, MDHHS may immediately contract with a third party.

4.47  Dispute Resolution

The parties will endeavor to resolve any Agreement dispute in accordance with this provision.  The parties must submit the dispute to a senior executive if unable to resolve the dispute within 15 business days.  The parties will continue performing while a dispute is being resolved, unless the dispute precludes performance.   A dispute involving payment does not preclude performance.

Litigation to resolve the dispute will not be instituted until after the dispute has been elevated to the parties' senior executive and either concludes that

resolution is unlikely, or fails to respond within 15 business days. The parties are not prohibited from instituting formal proceedings: (a) to avoid the expiration of statute of limitations period; (b) to preserve a superior position with respect to creditors; or (c) where a party makes a determination that a temporary restraining order or other injunctive relief is the only adequate remedy. This Section does not limit MDHHS's right to terminate this Agreement.

4.48  Media Releases

News releases (including promotional literature and commercial advertisements) pertaining to the Agreement or project to which it relates must not be made without prior written MDHHS approval, and then only in accordance with the explicit written instructions of MDHHS.

4.49  Website Incorporation

MDHHS is not bound by any content on Contractor's website unless expressly incorporated directly into this Agreement.

4.50  Entire Agreement

This Agreement is the entire agreement of the parties related to the Agreement Activities. This Agreement supersedes and replaces all previous understandings and agreements between the parties for the Agreement Activities.

4.51  Severability

If any part of this Agreement is held invalid or unenforceable, by any court of competent jurisdiction, that part will be deemed deleted from this Agreement and the severed part will be replaced by agreed upon language that achieves the same or similar objectives. The remaining Agreement will continue in full force and effect.

4.52  Waiver

Failure to enforce any provision of this Agreement will not constitute a waiver.

4.53  Survival

The provisions of this Agreement that impose continuing obligations, including warranties and representations, termination, transition, insurance coverage, indemnification, and confidentiality, will survive the expiration or termination of this Agreement.

4.54  Agreement Modification

This Agreement may not be amended except by signed agreement between the parties.   Notwithstanding the foregoing, no subsequent Statement of Work or amendment executed after the effective date will be construed to amend this Agreement unless it specifically states its intent to do so and cites the section or sections amended.

The Contractor shall, upon request of MDHHS and receipt of a proposed amendment, amend this Agreement, if and when required in the opinion of MDHHS, due to the revision of federal or state laws or regulations.

4.55  Options to Renew

At the discretion of MDHHS, this Agreement may be renewed in writing by an amendment not less than 30 days before its expiration. This Agreement may be renewed for up to two additional one-year periods.

4.56  Certification Regarding Debarment, Suspension, and Other Responsibility Matters

Assurance is hereby given to MDHHS that the Contractor will comply with Federal Regulation, 2 CFR part 180 and certifies to the best of its knowledge and belief that it, its employees and its subcontractors:

a. Are not presently debarred, suspended, proposed for debarment, declared ineligible, sentenced to a denial of federal benefits by a state or federal court, or voluntarily excluded from covered transactions by any federal or state department or agency;

b. Have not within a three-year period preceding this Agreement been convicted of or had civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property;

c. Are not presently indicted for or otherwise criminally or civilly charged by a governmental entity (federal, state, or local) with commission of any of the offenses enumerated in section 2, and;

d. Have not within a three-year period preceding this Agreement had one or more public transactions (federal, state or local) terminated for cause or default.

Where the parties are unable to certify to any of the statements in this certification, the Contractor shall attach an explanation to this Agreement.

Rev. 4-16

The Contractor certifies to the best of its knowledge that within the past three years, the Contractor has not;

a. Failed to substantially perform a state contract, agreement, or subcontract according to its terms, conditions, and specifications within specified time limits.
b. Refused to provide information or documents required by a contract or agreement including, but not limited to information or documents necessary for monitoring contract performance.
c. Failed to respond to requests for information regarding contract or agreement compliance, or accumulated repeated substantiated complaints regarding performance of a contract or agreement.
d. Failed to perform a state contract, agreement, or subcontract in a manner consistent with any applicable state or federal law, rule, regulation, order, or decree.

