# EXHIBIT  B

# David, Wierenga & Lauka, PC

## ATTORNEYS AT LAW

Ronald E. David
James R. Wierenga
Jeshua T. Lauka

99 Monroe Ave, NW Ste. 1210
Grand Rapids, MI 49503
tel.616.454.3883
dwlawpc.com

May 15, 2019

***VIA HAND DELIVERY***
Michigan Court of Claims
State Office Building
350 Ottawa, N.W.
Grand Rapids, MI 49503

> **Re:** **Catholic Charities West Michigan v Michigan Department of Health and Human Services, et al.**
> **Case No. 19-000072-MM**

Dear Clerk:

Enclosed please find the following documents for filing regarding the above-referenced matter:

1.   Catholic Charities West Michigan's Motion for Preliminary Injunction (original and Judge's copy);
2.   Brief in Support of Catholic Charities West Michigan's Motion for Preliminary Injunction (original and Judge's copy);
3.   Affidavit of Chris Slater in Support of Catholic Charities West Michigan's Motion for Preliminary Injunction (original and Judge's copy); and
4.   Check in the amount of $20 representing the filing fee.

Kindly forward the documents marked "JUDGE'S COPY" to Judge Stephens. Thank you for your assistance. If you have any questions, please feel free to contact our office.

Cordially,

DAVID, WIERENGA & LAUKA, PC

Tina A. Longcore
Legal Assistant to James R. Wierenga

/tal
Enclosures
cc: Michigan Dept. of Health & Human Services (w/encls.)
 Robert Gordon (w/encls.)
 Michigan Children's Services Agency (w/encls.)
 Jennifer Wrayno (w/encls.)
 Dana Nessel, Attorney General of Michigan (w/encls.)

STATE OF MICHIGAN
COURT OF CLAIMS

CATHOLIC CHARITIES WEST
MICHIGAN,

        Plaintiff,

v.

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.

        Defendant.

No. 19-000072-MM

Hon. Cynthia D. Stephens

---

Roger Brooks (NC Bar No. 16317)*
Jeremiah Galus (AZ Bar No. 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org
*Attorney for Plaintiff*

James R. Wierenga (P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com
*Attorney for Plaintiff*

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA  30043
(202) 339-0774
dcortman@ADFlegal.org
*Attorney for Plaintiff*

---

## CATHOLIC CHARITIES WEST MICHIGAN'S
## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to MCR 3.310, Plaintiff Catholic Charities West Michigan hereby

moves this Court for a preliminary injunction enjoining Defendants from enforcing a

new policy against Catholic Charities, which mandates that Catholic Charities

recommend same-sex couples as foster and adoptive parents, or lose its ability to partner with the State in serving foster children and be forced to shut down its 70-plus-year-old foster care ministry. A preliminary injunction is warranted because Defendants' new policy violates Catholic Charities' statutory and constitutional rights; Catholic Charities and the children it serves will suffer irreparable harm in the absence of a preliminary injunction; the balance of hardships tips strongly in Catholic Charities' favor; and protecting Catholic Charities' rights and the children it serves is in the public interest. In support of this motion, Catholic Charities relies on the accompanying brief, the Affidavit of Chris Slater, and the Verified Complaint. Oral argument is requested.

Dated:  May 15, 2019                          Respectfully submitted,

                                              James R. Wierenga (P48946)
                                              DAVID, WIERENGA & LAUKA, PC
                                              99 Monroe Ave., NW, Suite 1210
                                              Grand Rapids, MI 49503
                                              (616) 454-3883
                                              jim@dwlawpc.com

                                              Roger Brooks (NC Bar No. 16317)*
                                              Jeremiah Galus (AZ Bar No. 030469)*
                                              ALLIANCE DEFENDING FREEDOM
                                              15100 N. 90th Street
                                              Scottsdale, AZ 85260
                                              (480) 444-0020
                                              (480) 444-0028 (Fax)
                                              rbrooks@ADFlegal.org
                                              jgalus@ADFlegal.org

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA  30043
(202) 339-0774
dcortman@ADFlegal.org

*Pro hac vice application pending*

*Attorneys for Plaintiff Catholic Charities
West Michigan*

STATE OF MICHIGAN
COURT OF CLAIMS

CATHOLIC CHARITIES WEST
MICHIGAN,

        Plaintiff,

No. 19-000072-MM

v.

Hon. Cynthia D. Stephens

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.

        Defendant.

---

Roger Brooks (NC Bar No. 16317)*
Jeremiah Galus (AZ Bar No. 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org
*Attorney for Plaintiff*

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA  30043
(202) 339-0774
dcortman@ADFlegal.org
*Attorney for Plaintiff*

James R. Wierenga (P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com
*Attorney for Plaintiff*

---

## BRIEF IN SUPPORT OF CATHOLIC CHARITIES WEST MICHIGAN'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

INTRODUCTION..............................................................................................1

FACTUAL BACKGROUND................................................................................2

      A.    Catholic Charities' services are religious ministry motivated
            by religious beliefs............................................................................2

      B.    Michigan law protects Catholic Charities' beliefs and
            practices..........................................................................................3

      C.    Catholic Charities partners with DHHS to serve Michigan's
            foster children................................................................................4

      D.    Defendants adopt a new policy that violates state law and
            targets Catholic Charities' religious beliefs. ...................................6

RELEVANT LEGAL STANDARD.......................................................................7

ARGUMENT.....................................................................................................7

I.    The new policy violates Michigan's statutory protections for faith-
     based foster care and adoption providers.....................................................7

II.   The new policy violates Catholic Charities' free-exercise and free-
     speech rights under the Michigan and U.S. Constitutions. .......................10

      A.    Strict scrutiny applies under Article I, § 4 of the Michigan
            Constitution. .................................................................................10

      B.    Strict scrutiny applies under the Free Exercise Clause of the
            U.S. Constitution...........................................................................11

            1.    Defendants cannot exclude Catholic Charities from a
                 long-established religious ministry because of its
                 beliefs about marriage. ...........................................................11

            2.    Defendants cannot condition government payments
                 and referrals on Catholic Charities' willingness to
                 renounce its religious beliefs and identity..............................13

            3.    The new policy is neither neutral nor generally
                 applicable. ..............................................................................13