The Contractor shall include Section 4.56 (Certification Regarding Debarment, Suspension, and Other Responsibility Matters) language as written above in all subcontracts with other parties.

The Contractor shall require each primary subcontractor, whose subcontract will exceed $25,000, to disclose to the Contractor, in writing, whether at the time of the award of the subcontract, the subcontractor, or its principals, is or is not debarred, suspended, or proposed for debarment by the state of Michigan. The Contractor shall then inform MDHHS of the subcontractor's status and reasons for the Contractor's decision to use such subcontractor, if the Contractor so decides.

If it is determined that the Contractor knowingly rendered an erroneous certification under this provision, in addition to the other remedies available to the state, MDHHS may immediately terminate this Agreement.

If the state finds that grounds to debar exist, it shall send notice to the Contractor of proposed debarment indicating the grounds for proposed debarment and the procedures for requesting a hearing. If the Contractor does not respond with a written request for a hearing within 20 calendar days, the state shall issue the decision to debar without a hearing. The debarment period may be of any length up to eight years. After the debarment period expires, the Contractor may reapply for inclusion on bidder lists through the regular application process by authority of Executive Order 2003-1.

Rev. 4-16

# EXHIBIT  8

## SETTLEMENT AGREEMENT

*Dumont et al. v. Gordon et al.*
USDC EDMI Case No. 2:17-cv-13080-PDB-EAS

This Settlement Agreement (the "Agreement") between Kristy Dumont, Dana Dumont, Erin Busk-Sutton and Rebecca Busk-Sutton (collectively, the "Plaintiffs"), and Robert Gordon, in his official capacity as the Director of the Michigan Department of Health and Human Services ("MDHHS"), and Jennifer Wrayno, in her official capacity as the Acting Executive Director of the Michigan Children's Services Agency ("MCSA") (Gordon, Wrayno, MDHHS and MCSA collectively referred to herein as the "Department"), resolves Plaintiffs' claims against the Department in the case captioned *Dumont et al. v. Gordon et al.*, Case No. 2:17-cv-13080-PDB-EAS, pending in the United States District Court for the Eastern District of Michigan (the "Litigation"), as stated herein. Throughout this Agreement, Plaintiffs and the Department may be referred to as a "Party" or collectively referred to as "Parties."

WHEREAS, the Department contracts with licensed child placing agencies ("CPAs") to provide adoption-related services for permanent wards placed with the Department for care, supervision, and adoption ("Adoption Services Contracts").

WHEREAS, the Department contracts with licensed CPAs to provide foster care case management related services for children placed with the Department for care, supervision, and foster care placement ("PAFC Services Contracts"). Throughout this Agreement, the Adoption Services Contracts and the PAFC Services Contracts are collectively referred to as "Contracts."

WHEREAS, the Department may contract with one or more licensed CPAs ("Contractors") to subcontract with other licensed CPAs to provide adoption related services, in substantial compliance with the terms of the Adoption Services Contract, for permanent wards placed with the Department for care, supervision, and adoption ("Adoption Services Subcontracts").

WHEREAS, the Department may contract with one or more Contractors to subcontract with other licensed CPAs to provide foster care case management related services, in substantial compliance with the terms of the PAFC Services Contracts, for children placed with the Department for care, supervision, and foster care placement ("PAFC Services Subcontracts"). Throughout this Agreement, Adoption Services Subcontracts and PAFC Services Subcontracts are collectively referred to as "Subcontracts."

WHEREAS, the Contracts and the Subcontracts include a non-discrimination provision mandating that contracted CPAs comply with the Department's non-discrimination statement prohibiting discrimination "against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs, or disability" in the provision of services under contract with the Department (the "Non-Discrimination Provision").

WHEREAS, on September 20, 2017, Plaintiffs filed a complaint asserting claims against the Department in the Litigation. Thereafter, St. Vincent Catholic Charities, Melissa Buck, Chad Buck, and Shamber Flore intervened as defendants (collectively, "Intervening Defendants") in the Litigation. Plaintiffs have asserted no claims, and have no current intention to assert any claims,

against Intervening Defendants in the Litigation. Likewise, the named Defendants have asserted no claims, and have no current intention to assert any claims, against Intervening Defendants in the Litigation. Intervening Defendants have not asserted any claims, counter-claims or cross-claims against Plaintiffs, Defendants, or any third party in the Litigation.