C.      Strict scrutiny applies because the new policy compels
        Catholic Charities' speech. ................................................................ 16

D.      The new policy, as applied to Catholic Charities, does not
        survive strict scrutiny .................................................................... 17

III.    A preliminary injunction would prevent Catholic Charities from
        suffering irreparable harm, result in no harm to anyone, and be in
        the public interest. ........................................................................... 19

CONCLUSION ............................................................................................ 20

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adair v. Michigan,*
    486 Mich 468; 785 NW2d 119 (2010) .................................................9

*Bays v. City of Fairborn,*
    668 F3d 814 (CA 6, 2012) ...............................................................19

*Champion v. Secretary of State,*
    281 Mich App 307; 761 NW2d 747 (2008) .....................................10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 US 520 (1993).............................................13–15, 17, 18

*Elrod v. Burns,*
    427 US 347 (1976)..........................................................................19

*Employment Division v. Smith,*
    494 US 872 (1990).................................................................11, 13

*G & V Lounge, Inc v. Michigan Liquor Control Commission,*
    23 F3d 1071 (CA 6, 1994) ..............................................................20

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 US 418 (2006)..........................................................................18

*Hammel v. Speaker of the House of Representatives,*
    297 Mich App 641; 825 NW2d 616 (2012) .......................................7

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 US 171 (2012)............................................................................2

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 US 557 (1995)..........................................................................16

*Janus v. American Federation of State, County, & Municipal*
    *Employees, Council 31,*
    138 S Ct 2448 (2018..................................................................16

*Lyng v. Northwest Indian Cemetery Protective Association,*
    485 US 439 (1988)..........................................................................11

*Masterpiece Cakeshop, Limited v. Colorado Civil Rights Commission,*
    138 S Ct 1719 (2018)...............................................................12, 14

*Michigan AFSCME Council 25 v. Woodhaven-Brownstown School District,*
    294 Mich App 143; 145 NW2d 444 (2011) ........................................................7

*National Institute of Family & Life Advocates v. Becerra,*
    138 S Ct 2361 (2018)........................................................................................17

*Newsom v. Norris,*
    888 F2d 371 (CA 6, 1989) .............................................................................19

*Obergefell v. Hodges,*
    135 S Ct 2584 (2015).....................................................................................7, 8

*People v. DeJonge,*
    442 Mich 266; 501 NW2d 127 (1993) ...............................................11, 15, 16

*Thomas M. Cooley Law School v. Doe 1,*
    300 Mich App 245; 833 NW2d 331 (2013) ...................................................17

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S Ct 2012 (2017)..................................................................................12, 13

*West Virginia State Board of Education v. Barnette,*
    319 US 624 (1943)..........................................................................................16

## **Constitutional Provisions**

US Const, Am I.................................................................................*passim*

Const 1963, art 1, § 4 .......................................................................*passim*

## **Codes and Statutes**

MCL 400.5a .....................................................................................3, 9

MCL 710.23g ...................................................................................3, 9

MCL 722.111(d) ...........................................................................3–5, 8

MCL 722.124e................................................................................3, 7–10, 20

MCL 722.124f.................................................................................3, 9–10

Mich Admin Code, R 400.12310(3) ...............................................15

Mich Admin Code, R 400.12404(3) ...............................................15

Mich Admin Code, R 400.12605(3) ........................................................15

Mich Admin Code, R 400.12709(2) ........................................................15

Mich Admin Code, R 400.12706(2) ........................................................15

## **Other Authorities**

MDHHS, Hope for a Home,
     https://www.michigan.gov/mdhhs/0,5885,7-339-73971_60126---,00.html.........4

## INTRODUCTION

For more than 70 years, Catholic Charities West Michigan has served Michigan's children through its foster care and adoption ministry, placing approximately 4,500 children in loving homes over the past decade alone. Today, with roughly 13,000 children in Michigan's foster care system, Catholic Charities' ministry is needed more than ever. Despite this urgent need, Defendants are acting to *reduce* the services available to foster children in this state, excluding Catholic Charities from serving solely because of its religious beliefs about marriage. Specifically, in April 2019, Defendants instituted a new policy mandating that Catholic Charities affirmatively recommend same-sex couples as foster and adoptive parents, or be prevented from serving foster children altogether.

This new policy does not help a single child find a home; it only coerces effective, caring, and reliable providers out of the system. And as explained below, it blatantly violates statutory protections for faith-based providers, which the Legislature enacted in 2015 to avoid the very violations of conscience Defendants seek to coerce here. The new policy also violates Catholic Charities' free-exercise and free-speech rights protected by the Michigan and U.S. Constitutions.

A preliminary injunction is thus absolutely essential. Not just to prevent irreversible statutory and constitutional violations and the shuttering of a 70-plus-year old religious ministry, but also to protect real families and children entrusted to Catholic Charities' care. Indeed, having partnered with the State for decades, Catholic Charities manages *hundreds* of foster-care-related cases. By preserving the status quo, this Court can guarantee that foster families licensed through Catholic

Charities will continue to receive reimbursement payments needed to care for the children in their homes; ensure that foster children maintain the crucial relationships that they have spent months and years developing with Catholic Charities' case workers; and guard against foster children being traumatically transferred, once again, to new families.

## FACTUAL BACKGROUND

### A. Catholic Charities' services are religious ministry motivated by religious beliefs.

Catholic Charities West Michigan is a nonprofit religious organization affiliated with the Roman Catholic Diocese of Grand Rapids that has been feeding the hungry, counseling those who struggle, and building strong families for over 70 years. (Slater Aff. ¶ 3.) Today, it is one of western Michigan's largest social services providers, offering a broad spectrum of child welfare, family preservation, behavioral health, and community outreach services. (*Id.* ¶ 6.)

As a Catholic organization, Catholic Charities believes and adheres to the teachings and doctrines of the Catholic Church. (*Id.* ¶ 5.) Its services are offered in accord with the tradition of Catholic social teaching and designed to support individuals and families in their "emotional, social and spiritual development." (*Id.* ¶ 5.) Serving a diverse community, Catholic Charities ministers to over 21,000 individuals each year without regard to race, religion, sex, marital status, gender identity, sexual orientation, or any other protected characteristic. (Slater Aff. ¶ 6.)