WHEREAS, Plaintiffs and the Department wish to resolve the Litigation; the Parties agree that they are entering into this Agreement for that purpose only and it is not to be construed as an admission of any liability or wrongdoing.

THEREFORE, in addition to the foregoing, and in the interest of resolving the Litigation, the Parties agree as follows:

Section 1.     Unless prohibited by law or court order:

    a. The Department shall continue including in Contracts, and shall continue requiring all Contractors to include in Subcontracts, the Non-Discrimination Provision, or a materially and substantially similar provision ("Similar Provision").

    b. For the avoidance of doubt, policies and practices prohibited under the Non-Discrimination Provision include, without limitation,

        i. turning away or referring to another contracted CPA an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract;

        ii. refusing to provide orientation or training to an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract;

        iii. refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a Contract or a Subcontract; and

        iv. refusing to place a child accepted by the CPA for services under a Contract or a Subcontract with an otherwise qualified LGBTQ individual or same-sex couple suitable as a foster or adoptive family for the child;

in each case, without regard to whether such individual or couple has identified any particular child for foster placement or adoption.

    c. The Department shall enforce the Non-Discrimination Provision or Similar Provision against a CPA that the Department determines is in violation of, or is unwilling to comply with, such provisions (collectively, a "Contract

Violation"), up to and including termination of the Contracts in accordance with the termination provisions therein, including without limitation:

i.   In the event a CPA refuses to comply with the Non-Discrimination Provision or Similar Provision within a reasonable time after notification by the Department of a Contract Violation, the Department will terminate the CPA's Contracts.

ii.   The Department will initiate an investigation when made aware of an alleged Contract Violation. In the event the Department determines that a CPA has committed a Contract Violation, the Department will provide the CPA with notice and a reasonable opportunity to implement a Department-approved corrective action plan mandating immediate, regular, and continuous provision of foster care case management services or adoption services, as applicable, in compliance with the Non-Discrimination Provision or Similar Provision; where the CPA fails to demonstrate compliance after a reasonable opportunity to implement the approved corrective action plan, the Department will terminate the CPA's Contracts.

d.   The Department shall require all Contractors to enforce the Non-Discrimination Provision or Similar Provision against a CPA that the Contractor or the Department determines is in violation of, or is unwilling to comply with, such provisions (collectively, a "Subcontract Violation"), up to and including termination of the Subcontracts in accordance with the termination provisions therein, including without limitation:

i.   In the event a CPA refuses to comply with the Non-Discrimination Provision or Similar Provision within a reasonable time after notification by the Contractor or the Department of a Subcontract Violation, the Department will require the Contractor to terminate the CPA's Subcontracts.

ii.   The Department will require a Contractor to initiate an investigation when made aware of an alleged Subcontract Violation. In the event the Contractor or the Department determines that a CPA has committed a Subcontract Violation, the Department will require the Contractor to provide the CPA with notice and a reasonable opportunity to implement a Contractor-approved corrective action plan mandating immediate, regular, and continuous provision of foster care case management services or adoption services, as applicable, in compliance with the Non-Discrimination Provision or Similar Provision; where the CPA fails to demonstrate compliance after a reasonable opportunity to implement the approved corrective action plan, the Department will require the Contractor to terminate the CPA's Subcontracts.

3

e. The Department shall provide ongoing training as part of the Department's existing training programs to Department employees, Contractors, and contracted CPAs with respect to:

   i. the Litigation and the obligations under this Agreement;

   ii. the obligations of, and reporting channels available to, the Department's employees and Contractors to report any Contract or Subcontract Violation or suspected Contract or Subcontract Violation by contracted CPAs, including, without limitation, to the Department's Division of Child Welfare Licensing via the "Online Complaint Form" accessible on the Department's website;

   iii. the Department's obligations to investigate any Contract Violation or suspected Contract Violation reported verbally or in writing to the Department and to enforce the Non-Discrimination Provision or Similar Provision; and

   iv. a Contractor's obligations to investigate any Subcontract Violation or suspected Subcontract Violation by contracted CPAs reported verbally or in writing to the Contractor, and to enforce the Subcontracts.

f. The Department shall publish and maintain a hyperlink to the Department's Division of Child Welfare Licensing "Online Complaint Form" in a prominent place on the landing page of the Department's website; and

g. The Department shall make a public announcement in substantially the following form:

   The Department's contracts with child placing agencies prohibit discrimination against any individual or group because of race, religion, age, national origin, color, height, weight, marital status, sex, sexual orientation, gender identity or expression, political beliefs or disability.