In addition to its other ministries, Catholic Charities obeys historic teachings of scripture and the Church by providing foster care and adoption services to

2

vulnerable children. (*Id.* ¶ 7; Verified Compl. ("VC") ¶¶ 23–26, 53.) As one of Michigan's largest providers, Catholic Charities has approximately 100 employees dedicated exclusively to foster care and adoption services, and about 170 licensed foster homes ready to help children in need. (Slater Aff. ¶ 8.) Catholic Charities has over 300 foster children in its care and custody each day, and serves about 450 foster children annually. (*Id.*) In the past decade alone, Catholic Charities has placed around 4,500 children in loving adoptive or foster homes. (*Id.*)

To be clear about and protect its religious beliefs, Catholic Charities has a written statement of faith for its foster care and adoption ministry. (*Id.* ¶ 9.) While Catholic Charities may not, consistent with its Catholic faith, recommend or facilitate child placements with same-sex couples, it will refer such couples to other child placing agencies and routinely serves them throughout its numerous other ministries. (*Id.* ¶¶ 14, 16.)

## B.   Michigan law protects Catholic Charities' beliefs and practices.

In 2015, the Michigan Legislature expressly protected the right of faith-based foster care and adoption providers to operate according to their consciences and beliefs. See 2015 PA 53 (codified at MCL 722.124e & 722.124f); 2015 PA 54 (codified at MCL 710.23g); and 2015 PA 55 (codified at MCL 400.5a).

Under these laws, "a child placing agency" cannot be forced to provide services or accept referrals from the State that conflict with its "sincerely held religious beliefs." MCL 722.124e(2), 722.124f(1), 710.23g. Nor may the government take "adverse action" against an agency that has declined any service or referral based on its religious beliefs. MCL 722.124e(3), 722.124f(2), 710.23g, 400.5a. If an agency is

3

unable to provide any service due to its religious beliefs, however, it must "[p]romptly refer" the "applicant" to a list of other agencies or to an "agency that is willing and able to provide the declined services." MCL 722.124e(4). Catholic Charities complies with these requirements. (Slater Aff. ¶ 14.)

In enacting these statutory protections, the Michigan Legislature found that faith-based organizations "have a long and distinguished history" of providing foster care and adoption services in Michigan, and that allowing them to continue serving consistent with their faith convictions "will benefit the children and families who receive publicly funded services." MCL 722.124e(1)(f) & (g). The Legislature further found that private foster care and adoption providers "have the right to free exercise of religion," including the right to "abstain from conduct that conflicts with [their] sincerely held religious beliefs." MCL 722.124e(1)(e).

## C.   Catholic Charities partners with DHHS to serve Michigan's foster children.

In Michigan, there are about 13,000 children in foster care.[1] While this incredible need is largely met by private child placing agencies, rather than by DHHS staff, private agencies are *prohibited* from overseeing foster care placements or facilitating foster care adoptions unless they enter into an agreement to accept referrals from DHHS. (Slater Aff. ¶ 22.) Under such agreements, DHHS reimburses the approved agency for foster or adoption services provided to referred children, at agreed rates. (*Id.* ¶¶ 18–19.) Because "[h]aving as many possible qualified adoption

---

[1] MDHHS, Hope for a Home, https://www.michigan.gov/mdhhs/0,5885,7-339-73971_60126---,00.html (last accessed May 15, 2019).

and foster parent agencies" is "a substantial benefit" to children in need, MCL 722.124e(c), DHHS contracts with both faith-based and secular agencies. (Slater Aff. ¶ 17.)

For decades, the State has entered into agreements with Catholic Charities to serve Michigan's abused, neglected, and abandoned children. (*Id.* ¶ 18.) And for good reason. Catholic Charities' foster care and adoption ministry exceeds state minimum requirements, and it is particularly effective at recruiting foster families and adoptive parents that the State and secular agencies do not, and cannot, recruit.  (*Id.* ¶¶ 10, 21.) While Catholic Charities does not limit those it serves to any particular religion, it successfully recruits many foster families and adoptive parents who share its faith and religious beliefs. (*Id.* ¶ 10.)

Under its current contracts with the State, Catholic Charities receives referrals from DHHS for both foster care and public adoption services, and DHHS agrees to reimburse Catholic Charities for certain services performed. These agreements acknowledge that, under Michigan law, Catholic Charities "has the sole discretion to decide whether to accept or not accept a referral." (VC, Ex. 6 at 7; Ex. 7 at 5.) And no payment is made unless Catholic Charities accepts the referral. (Slater Aff. ¶ 18.) For accepted foster care referrals, DHHS provides a per diem to cover expenses once the child is placed with a foster family. (*Id.* ¶ 19.) While Catholic Charities retains a portion of the per diem to help cover its own costs, the rest goes to the foster family to defray the costs of caring for the child. (*Id.*) For accepted public adoption referrals, DHHS provides lump sum payments to help cover Catholic

Charities' costs whenever the child is placed, the adoption is finalized, and the adoption becomes permanent. (*Id.*) Any pre-placement services such as training, studying, and recommending parents for foster care or adoption generally are not referred by DHHS or paid for under the contracts. Catholic Charities pays for any such efforts with its own private funds. (*Id.* ¶ 20.)

**D.    Defendants adopt a new policy that violates state law and targets Catholic Charities' religious beliefs.**

DHHS's decades-long respect for Catholic Charities' religious beliefs changed shortly after Dana Nessel was elected attorney general in 2018. Before her election, Ms. Nessel stated that the "only purpose" of Michigan's statutory protections for faith-based foster care and adoption providers was "to discriminate against people" and she attacked religious providers like Catholic Charities as "hate mongers." (VC ¶¶ 141– 42.) Promptly after her election, AG Nessel instructed DHHS to reverse its previous position and enter into a "friendly" settlement of pending litigation, in which DHHS agreed to exclude faith-based providers from serving Michigan's foster children unless they agreed to recommend same-sex couples as foster and adoptive parents. That settlement agreement—in which DHHS committed to violate Michigan law—was finalized in March 2019. (VC, Ex. 8.)