   Examples of prohibited discriminatory conduct include:

   • turning away or referring to another contracted CPA an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for contracted services;

   • refusing to provide orientation or training to an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for contracted services;

4

- refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for contracted services; and

- refusing to place a child accepted by the CPA for contracted services with an otherwise qualified LGBTQ individual or same-sex couple suitable as a foster or adoptive family for the child.

If you are aware of a violation or suspected violation of these nondiscrimination provisions, a complaint may be made via the Online Complaint Form accessible on the Department's website.

Section 2.    For the avoidance of doubt, nothing in this Agreement shall require the Department to take adverse action against any CPA on the basis that such CPA has decided to accept or not accept a referral from the Department of a particular child for services under a contract with the Department.

Section 3.    Subject to Section 1, nothing in this Agreement shall affect the Department's obligations, authority, or discretion to audit, train, diligently investigate, or vigorously enforce the terms of the Contracts or Subcontracts in accordance with applicable laws, rules, regulations, policies, court orders, and contract terms.

Section 4.    Subject to Section 1, the Department retains sole authority and sole discretion on all matters pertaining to all Contracts and Subcontracts, including without limitation all training, all aspects of investigating an alleged Contract or Subcontract Violation, determining whether a Contract or Subcontract Violation occurred, and all enforcement measures.

Section 5.    Subject to Section 1, nothing in this Agreement expands the Department's obligation to monitor CPA compliance with Contracts and Subcontracts beyond that which is required under applicable law, rules, regulations, and policies.

Section 6.    This Agreement is intended for the direct benefit of the following individuals injured by a breach of this Agreement: (i) the Parties hereto, (ii) any LGBTQ individual or same-sex couple that seeks to foster a child accepted by a CPA for foster care case management services or adoption services under a Contract or Subcontract and the CPA is alleged to have committed a Contract Violation or Subcontract Violation directly involving the individual or couple, (iii) any LGBTQ individual or married same-sex couple that seeks to adopt a child accepted by a CPA for foster care case management services or adoption services under a Contract or Subcontract and the CPA is alleged to have committed a Contract Violation or Subcontract Violation directly involving the individual or couple, and (iv) any child accepted by a CPA for foster care case management services or adoption services under a Contract or Subcontract and the CPA is alleged to have committed a Contract Violation or Subcontract Violation directly involving the

5

child. Each person described in subclauses (ii), (iii) and (iv) of the immediately preceding sentence shall be a direct third-party beneficiary of, and may, to the extent of their injury and ability to satisfy standing requirements, independently enforce the terms of this Agreement as if it were a party hereto.

Section 7.    In the event any Party or a third-party beneficiary asserts that another Party is not in compliance with one or more of its obligations in this Agreement, the Parties and any third-party beneficiaries shall address such alleged breach in good faith and act promptly in an attempt to resolve it. The asserting Party or third-party beneficiary shall provide the other Party with written notice of such assertion and a ninety (90) day opportunity to cure such noncompliance prior to taking legal action. Notice shall be made via certified mail, return receipt requested as follows:

| | |
|---|---|
| **Michigan Department of Health and Human Services State of Michigan** Director, Bureau of Legal Affairs 333 South Grand Avenue Lansing, MI 48909 517.241.0048 | **American Civil Liberties Union Fund of Michigan** Jay D. Kaplan / Michael J. Steinberg 2966 Woodward Avenue Detroit, MI 48201 (313) 578-6823 jkaplan@aclumich.org msteinberg@aclumich.org |