In April 2019, Defendants sent a directive to Michigan's child placing agencies, including Catholic Charities, purporting to implement the settlement. (VC, Ex. 9.) The directive says that "regardless of whether the individual or couple being considered has identified a particular child for foster or adoptive placement," Catholic Charities can no longer refer a same-sex couple to another agency or decline to

6

recruit, train, evaluate, or recommend a same-sex couple as prospective foster or adoptive parents. (VC, Ex. 9 at 1–2.) The directive states that Defendants will terminate Catholic Charities' contracts, and thus prohibit it from serving foster children, if it "refuses to comply" with this new policy. (VC, Ex. 9 at 2.)

## RELEVANT LEGAL STANDARD

A preliminary injunction preserves the "status quo pending a final hearing regarding the parties' rights." *Mich AFSCME Council 25 v. Woodhaven-Brownstown Sch Dist*, 293 Mich App 143, 145; 809 NW2d 444 (2011). To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) the balance of hardships tips in its favor; and (4) an injunction is in the public interest. *Hammel v. Speaker of the House of Representatives*, 297 Mich App 641, 648; 825 NW2d 616 (2012).

## ARGUMENT

### I.   The new policy violates Michigan's statutory protections for faith-based foster care and adoption providers.

The Michigan Legislature anticipated situations like this one. In 2015, it enacted Public Acts 53, 54, and 55, expressing its will that Michigan "child placing agencies" remain "free[ ] to abstain from conduct that conflicts with [their] sincerely held religious beliefs." MCL 722.124e(1)(e). Because Defendants' new policy violates both the text and intent of those laws, Catholic Charities is likely to succeed on its state statutory claim (Count I).

When the U.S. Supreme Court issued its same-sex marriage ruling in 2015, it determined that the belief that marriage is a union of one man and one woman is a

"decent and honorable" belief that continues to be held "in good faith by reasonable and sincere people." *Obergefell v. Hodges*, 135 S Ct 2584, 2594, 2602 (2015). The Court further explained that, because the First Amendment protects that belief, "religious organizations and persons" must be "given proper protection" to "continue the family structure they have long revered." *Id.* at 2607.

Public Acts 53, 54, and 55 provide this "proper protection." Together, they guarantee that faith-based providers like Catholic Charities can continue to serve foster children consistently with their religious beliefs, while at the same time ensuring that no person's ability to adopt or participate in foster care is denied.

Specifically, under Public Act 53, a "child placing agency" cannot be required to provide "any services" that conflict the agency's sincerely held religious beliefs. MCL 722.124e(2).[2] The government therefore may not take "adverse action" against an agency that "has declined or will decline to provide any services" due to its religious beliefs. MCL 722.124e(3). And while an agency may not decline "foster care case management and adoption services" for a particular child *after* it accepts the referral from DHHS and agrees to perform those particular services, MCL 722.124e(7)(b), the law ensures that it can decline the referral "if the services would conflict with" its religious beliefs. MCL 722.124f(1). Further, Public Act 53 clarifies that the child placing agency retains "sole discretion" to decide whether to perform pre-referral activities and services "related to that referral," such as recruiting,

---

[2] A "child placing agency" is defined as governmental organization or nonprofit agency organized "for the purpose of receiving children for placement in private family homes for foster care or for adoption." MCL 722.111(d).

training, studying, and recommending prospective foster care and adoptive parents. *Id.* Because such services are not publicly funded, see MCL 722.124e(1)(h); Slater Aff. ¶ 20, the government "shall not control the child placing agency's decision whether to engage in those activities or perform those services." MCL 722.124f(1). If an agency is unable to provide any service due to its religious beliefs, it must [p]romptly refer" the "applicant" to a list of other providers or to a provider "that is willing and able to provide the declined services." MCL 722.124e(4).

Public Acts 54 and 55 bolster these religious protections. Public Act 54, which amended the Michigan adoption code, ensures that the protections apply to all adoption services, including foster-care-related adoptions. MCL 710.23g. And Public Act 55, which amended the law regulating DHHS, reiterates that "the department shall not take an adverse action against a child placing agency" because the agency has not or will not provide services that conflict with its beliefs. MCL 400.5a.

Here, Defendants' new policy violates both "the purpose and intent" of these laws. *Adair v. Michigan*, 486 Mich 468, 477; 785 NW2d 119 (2010). Defendants threaten to cancel the contracts needed for Catholic Charities to continue serving foster children, unless Catholic Charities agrees to violate its sincerely held religious beliefs about marriage. Specifically, Defendants promise to "terminate" the contracts if Catholic Charities "refuses to comply" with the new policy by "referring" same-sex couples to other providers, or by declining to train, evaluate, or license such couples as prospective foster or adoptive parents. (VC, Ex. 9 at 2.) But Public Acts 53, 54, and 55 forbid Defendants from taking adverse action on these grounds. While Defendants

may disagree with the legislative policies reflected in those laws, they are not at liberty to impose contradictory ones.[3]

## II. The new policy violates Catholic Charities' free-exercise and free-speech rights under the Michigan and U.S. Constitutions.

Although Michigan's strong statutory protection makes reaching the other claims unnecessary, a preliminary injunction is also warranted because Catholic Charities is likely to succeed on its state and federal constitutional claims.

### A. Strict scrutiny applies under Article I, § 4 of the Michigan Constitution.

The Michigan Constitution, which includes a free exercise clause, an establishment clause, and a freedom of conscience and to worship clause, provides broader religious protections than its federal counterpart. Const. 1963, art 1, § 4; *Champion v. Secretary of State*, 281 Mich App 307, 315; 761 NW2d 747 (2008). Courts evaluate alleged violations of Article 1, § 4 of the Michigan Constitution using a five-factor compelling-interest test that asks: (1) whether plaintiff's belief, or conduct motivated by belief, is sincerely held; (2) whether that belief or conduct is religious; (3) whether that belief or conduct is burdened by state action; (4) whether that burden is justified by a compelling state interest; and (5) whether the state could satisfy its interest through a less obtrusive regulation. *Id.* In other words, if government action burdens sincere religious beliefs, it must pass strict scrutiny. Defendants cannot satisfy that test.

---

[3] The law broadly defines "adverse action" to include, among other things, "declining to enter into a contract," "refusing to renew a contract," or "canceling a contract." MCL 722.124e(7)(a), 722.124f(5).