Section 8.    Specific performance shall be the sole and exclusive remedy available to each Party and each third-party beneficiary asserting any claim relating to the Department's failure to meet its obligations under this Agreement. Each Party and each third-party beneficiary asserting any claim relating to the Department's obligations under this Agreement waives all rights to recover any damage, loss, attorney fees, costs, or any other expense arising out of asserting such claims. The Parties also agree that, regardless of the failure of the sole and exclusive remedy, the Department will not be liable to any Party or third-party beneficiary asserting any claim relating to the Department's obligations under this Agreement for any incidental or consequential damages of whatsoever kind or nature. The Parties intend the exclusion of incidental and consequential damages as an independent agreement apart from the sole and exclusive remedy herein. The limitations of this Section 8 apply only to claims relating to the Department's obligations under this Agreement.

Section 9.    Upon signing this Agreement, Plaintiffs shall file a Stipulation of Voluntary Dismissal with Prejudice substantially in the form attached to as Annex A and submit a Proposed Order on Stipulation of Dismissal substantially in the form attached hereto as Annex B. This Agreement becomes effective upon entry of the Proposed Order on Stipulation of Dismissal by the district court.

Section 10.   The Parties shall bear their own attorneys' fees and costs associated with the Litigation.

Section 11.    The Parties understand that this Agreement is a public record that may be disclosed in response to a proper request under Michigan's Freedom of Information Act.

Section 12.    The Parties acknowledge and agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without giving effect to conflict of laws, rules or statutes.

Section 13.    The Parties acknowledge, understand, and agree that they are entering into this Agreement knowingly, voluntarily, and of their own free will and volition, without coercion or undue influence.

Section 14.    Each Party has been represented by counsel and cooperated in the drafting and preparation of this Agreement.  Hence, this Agreement shall not be construed against any Party on the basis that the Party was the drafter.

Section 15.    This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts shall constitute one Agreement.

Section 16.    The undersigned represent that they are authorized to sign this Agreement.

Section 17.    Each Party represents that they believe there is no state or federal law, rule, regulation, policy, contract term, or other obligation that prevents it from complying with its obligations under this Agreement; *provided*, that solely for purposes of this Section 17, the obligations in Section 1 shall be read without the introductory phrase "Unless prohibited by law or court order."

Section 18.    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  No Party may assign this Agreement or any rights or obligations hereunder without the prior written consent of each other Party hereto.

Section 19.    No modification or waivers of any provision of this Agreement shall be valid or binding unless made in writing and signed by each Party or by a person authorized to sign on behalf of such Party.

*[Signature Page Follows]*

7

IN WITNESS WHEREOF, this Agreement is executed as of March 22, 2019.

**PLAINTIFFS**

Kristy Dumont

Dana Dumont

Erin Busk-Sutton

Rebecca Busk-Sutton

**DEFENDANTS**

Robert Gordon, in his official capacity as
Director, Michigan Department
of Health and Human Services

Jennifer Wrayno, in her official capacity
as Acting Executive Director, Michigan
Children's Services Agency

*[Signature Page to Settlement Agreement]*

**IN WITNESS WHEREOF,** this Agreement is executed as of March 22, 2019.

**PLAINTIFFS**

_____

Kristy Dumont

_____

Dana Dumont

_____

Erin Busk-Sutton

_____

Rebecca Busk-Sutton

**DEFENDANTS**

_____

Robert Gordon, in his official capacity as
Director, Michigan Department
of Health and Human Services

_____

Jennifer Wrayno, in her official capacity
as Acting Executive Director, Michigan
Children's Services Agency

[*Signature Page to Settlement Agreement*]

**IN WITNESS WHEREOF**, this Agreement is executed as of March **22**, 2019.

**PLAINTIFFS**

_____

Kristy Dumont

_____

Dana Dumont

_____

Erin Busk-Sutton

_____

Rebecca Busk-Sutton

**DEFENDANTS**

_____

Robert Gordon, in his official capacity as
Director, Michigan Department
of Health and Human Services

_____

Jennifer Wrayno, in her official capacity as
Acting Executive Director, Michigan
Children's Services Agency

[*Signature Page to Settlement Agreement*]