The first two elements—the sincerity and religious nature of Catholic Charities' beliefs—are easily satisfied here. (Slater Aff. ¶¶ 9, 14; VC ¶¶ 22–32.) As to the third element, Defendants' new policy heavily burdens Catholic Charities' religious beliefs and practices. Indeed, if Catholic Charities follows its beliefs about marriage, Defendants will cancel its contracts and in fact bar it from ministering to children by providing any foster services. This substantially burdens Catholic Charities' religion because it "coerce[s]" Catholic Charities "into violating [its] religious beliefs" and "penalize[s] religious activity by denying [Catholic Charities] an equal share of the rights, benefits, and privileges enjoyed by other citizens." *People v. DeJonge*, 442 Mich 266, 283; 501 NW2d 127 (1993) (quoting *Lyng v. Nw Indian Cemetery Protective Ass'n*, 485 US 439, 449 (1988)).

Because Defendants' new policy substantially burdens Catholic Charities' sincerely held religious beliefs and practices, it must survive strict scrutiny. As explained below, it cannot satisfy that heightened level of review.

### B.      Strict scrutiny applies under the Free Exercise Clause of the U.S. Constitution.

Defendants' new policy also triggers—and fails to satisfy—strict scrutiny under the federal free exercise clause for several independent reasons.

#### 1.   Defendants cannot exclude Catholic Charities from a long-established religious ministry because of its beliefs about marriage.

Although federal free-exercise claims are often considered under the test articulated in *Employment Division v. Smith*, 494 US 872 (1990), that case does not define the limits of protected free exercise. In fact, the Supreme Court has rejected

the proposition that "any application" of a neutral and generally applicable law is "necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S Ct 2012, 2021 n.2 (2017).

In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 US 171 (2012), the Supreme Court unanimously held that the government may not apply a neutral and generally applicable nondiscrimination law to a religious school if it would interfere with the school's selection of its teachers and ability to operate consistently with its faith. And in *Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Comm*, 138 S Ct 1719, 1727 (2018), the Court stated that the government could not invoke a nondiscrimination rule to compel clergy "to perform [a same-sex wedding] ceremony," regardless of whether the government imposed that rule on secular officiants and regardless of any offense caused to same-sex couples.

Similar to clergy's involvement in marriage ceremonies, religious groups have been serving orphans and abandoned children for centuries, long before government became involved. The government cannot now impose new rules to drive religious ministries off the field, demanding that they bow the knee to the government's preferred views on topics that have always been central to religious faith and teachings: marriage, family, and the proper raising of the next generation. The Free Exercise Clause prohibits the government from conducting such a hostile takeover of long-established religious ministries—whether that be marriages (*Masterpiece*), educating the next generation (*Hosanna-Tabor*), or caring for abused, neglected, and abandoned children.

### 2. Defendants cannot condition government payments and referrals on Catholic Charities' willingness to renounce its religious beliefs and identity.

In *Trinity Lutheran*, the Supreme Court held that the Free Exercise Clause prevents the government from excluding a religious organization from a public benefit based solely on it being religious. There, the Court concluded that the State of Missouri could not exclude a church-operated preschool and daycare from a playground safety grant program because of the preschool's religious nature. 137 S Ct at 2025. The Free Exercise Clause, the Court explained, forbids the government from requiring an organization "to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." *Id.* at 2024.

Yet that is precisely what Defendants are doing with their new policy. They are conditioning a public benefit—the ability to participate in state foster care and adoption programs and receive reimbursement payments—on Catholic Charities' willingness to renounce its religious beliefs and character as it pertains to marriage and family. Such a rule "imposes a penalty on the free exercise of religion that must be subjected to the most rigorous scrutiny." *Id.*

### 3. The new policy is neither neutral nor generally applicable.

Strict scrutiny also applies under a *Smith* analysis because Defendants' new policy is neither neutral nor generally applicable.

While deliberately targeting religious beliefs is "never permissible," the Supreme Court has explained that the Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion. *Church of the Lukumi Babalu Aye,*

*Inc. v. City of Hialeah*, 508 US 520, 533–34 (1993). A law or regulation thus is not neutral if its practical effect or "object" is to "infringe upon or restrict practices because of their religious motivation." *Id.*

Here, Defendants' new policy is hostile, not neutral. Instead of protecting faith-based providers as Michigan law requires, the new policy penalizes religious providers that adhere to certain beliefs about marriage and family that are despised by AG Nessel (and DHHS under her instruction). Indeed, the plain text of the new policy demonstrates that its purpose is to single out beliefs and practices followed only by certain faith-based providers. (VC, Ex. 9 at 1–2) (describing prohibited practices under the nondiscrimination provision exclusively in terms of "LGBTQ individual[s]" or "same-sex couple[s]"). Moreover, the driving force behind the new policy—AG Nessel—has labeled those that share Catholic Charities' beliefs about marriage as "a radical fringe," "reprehensible," and "hate mongers," and disparaged them as "dislik[ing] gay people more than [they] care about the needs of foster care kids." (VC ¶¶ 138–42.)[4] Through both actions and words, Defendants have violated their "duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 138 S Ct at 1731.

In addition to lacking neutrality, the new policy triggers strict scrutiny because it is not "generally applicable." In *Lukumi*, the Supreme Court struck down an

---

[4] Defendant Nessel's assertion that religious service providers are ignoring the needs of foster children is false and grimly ironic, since DHHS does not dispute that Catholic Charites has an outstanding record of placing children rapidly and placing them in healthy environments, and it is Defendant Nessel and DHHS that are seeking to deny the children of Michigan the benefit of these services solely to enforce their ideology and punish dissent.

ordinance that prohibited ritual animal sacrifice but allowed animal killings in many other contexts. The Court explained that a law is not generally applicable if it exempts *non*religious conduct that undermines the government's interests "in a similar or greater degree than [religious conduct] does." 508 US at 543–44.