# EXHIBIT 9



| | Subject/Title | Settlement Agreement – Dumont v. MDHHS |
|---|---|---|
| | Type | ☒Informational Memorandum ☒Program Instruction ☐Policy Guide |
| | Issuance Date | 04/10/2019 |
| | Obsolete Date | N/A |
| | Contact Name | Office of Child Welfare Policy & Programs |
| | Email | Child-Welfare-Policy@michigan.gov |
| | Due Date | N/A |
| | Due to | N/A |
| | Distribution | ☒ CSA Central Office Managers/Staff ☒ MDHHS BSC and County Directors ☒ MDHHS Juvenile Justice Managers/Staff ☒ MDHHS Child Welfare Managers/Staff ☒ Native American Tribes ☒ Office of Workforce Development and Training ☒ Private Agency Child Welfare Managers/Staff ☒ Private Residential Abuse/Neglect Managers/Staff ☒ Private Residential Juvenile Justice Managers/Staff ☐ Other: |

**Michigan Department of Health & Human Services**

**Children's Services Agency**

**Communication Issuance**

**19-041**

On March 22, 2019, MDHHS entered into a settlement agreement with the plaintiffs in a lawsuit pertaining to non-discrimination in the delivery of foster care and adoption services. The settlement agreement requires MDHHS to:

- Release a public announcement regarding the department's non-discrimination provision.
- Include specific language pertaining to non-discrimination in all Adoption and Placement Agency Foster Care (PAFC) Services Contracts/Subcontracts and applicable policies.
- Include in all Adoption Services Contracts/Subcontracts and all PAFC Services Contracts/Subcontracts a requirement that agencies comply with the MDHHS non-discrimination statement.
- Investigate reports of alleged non-compliance with the non-discrimination provision.
- Initiate contract action when violations occur or when an agency expresses unwillingness to comply.
- Provide ongoing training regarding MDHHS contract obligations and enforcement, settlement agreement obligations, and mechanisms to report alleged non-compliance.
- Maintain a link on the MDHHS website to the Division of Child Welfare Licensing (DCWL) Online Complaint Form.

Adoption and PAFC Services contracts prohibit discrimination *"against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs, or disability"* in the provision of services under contract with MDHHS.

In every case, regardless of whether the individual or couple being considered has identified a particular child for foster or adoptive placement, policies and practices prohibited under the non-discrimination provision include, among others:

Rev. 6-16                                                                 1

- Turning away or referring to another contracted Child Placing Agency (CPA) an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract.
- Refusing to provide orientation or training to an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract.
- Refusing to perform a home study or process a foster care licensing application or an adoption application for an otherwise potentially qualified LGBTQ individual or same-sex couple that may be a suitable foster or adoptive family for any child accepted by the CPA for services under a contract or a subcontract.
- Refusing to place a child accepted by the CPA for services under a contract or a subcontract with an otherwise qualified LGBTQ individual or same-sex couple suitable as a foster or adoptive family for the child.

MDHHS is required to investigate allegations of non-compliance with the non-discrimination provision and enforce the contract/subcontracts when violations are established. If MDHHS determines a CPA has committed a contract violation, it will provide the agency with notice and a reasonable opportunity to implement a MDHHS-approved corrective action plan mandating immediate, regular, and continuous provision of foster care case management services or adoption services in compliance with the non-discrimination provision. If the agency refuses to comply or fails to demonstrate compliance after a reasonable opportunity to implement the approved corrective action plan, MDHHS will terminate the agency's contract. MDHHS must also require all contractors to enforce the non-discrimination provision with any subcontractors.

If a MDHHS employee or contractor employee is aware of a violation or suspected violation of these non-discrimination provisions, a complaint should be made and utilizing the Division of Child Welfare Licensing (DCWL) Online Complaint Form accessible on the MDHHS website: https://www.michigan.gov/mdhhs/0,5885,7-339-71551_27716-82239--,00.html

Applicable contracts and policies will be updated to reflect these requirements. Additionally, training regarding these provisions is required to be completed by all MDHHS and private agency child welfare staff by June 30, 2019. A recorded webinar to complete this requirement is available on the learning management system, *Non-discrimination Settlement Agreement Training*. Completion of training will be monitored.

Questions regarding the settlement provisions can be directed to: Child-Welfare-Policy@michigan.gov.