When viewed in light of the State's purported interest in eliminating discrimination in child placements, the new policy here is woefully underinclusive. In fact, Michigan regulations *require* child placing agencies to make distinctions based on otherwise protected characteristics such as race, religion, gender, and marital status in foster care and adoption licensing and placements. For example, agencies must assess applicants' "[m]arital and family status" and "[s]pirituality or religious beliefs." Mich Admin Code, R 400.12310(3)(a), R 400.12605(3)(a). They must also determine the "gender, race, [and] ethnic background" of children preferred by the applicants, Mich Admin Code, R 400.12310(3)(h), R 400. 12605(3)(k), and are restricted to making placements consistent with those preferences. Mich Admin Code, R 400.12404(3), R 400.12709(2). Moreover, agencies must take into account the "child and child's family's religious preference" when making foster placements, Mich Admin Code, R. 400.12404(3), and consider race, ethnicity, and cultural identity when recruiting adoptive parents. Mich Admin Code, R 400.12706(2)(b). Because these exemptions undermine the government's claimed interest in "nondiscrimination" as much or more than Catholic Charities' faith-driven selections do, strict scrutiny applies. *Lukumi*, 508 US at 543–44.[5]

---

[5] Strict scrutiny also applies under the hybrid-rights doctrine because, as explained below, Defendants' new policy implicates Catholic Charites' freedom of speech as well as its freedom of

**C.    Strict scrutiny applies because the new policy compels Catholic Charities' speech.**

A long line of Supreme Court precedent precludes the government from forcing a citizen "to utter what is not in his mind," *W Va State Bd of Educ v. Barnette*, 319 US 624, 634 (1943), to affirm "a belief with which the speaker disagrees," *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 US 557, 573 (1995), or to "mouth support for views they find objectionable." *Janus v. American Federation of State, Co, & Muni Employees, Council 31*, 138 S Ct 2448, 2463 (2018).

A preliminary injunction should also issue because Defendants' new policy would require Catholic Charities to convey, in writing, repeatedly, an opinion that it believes to be false—namely, that a same-sex couple *will* be in the child's best interests. As an authorized child placing agency, Catholic Charities evaluates candidate foster and adoptive parents, and must provide *written assessments* and *recommendations* to the State about whether particular candidate parents should be approved, and whether it is in the best interests of particular children to be placed in particular homes. In practice, the new policy seeks to force Catholic Charities to affirm, in official submissions to the State, that placements with same-sex couples *will* be in the best interests of children, when in fact Catholic Charities religious beliefs about human nature, marriage, and family teach it that those placements *will not* be in the best interests of children.

---

religion. *DeJonge*, 442 Mich at 279 (applying strict scrutiny to government action that implicates free-exercise rights in conjunction with other constitutional protections).

Last year, the Supreme Court criticized California for forcing pro-life pregnancy resource centers to publish notices about abortion that they opposed. *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S Ct 2361 (2018). The Court concluded that, "[b]y compelling individuals to speak a particular message," the laws at issue necessarily "alter[ed] the content of [their] speech." *Id.* at 2371. Applying strict scrutiny, the Court rejected the argument that "professional speech"—that is, speech made by "individuals who provide personalized services to clients and who are subject to a generally applicable licensing and regulatory regime"—deserves diminished constitutional protection. *Id.* at 2371–72. Strict scrutiny applies here for the same reasons.[6]

The new policy will also compel speech contrary to conscience by forcing Catholic Charities into counseling relationships with same-sex couples, concerning family relationships and fostering. There, Catholic Charities will have to speak contrary to its beliefs or express those beliefs honestly and subject itself to charges of "discrimination." Again, the policy would "alter the content of [Catholic Charities'] speech," and strict scrutiny must apply. *Id.* at 2371.

### D.   The new policy, as applied to Catholic Charities, does not survive strict scrutiny

Because strict scrutiny applies, Defendants must prove that their new policy "advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those

---

[6] "Because the right to free speech under the Michigan Constitution is coterminous with the right to free speech under the First Amendment, this Court may use federal authority to interpret Michigan's guarantee of free speech." *Thomas M. Cooley Law Sch v. Doe 1*, 300 Mich App 245, 275; 833 NW2d 331 (2013).

interests." *Lukumi,* 508 US at 546. Strict scrutiny requires this Court to look "beyond broadly formulated interests" and instead "scrutinize [ ] the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 US 418, 431 (2006).

Defendants cannot satisfy scrutiny here because no compelling governmental interest justifies violating Catholic Charities' constitutional rights. As noted, Michigan law contains numerous exemptions allowing child placing agencies—including state-operated ones—to make distinctions based on otherwise protected characteristics such as race, religion, gender, and marital status in foster care and adoption licensing and placements. And Defendants further concede that private child placing agencies may decline referrals from DHHS for *any* reason. (See VC, Ex. 8 at 5.) Requiring Catholic Charities to train, study, and recommend same-sex couples as adoptive or foster parents in violation of its religious beliefs "cannot be regarded as protecting an interest of the highest order" when existing exemptions already permit "appreciable damage to that supposedly vital interest." *Lukumi,* 508 US at 547.

Nor is Defendants' new policy narrowly tailored. When numerous other child placing agencies provide same-sex couples with ready alternatives, and the law expressly allows referrals for a host of other reasons, forcing Catholic Charities to choose between its religious beliefs and serving vulnerable children is unnecessary. See *id.* at 546 ("underinclusive" ordinances not narrowly tailored).

### III.  A preliminary injunction would prevent Catholic Charities from suffering irreparable harm, result in no harm to anyone, and be in the public interest.

The remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also weigh in favor of a preliminary injunction.

As detailed above, Defendants' new policy violates Catholic Charities' constitutional rights. And the loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 US 347, 373 (1976); accord *Newsom v. Norris*, 888 F2d 371, 378 (CA 6, 1989). Furthermore, because a child placing agency is prohibited from performing foster care and public adoption services in the absence of a contract with DHHS, the new policy would force Catholic Charities to close its 70-plus-year-old ministry to foster children. (Slater Aff. ¶¶ 22–23.)

The balance of equities likewise weighs in favor of Catholic Charities. Indeed, a preliminary injunction would properly guard against statutory and constitutional violations and protect the hundreds of children and families in Catholic Charities' care while this case is pending. Preserving the status quo as it has existed for decades would not irreparably harm Defendants because same-sex couples interested in fostering or adopting may do so through numerous other agencies, including state-operated ones. Moreover, Defendants can have no legitimate interest in violating existing statutes or applying an unconstitutional rule. See *Bays v. City of Fairborn*, 668 F3d 814, 825 (CA 6, 2012) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment.").

Finally, protecting constitutional rights "is always in the public interest." *G & V Lounge, Inc v. Michigan Liquor Control Comm*, 23 F3d 1071, 1079 (CA 6, 1994). So too is ensuring that faith-based providers like Catholic Charities can continue providing adoption and foster care services "to the children of this state who are in need of these placement services." MCL 722.124e(1)(c) As the Michigan Legislature recognized, "the more qualified agencies taking part in this process, the greater the likelihood that permanent child placement can be achieved." *Id.*

## CONCLUSION

Because existing state law and the Michigan and U.S. Constitutions prohibit Defendants from forcing Catholic Charities to choose between its religious beliefs and serving vulnerable and needy children, this Court should grant the request for a preliminary injunction.

Dated:  May 15, 2019                          Respectfully submitted,

James R. Wierenga (P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

Roger Brooks (NC Bar No. 16317)*
Jeremiah Galus (AZ Bar No. 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 (Fax)
rbrooks@ADFlegal.org
jgalus@ADFlegal.org

20

David A. Cortman (GA Bar No. 188810)\*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA  30043
(202) 339-0774
dcortman@ADFlegal.org

*\*Pro hac vice application pending*

*Attorneys for Plaintiff Catholic Charities
West Michigan*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2019, I served the foregoing Motion for Preliminary Injunction and related exhibit(s) and Brief in Support on the following via first class mail, postage prepaid:

Michigan Department of Health and Human Services
333 S. Grand Ave.
Lansing, MI 48933-2108

Robert Gordon, Director of MI DHHS
333 S. Grand Ave.
Lansing, MI 48933-2108

Michigan Children Services Agency
235 S. Grand Ave., Suite 1518
Lansing, MI 48933

Jennifer Wrayno, Acting Executive Director of MI CSA
235 S. Grand Ave., Suite 1518
Lansing, MI 48933

Dana Nessel, Attorney General of Michigan
G. Mennen Williams Building
525 W. Ottawa Street
Lansing, MI 48933-1067

Tina A. Longcore
Legal Assistant
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
tina@dwlawpc.com

STATE OF MICHIGAN
COURT OF CLAIMS

CATHOLIC CHARITIES WEST
MICHIGAN,

        Plaintiff,

v.

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.

        Defendant.

No. 19-000072-MM

Hon. Cynthia D. Stephens

---

Roger Brooks (NC Bar No. 16317)*
Jeremiah Galus (AZ Bar No. 030469)*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org

David A. Cortman (GA Bar No. 188810)*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA 30043
(202) 339-0774
dcortman@ADFlegal.org

James R. Wierenga (P48946)
DAVID, WIERENGA & LAUKA, PC
99 Monroe Ave., NW, Suite 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

---

**AFFIDAVIT OF CHRIS SLATER IN SUPPORT OF CATHOLIC CHARITIES
WEST MICHIGAN'S MOTION FOR PRELIMINARY INJUNCTION**

State of Michigan      )
                      ) ss.
County of Kent       )

I, Christopher Slater, being duly sworn upon his oath, states as follows:

1. I am over 18 years of age and of sound mind. I have personal knowledge of the facts stated in this affidavit and, if called upon, could testify competently to these facts.

2. I am the CEO of Catholic Charities West Michigan, and have served in that position since July 2018. I first began working at Catholic Charities in 2015. Before being named CEO, I served as Catholic Charities' CFO and interim CEO. I received a bachelor's degree in business administration from Western Michigan University in 2009. I also am a certified public accountant.

3. Founded in 1947, Catholic Charities is a nonprofit religious organization affiliated with the Roman Catholic Diocese of Grand Rapids. It was created to assist the Diocese and its Bishop to carry out the Church's ministry to the poor, weak, and distressed—a ministry that is commanded by the Catholic faith.

4. The Scriptures teach us again and again to imitate Jesus Christ's love for the poor and needy. The Epistle of St. James, for example, teaches that true religion is to care for the orphan and the widow (James 1:27). And in the Gospel of Matthew, Jesus describes the last judgment and says that we will be judged based on how we treat the poor and vulnerable (Matthew 25:31–46). The Catholic Church puts these teachings into practice through, among other things, child welfare service organizations such as Catholic Charities.

5. As a Catholic organization, Catholic Charities believes and adheres to the teachings and doctrines of Scripture and the Catholic Church. As such, all of its services are offered in accord with Catholic teaching and designed to support

individuals, families, and communities in their emotional, social, and spiritual development, with particular concern for those who are poor and vulnerable.

6.     Today, Catholic Charities is one of the region's largest social services providers. It offers a wide-array of child welfare, family preservation, behavioral health, and community outreach services throughout 18 counties in western Michigan. Through these programs, Catholic Charities serves a diverse community, ministering to over 21,000 individuals each year without regard to race, religion, sex, marital status, gender identity, sexual orientation, or any other protected characteristic.

7.     In addition to its other ministries, Catholic Charities serves Michigan's children and families through foster care and adoption programs. Catholic Charities' foster care and adoption services are compelled by, and thus an exercise of, its religious beliefs. Catholic Charities believes that each human person is made in the image of God and has dignity, and that it is called to care for orphans and children whose parents cannot care for them. As an approved child placing agency, Catholic Charities certifies foster homes for licensure, evaluates and recommends applicants for adoption, and facilitates child placements.

8.     Catholic Charities is one of the largest foster care and adoption providers in the State of Michigan. It has approximately 280 employees, about 100 of whom focus exclusively on providing foster care and adoption services. Catholic Charities has over 300 foster children in its care and custody on any given day, serves approximately 450 foster children annually, and has approximately 170

licensed foster care homes. In just the past 10 years, Catholic Charities has placed approximately 4,500 children in loving adoptive or foster homes.

9.     Consistent with the teachings and doctrine of the Catholic Church, Catholic Charities believes that marriage is the sacramental union of one man and one woman. To protect this belief and its Catholic identity, Catholic Charities adopted a written statement of faith for its foster care and adoption ministry. That statement of faith prohibits Catholic Charities from recommending or facilitating child placements with same-sex couples, consistent with Catholic teaching and doctrine about marriage and family.

10.     Catholic Charities makes its religious nature and character clear throughout all of its programs and services. And its religious convictions, including those related to marriage and family, are central to its Catholic identity and are very well known. This is a distinguishing feature of Catholic Charities. Because of its distinctly religious nature and beliefs, Catholic Charities is particularly successful at recruiting foster families and adoptive parents that the State and secular providers do not, and could not, recruit. While Catholic Charities does not limit those it serves to any particular religion, it successfully recruits many foster families and adoptive parents who share its faith and religious beliefs.

11.     Close cooperation and collaboration between Catholic Charities and the prospective parents is essential because the foster care process and adoption process are personal and intimate experiences. A critical component of Catholic Charities' involvement is to provide counseling and guidance to the prospective

4

foster and adoptive parents throughout each step of the application, home study, placement, supervision, and finalization process.

12.     The home study process, in particular, is especially personal because it requires in-depth discussions and training about the proper environment for, and approach to, raising children. As part of the home study, Catholic Charities must visit the applicant's home in person and evaluate each person living in it. During that process, Catholic Charities interviews the applicants to assess their strengths and weaknesses and to explore important topics related to marital stability, parenting experience, parenting philosophy, family origin and dynamics, faith and religious practice, financial stability, and the ability to parent a child of a different race or culture or a child with special needs, among other things.

13.     After assessing a prospective foster or adoptive parent, Catholic Charities must then provide the State with a written evaluation and recommendation. The State requires Catholic Charities to prepare a written report analyzing the home environment and relationships in the home, among other things, and to make an official recommendation stating whether Catholic Charities believes placing a child with the applicant(s) would be in the child's best interests.

14.     Catholic Charities serves and places children regardless of the child's race, sex, religion, color, gender identity, sexual orientation, or any other protected characteristics. But because of its Catholic beliefs about human nature and the nature of marriage and family, it does not believe that foster or adoption placement with same-sex couples is in the best interests of children, and so cannot consistent

with its faith and conscience assist in making such placements. Instead, and consistent with state law, if a same-sex couple asks Catholic Charities to license them as foster or adoptive parents, Catholic Charities refers the couple to one of the numerous other providers that are able to assist the couple.

15.    Notably, DHHS provides foster care services at county offices throughout the state, and there are numerous other private foster care and adoption providers in western Michigan that do not share Catholic Charities' particular religious beliefs.

16.    Catholic Charites routinely serves same-sex couples throughout its numerous other ministries. For example, Catholic Charities regularly serves same-sex couples through its food and baby pantry programs, pregnancy services, mental health and addiction treatment programs, domestic violence treatment program, senior companion services, and foster grandparent program, among other things.

17.    In Michigan, a child placing agency such as Catholic Charities cannot oversee foster care placements or facilitate public adoptions *at all* unless it enters into a contract with the State. Under such contracts, a child placing agency is eligible to receive referrals and reimbursement payments from DHHS for the performance of certain foster care or adoption services. Currently, DHHS contracts with about 90 child placing agencies to perform foster care and adoption services throughout Michigan, some of which are faith-based and some of which are secular. The number of private agencies with which DHHS can contract is not fixed.

18.     For decades, the State has entered into contracts with Catholic Charities to perform foster care and public adoption services. Under the current contracts, DHHS does not make any reimbursement payment to Catholic Charities unless it accepts a referral. The contracts recognize, however, that Michigan law gives Catholic Charities the sole discretion to decide whether or not to accept a referral.

19.     If Catholic Charities decides to accept a foster care referral from DHHS, it receives a per diem from the State after the child is placed with a foster family or relative caregiver. While a portion of that per diem covers some of Catholic Charities' costs, the rest of the per diem is passed along to the foster family or caregiver to defray the costs of caring for the child. If Catholic Charities accepts an adoption referral from DHHS, it receives lump sum payments when the child is placed with a family, the adoption is finalized, and the adoption is made permanent.

20.     Any pre-placement services that Catholic Charities performs, such as training, studying, and recommending parents for foster care or adoption generally are not referred by DHHS or paid for under the contracts. Catholic Charities pays for these pre-placement activities and services with its own funds received from private donations made directly to Catholic Charities.

21.     Catholic Charities' foster care and adoption ministry exceeds state minimum requirements, providing services and opportunities that the State does not, and could not, provide. For example, Catholic Charities provides monthly foster parent training opportunities; comprehensive consultations; mentors; behavioral

7

specialists; 24-hour emergency on-call services; an on-site dentist for children; medical, dental, clothing, and extracurricular funds for children; transportation services; and a "Family Visit House," where parents and children can visit each other and enjoy their time together in a comfortable, homelike environment. To offer all of these extra services, Catholic Charities must (and does) raise additional funds from private contributions to enable it to provide services to children who are abandoned or in need of a home well beyond those covered by any reimbursement payments it receives from DHHS for accepting referrals.

22.     If Catholic Charities could no longer partner with the State, it would be prohibited from providing foster care and public adoption services entirely. That is because, in Michigan, a child placing agency cannot legally offer such services unless it has a contract with and accepts referrals from the State. Thus, if the State canceled Catholic Charities' contracts, Catholic Charities' foster care and public adoption ministry would cease to exist.

23.     This would absolutely stop Catholic Charities from carrying out its faith-commanded ministry to children who are abandoned or in need of a home; it would deprive at least 100 Michiganders that are employed in Catholic Charities' fostering and adoption ministry of not just their jobs, but of the opportunity to serve through a faith-based ministry; it would deprive the approximately 170 foster families currently licensed through Catholic Charities of their choice to work with a faith-based agency; and most critically, it would harm the more than 300 foster

children that Catholic Charities currently has in its care and the many hundreds

that it will otherwise serve over just the next few years.

24.     In my view, such a tragic result is completely unnecessary. The State

has long been aware of Catholic Charities' religious beliefs and practices, including

those related to same-sex marriage. In fact, before Defendants adopted their new

policy, local DHHS offices regularly cooperated with Catholic Charities to ensure

that it could continue serving Michigan's children and families without being asked

to compromise its religious beliefs.

Dated: May 15, 2019

_____
Christopher Slater

Subscribed and sworn to me on _May 15, 2019_, Kent County, Michigan.
My commission expires: _06/28/2020_ Signature: _Sheila A. Rogalski_
Notary public, State of Michigan, County of _Kent_

Sheila A. Rogalski
Notary Public-Michigan
Kent County
My Commission Expires 6/28/2020