UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHOLIC CHARITIES
WEST MICHIGAN,

     Plaintiff,

                          2:19-CV-11661-DPH-DRG

v.
                          Hon. Denise Page Hood

                          Hon. David R. Grand

MICHIGAN DEPARTMENT
OF HEALTH AND HUMAN
SERVICES; ROBERT GORDON, in
his official capacity as Director
of the Michigan Department of
Health and Human Services;
MICHIGAN CHILDREN'S
SERVICES AGENCY; JENNIFER
WRAYNO, in her official capacity as
Acting Executive Director of
Michigan Children's Services Agency;
DANA NESSEL, in her official
capacity as Attorney General of
Michigan.

                          **PLAINTIFF CATHOLIC
CHARITIES WEST
MICHIGAN'S MOTION FOR
PRELIMINARY
INJUNCTION**

     Defendants.

_____/

James R. Wierenga (P48946)
Attorney for Plaintiff
David, Wierenga & Lauka, PC
99 Monroe Ave., NW
Ste. 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

David A. Cortman (GA Bar #188810)
Attorney for Plaintiff
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Roger Brooks (NC Bar #16317)*
Jeremiah Galus (AZ Bar #030469)*
Attorneys for Plaintiff
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org

*Admission pending

Toni L. Harris (P63111)
Joshua S. Smith (P63349)
Precious S. Boone (P81631)
Elizabeth R. Husa Briggs
(P73907)
Attorneys for Defendants
Michigan Department of
Attorney General
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HarrisT19@michigan.gov
Smithj46@michigan.gov

_____/

## PLAINTIFF CATHOLIC CHARITIES WEST MICHIGAN'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Catholic Charities West Michigan hereby moves this Court to issue a preliminary injunction pursuant to Fed. R. Civ. P. 65, requiring Defendants to comply with Mich. Comp. Laws §§ 722.124e, 722.124f, 710.23g, and 400.5a, and enjoining them from enforcing a new policy against Catholic Charities that forces the religious organization to start recommending and facilitating foster and adoptive placements with same-sex couples in violation of its religious beliefs or be stripped of the ability to provide such services to children in Michigan's child welfare system—a religious ministry that Catholic Charities has been performing for over 70 years. In support of this motion, Catholic Charities states as follows:

1.      On May 15, 2019, Catholic Charities filed a motion for preliminary injunction while this case was pending before the Michigan Court of Claims;

2.      Before the Michigan Court of Claims could rule on that motion, however, Defendants removed the case to this Court;

3.      To preserve its rights and avoid any prejudice, Catholic Charities is refiling its motion for preliminary injunction in conformance with Fed. R. Civ. P. 65 and Local Rules 7.1 and 65.1.

4.      Nevertheless, Catholic Charities contends that this Court is not the proper venue for this case. Catholic Charities filed a motion to change venue to the U.S. District Court for the Western District of Michigan on June 19, 2019. (*See* ECF No. 9.)

5.     The proper venue for hearing this case and motion is the Western District of Michigan.

6.     As explained in more detail in the accompanying brief, a preliminary injunction is warranted. In short, Defendants' new policy violates Catholic Charities' statutory and constitutional rights; Catholic Charities and the children and families it serves will suffer irreparable harm in the absence of a preliminary injunction; the balance of hardships tips strongly in Catholic Charities' favor; and protecting Catholic Charities' rights and the children and families it serves is in the public interest.

7.     A preliminary injunction is necessary to preserve the Court's ability to render a meaningful decision on the merits.

8.     In support of this motion, Catholic Charities relies on the accompanying brief, the Declaration of Chris Slater, and the Verified Complaint (*see* ECF No. 1-2).

9.     Pursuant to Local Rule 7.1(a), Plaintiff's counsel conferred with Defendants' counsel, explained the nature of this motion and its legal basis, and requested but did not obtain concurrence in the relief sought.

Dated: June 26, 2019                    Respectfully submitted,


                                        /s/David Cortman
                                        David A. Cortman (GA Bar 188810)
James R. Wierenga (P48946)              Alliance Defending Freedom
David, Wierenga & Lauka, PC             1000 Hurricane Shoals Rd. NE, Ste.
99 Monroe Ave., NW, Ste. 1210          D-1100
Grand Rapids, MI 49503                  Lawrenceville, GA 30043
(616) 454-3883                          (770) 339-0774
jim@dwlawpc.com                         dcortman@ADFlegal.org

                                        Roger Brooks (NC Bar 16317)*
                                        Jeremiah Galus (AZ Bar 030469)*
                                        Alliance Defending Freedom
                                        15100 N. 90th Street
                                        Scottsdale, AZ 85260
                                        (480) 444-0020
                                        rbrooks@ADFlegal.org
                                        jgalus@ADFlegal.org

                                        *Admission pending

                                        *Attorneys for Plaintiff Catholic
                                        Charities West Michigan*

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHOLIC CHARITIES
WEST MICHIGAN,

      Plaintiff,

                                 2:19-CV-11661-DPH-DRG

v.                              Hon. Denise Page Hood

                                 Hon. David R. Grand

MICHIGAN DEPARTMENT
OF HEALTH AND HUMAN
SERVICES; ROBERT GORDON, in
his official capacity as Director
of the Michigan Department of
Health and Human Services;
MICHIGAN CHILDREN'S
SERVICES AGENCY; JENNIFER
WRAYNO, in her official capacity as
Acting Executive Director of
Michigan Children's Services Agency;
DANA NESSEL, in her official
capacity as Attorney General of
Michigan.

      Defendants.

**PLAINTIFF CATHOLIC CHARITIES WEST MICHIGAN'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

_____/

James R. Wierenga (P48946)
Attorney for Plaintiff
David, Wierenga & Lauka, PC
99 Monroe Ave., NW
Ste. 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

David A. Cortman (GA Bar #188810)
Attorney for Plaintiff
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org

Roger Brooks (NC Bar #16317)*
Jeremiah Galus (AZ Bar #030469)*
Attorneys for Plaintiff
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org

*Admission pending

Toni L. Harris (P63111)
Joshua S. Smith (P63349)
Precious S. Boone (P81631)
Elizabeth R. Husa Briggs
(P73907)
Attorneys for Defendants
Michigan Department of
Attorney General
Health, Education & Family
Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
HarrisT19@michigan.gov
Smithj46@michigan.gov

_____/

**PLAINTIFF CATHOLIC CHARITIES WEST MICHIGAN'S BRIEF
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Index of Authorities.................................................................iii

Concise Statement of Issue Presented.......................................vi

Controlling or Most Appropriate Authority.............................vii

Introduction............................................................................1

Factual Background .................................................................3

    A.    Catholic Charities' services are religious ministry
           motivated by religious beliefs.................................3

    B.    Michigan Public Acts 53, 54, and 55 protect Catholic
           Charities' beliefs and practices. ............................4

    C.    Catholic Charities partners with DHHS to serve
           Michigan's foster children. ...................................6

    D.    Defendants adopt a new policy that violates state
           law and targets Catholic Charities' religious beliefs.........8

Relevant Legal Standard .........................................................9

Argument.................................................................................9

  I.    The new policy violates Michigan's statutory protections
      for faith-based foster care and adoption providers. ..................9

  II.    The new policy violates Catholic Charities' free-exercise
      and free-speech rights under the Michigan and U.S.
      Constitutions.................................................................12

    A.    Strict scrutiny applies under Article I, § 4 of the
           Michigan Constitution......................................12

    B.    Strict scrutiny applies under the Free Exercise
           Clause of the U.S. Constitution.........................13

        1.    The new policy completely excludes Catholic
                Charities from a long-established religious
                ministry because of its beliefs about marriage........14

        2.    The new policy discriminates against Catholic
                 Charities by conditioning a government benefit
                on giving up its religious beliefs and identity.........15

3.     The new policy singles out religious beliefs and
       is based on religious hostility. .................................. 16

4.     The new policy is woefully underinclusive. ............ 18

C.   Strict scrutiny applies because the new policy
     compels Catholic Charities' speech. .................................. 19

D.   The new policy, as applied to Catholic Charities,
     does not survive strict scrutiny. ....................................... 20

III.  A preliminary injunction would prevent Catholic
      Charities from suffering irreparable harm, result in no
      harm to anyone, and be in the public interest. ......................... 23

Conclusion ............................................................................................. 25

# INDEX OF AUTHORITIES

## Cases

*Adair v. Michigan*,
785 N.W.2d 119 (Mich. 2010) ......................................................... 11

*Bays v. City of Fairborn*,
668 F.3d 814 (6th Cir. 2012) .......................................................... 24

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) ....................................................................... 21

*Burwell v. Hobby Lobby*,
573 U.S. 682 (2014) ....................................................... 21, 22, 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ................................................................. *passim*

*Contractors Association of East Pennsylvania v. City of Philadelphia*,
6 F.3d 990 (3d Cir. 1993) ............................................................... 21

*Country Mill Farms, LLC v. City of East Lansing*,
280 F. Supp. 3d 1029 (W.D. Mich. 2017) ...................................... 12

*Elrod v. Burns*,
427 U.S. 347 (1976) ....................................................................... 24

*Employment Division v. Smith*,
494 U.S. 872 (1990) ................................................................. 14, 16

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
23 F.3d 1071 (6th Cir. 1994) .................................................... 24, 25

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) ....................................................................... 14

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
515 U.S. 557 (1995) ....................................................................... 19

*Lyng v. Northwest. Indian Cemetery Protective Association*,
485 US 439 (1988) ......................................................................... 13

*Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Commission*,
138 S. Ct. 1719 (2018) ............................................................. 14, 17

iii

*Nat'l Institute of Family & Life Advocates v. Becerra,*
  38 S. Ct. 2361 (2018) ........................................................ 20

*National Credit Union Admin Board v. Jurcevic,*
  867 F.3d 616 (6th Cir. 2017) ............................................ 9

*Obergefell v. Hodges,*
  135 S. Ct. 2584 (2015) ...................................................... 10

*People v. DeJonge,*
  501 N.W.2d 127 (Mich. 1993) .......................................... 13

*Susan B. Anthony List v. Driehaus,*
  814 F.3d 466 (6th Cir. 2016) ............................................ 21

*Thomas M. Cooley Law Sch. v. Doe 1,*
  833 N.W.2d 331 (Mich. Ct. App. 2013) ........................... 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  137 S. Ct. 2012 (2017) ...................................... 14, 15, 16

*United Food & Commercial Workers Union, Local 1099 v.*
  *Southwest Ohio Regional Transit Authority,*
  163 F.3d 341 (6th Cir. 1998) ............................................ 9

*Ward v. Polite,*
  667 F.3d 727 (6th Cir. 2012) ............................................ 16

*West Virginia State Board of Education v. Barnette,*
  319 U.S. 624 (1943) .......................................................... 19

## Constitutional Provisions

Mich. Const. 1963, art. 1, § 4 ............................................... 12

## Codes and Statutes

Michigan Compiled Laws

§ 400.5a ......................................................... 4, 5, 11

§ 710.23g ....................................................... 4, 5, 11

§ 722.111(d) ........................................................... 5

§ 722.124e ............................................... *passim*

§ 722.124f ............................................................... 1, 4, 5, 10, 11

Michigan Administrative Code

R 400.12310(3) ....................................................................... 18

R 400.12404(3) ....................................................................... 18

R 400.12404(4) ....................................................................... 18

R 400.12605(3) ....................................................................... 18

R 400.12706(2) .................................................................. 18, 19

R 400.12709(2) ....................................................................... 18

## **Other Authorities**

Fox 2 Detroit, *Opponents say adoption bill discriminates against gays and lesbians* (Mar. 5, 2015, 10:43 AM), https://bit.ly/2Dcr49R; *see also* Dana Nessel (@dananessel), Twitter (Apr. 14, 2019, 1:57 PM), https://bit.ly/2Ya8bwp. .................................................... 2

MDHHS, Hope for a Home, https://bit.ly/2XvIYQi ................................. 6

Rick Pluta, *Faith-based adoption bills headed to House floor*, Michigan Radio NPR (Mar. 4, 2015), https://bit.ly/2KCYAet .......................... 2

Ed White, *Dem AG candidate: Adoption law discriminates against gays*, Associated Press (Sept. 27, 2018), https://bit.ly/2Fq3YgU. ............. 1

## CONCISE STATEMENT OF ISSUE PRESENTED

Whether this Court should temporarily enjoin the State from enforcing a new policy that would eliminate Catholic Charities West Michigan's 70-plus-year-old religious ministry to Michigan's foster children if Catholic Charities does not start recommending child placements with same-sex couples in violation of its religious beliefs.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Mich. Comp. Laws § 722.124e

Mich. Comp. Laws § 722.124f

Mich. Comp. Laws § 710.23g

Mich. Comp. Laws § 400.5a

*Country Mill Farms, LLC v. City of East Lansing*,
  280 F. Supp. 3d 1029 (W.D. Mich. 2017).

*People v. DeJonge*,
  501 N.W.2d 127 (Mich. 1993)

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017)

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
  565 U.S. 171 (2012)

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018)

*Employment Division v. Smith*,
  494 U.S. 872 (1990)

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012)

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
  515 U.S. 557 (1995)

*Nat'l Institute of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018)

*Burwell v. Hobby Lobby*,
  573 U.S. 682 (2014)

## INTRODUCTION

For over 70 years, Catholic Charities West Michigan has served Michigan's children through its foster care and adoption ministry. Today, with roughly 13,000 children in the state's foster care system, Catholic Charities' ministry is needed more than ever. Despite this, Defendants are acting to *reduce* the services available to foster children, implementing a new policy in April 2019 that promises to exclude Catholic Charities from serving unless it affirmatively recommends same-sex couples as foster and adoptive parents.[1]

This new policy does not help a single child find a home; it only coerces effective, caring, and reliable providers out of the system. It also blatantly violates statutory protections for faith-based providers, which guarantee that private child placing agencies cannot be compelled to provide services that conflict with their "sincerely held religious beliefs." Mich. Comp. Laws §§ 722.124e(2), 722.124f(1). Although Defendant Attorney General Dana Nessel believes that the "only purpose" of those laws is "to discriminate against people,"[2] that religious providers like Catholic Charities "dislike gay people more than [they] care about the

---

[1] Although Catholic Charities cannot recommend or facilitate child placements with same-sex couples consistent with its faith, it will refer such couples to other child placing agencies and routinely serves them throughout its numerous other ministries. (Slater Decl. ¶¶ 14, 16.)

[2] Ed White, *Dem AG candidate: Adoption law discriminates against gays*, Associated Press (Sept. 27, 2018), https://bit.ly/2Fq3YgU.

needs of foster kids,"[3] and that such providers are "hate mongers,"[4] Defendants cannot run roughshod over the Legislature. Nor may they violate Catholic Charities' free-exercise and free-speech rights protected by the Michigan and U.S. Constitutions.

A preliminary injunction is thus absolutely essential, not just to prevent statutory and constitutional violations and the shuttering of a 70-plus-year old religious ministry, but also to prevent irreversible harm to the families and children entrusted to Catholic Charities' care. Indeed, having partnered with the State for decades, Catholic Charities manages *hundreds* of foster-care-related cases. By preserving the status quo, this Court can guarantee that foster families licensed through Catholic Charities will continue to receive reimbursement payments needed to care for their children; ensure that foster children maintain the crucial relationships they have spent months and years developing with Catholic Charities' case workers; and guard against foster children being traumatically transferred, once again, to new families.

---

[3] Rick Pluta, *Faith-based adoption bills headed to House floor*, Michigan Radio NPR (Mar. 4, 2015), https://bit.ly/2KCYAet.

[4] Fox 2 Detroit, *Opponents say adoption bill discriminates against gays and lesbians* (Mar. 5, 2015, 10:43 AM), https://bit.ly/2Dcr49R; *see also* Dana Nessel (@dananessel), Twitter (Apr. 14, 2019, 1:57 PM), https://bit.ly/2Ya8bwp.

# FACTUAL BACKGROUND

## A.   Catholic Charities' services are religious ministry motivated by religious beliefs.

Catholic Charities is a nonprofit religious organization affiliated with the Roman Catholic Diocese of Grand Rapids that has been feeding the hungry, counseling those who struggle, and building strong families for over 70 years. (Slater Decl. ¶ 3, attached as Ex. 1.) It is one of western Michigan's largest social services providers, offering a broad spectrum of child welfare, family preservation, behavioral health, and community outreach services. (*Id.* ¶ 6.)

As a Catholic organization, Catholic Charities believes and adheres to the teachings and doctrines of the Catholic Church. (*Id.* ¶ 5.) Its services are offered in accord with Catholic social teaching and designed to support individuals and families in their "emotional, social and spiritual development." (*Id.* ¶ 5.) Serving a diverse community, Catholic Charities ministers to over 21,000 individuals each year without regard to race, religion, sex, marital status, gender identity, sexual orientation, or any other protected characteristic. (*Id.* ¶ 6.)

Catholic Charities also obeys historic teachings of scripture and the Church by providing foster care and adoption services to vulnerable children. (*Id.* ¶ 7; Verified Compl. ("VC") ¶¶ 23–26, 53 [ECF No. 1-2].) As one of Michigan's largest providers, Catholic Charities has approximately 100 employees dedicated exclusively to foster care and adoption services, and about 170 licensed foster homes ready to help

3

children in need. (Slater Decl. ¶ 8.) Catholic Charities has over 300 foster children in its care and custody each day, and serves about 450 foster children annually. (*Id.*) In the past decade, Catholic Charities has placed around 4,500 children in loving adoptive or foster homes. (*Id.*)

To be clear about and protect its religious beliefs, Catholic Charities has a written statement of faith for its foster care and adoption ministry. (*Id.* ¶ 9.) While Catholic Charities cannot recommend or facilitate child placements with same-sex couples without violating its Catholic faith, it will refer such couples to other child placing agencies and routinely serves them throughout its numerous other ministries. (*Id.* ¶¶ 14, 16.)

### B. Michigan Public Acts 53, 54, and 55 protect Catholic Charities' beliefs and practices.

In 2015, the Michigan Legislature enacted Public Acts 53, 54, and 55, expressly protecting the right of faith-based foster care and adoption providers to operate according to their consciences and beliefs. Mich. Comp. Laws §§ 722.124e, 722.124f, 710.23g, and 400.5a.

Under these laws, "a child placing agency" cannot be forced to provide services or accept referrals from the State that conflict with its "sincerely held religious beliefs." *Id.* §§ 722.124e(2), 722.124f(1), 710.23g.[5] Further, the child placing agency retains "sole discretion" to

---

[5] A "child placing agency" is defined as a governmental organization or nonprofit agency organized "for the purpose of receiving children for

decide whether to perform pre-referral activities and services "related to that referral," such as recruiting, training, studying, and recommending prospective foster care and adoptive parents. *Id.* Because such services are not publicly funded, *see id.* § 722.124e(1)(h), the government "shall not control the child placing agency's decision whether to engage in those activities or perform those services." Mich. Comp. Laws § 722.124f(1). If an agency is unable to provide any service due to its religious beliefs, it must "[p]romptly refer" the "applicant" to a list of other providers or to a provider "that is willing and able to provide the declined services." *Id.* § 722.124e(4).

Nor may the government "cancel[ ] the child placing agency's funding," "cancel[ ] a contract with the child placing agency," or take any other "adverse action" against an agency that has declined any service or referral based on its religious beliefs. *Id.* §§ 722.124e(3), 722.124f(2), 710.23g, 400.5a.

In enacting these statutory protections, the Michigan Legislature found that faith-based organizations "have a long and distinguished history" of providing foster care and adoption services in Michigan, that allowing them to continue serving consistent with their faith convictions "will benefit the children and families who receive publicly funded services," and that "[h]aving as many possible qualified adoption

placement in private family homes for foster care or for adoption." Mich. Comp. Laws § 722.111(d).

and foster parent agencies" is "a substantial benefit" to children in need. Mich. Comp. Laws §§ 722.124e(1)(c), (f) & (g). The Legislature further found that private agencies "have the right to free exercise of religion," including the right to "abstain from conduct that conflicts with [their] sincerely held religious beliefs." *Id.* § 722.124e(1)(e).

### C.   Catholic Charities partners with DHHS to serve Michigan's foster children.

In Michigan, there are about 13,000 children in foster care.[6] While this incredible need is largely met by private child placing agencies, private agencies are *prohibited* from overseeing foster care placements or facilitating foster care adoptions unless they enter into an agreement to accept referrals from DHHS. (Slater Decl. ¶ 22.) Under such agreements, DHHS reimburses the approved agency for foster or adoption services provided to referred children, at agreed rates. (*Id.* ¶¶ 18–19.) Recognizing the "long and distinguished history" that both "[f]aith-based and non-faith-based child placing agencies have for providing adoption and foster care services in this state," Mich. Comp. Laws § 722.124e(1)(f), DHHS contracts with a broad spectrum of both faith-based and secular agencies. (Slater Decl. ¶ 17.)

For decades, the State has entered into agreements with Catholic Charities to serve Michigan's abused, neglected, and abandoned children. (*Id.* ¶ 18.) And for good reason. Catholic Charities exceeds

---

[6] MDHHS, Hope for a Home, https://bit.ly/2XvIYQi.

state minimum requirements, offering a plethora of extra services that are paid for entirely through private contributions, including healthcare, clothing, transport, extracurricular funds, and even a "Family Visit House." (*Id.* ¶ 21.) Because of its distinctly religious nature and beliefs, Catholic Charities also attracts foster and adoptive parents that the State and secular agencies do not, and cannot, recruit. (*Id.* ¶ 10.) While Catholic Charities does not limit those it serves to any particular religion, it successfully recruits many foster families and adoptive parents who share its faith and religious beliefs. (*Id.* ¶ 10.)

Under its current contracts, DHHS refers both foster care and public adoption services to Catholic Charities, agreeing to reimburse Catholic Charities for certain services performed. These agreements acknowledge that Catholic Charities "has the sole discretion to decide whether to accept or not accept a referral." (VC, Ex. 6 at 7; Ex. 7 at 5.) For foster care referrals, DHHS provides a per diem to cover expenses once the child is placed with a foster family. (Slater Decl. ¶ 19.) While Catholic Charities retains a portion to help cover its own costs, the rest goes to the foster family to defray the costs of caring for the child. (*Id.*) For public adoption referrals, DHHS provides lump sum payments whenever the child is placed, the adoption is finalized, and the adoption becomes permanent. (*Id.*) DHHS generally does not pay for any of Catholic Charities' pre-placement services such as training, studying, and recommending parents for foster care or adoption. (*Id.* ¶ 20.)

### D.   Defendants adopt a new policy that violates state law and targets Catholic Charities' religious beliefs.

DHHS's decades-long respect for Catholic Charities' religious beliefs changed shortly after Dana Nessel was elected attorney general in 2018. Before her election, Ms. Nessel stated that the "only purpose" of Michigan's statutory protections for faith-based foster care and adoption providers was "to discriminate against people" and she attacked religious providers like Catholic Charities as "hate mongers." (VC ¶¶ 141– 42.) Promptly after her election, AG Nessel instructed DHHS to settle a lawsuit challenging the State's longstanding practice of accommodating faith-based providers' religious beliefs. DHHS settled that lawsuit in March 2019, essentially agreeing to violate Michigan law by excluding faith-based providers from serving Michigan's foster children unless they agreed to recommend same-sex couples as foster and adoptive parents. (VC, Ex. 8.)

In April 2019, Defendants sent a directive to Michigan's child placing agencies, including Catholic Charities, purporting to implement the settlement. (VC, Ex. 9.) The directive says that "regardless of whether the individual or couple being considered has identified a particular child for foster or adoptive placement," Catholic Charities can no longer refer a same-sex couple to another agency or decline to recruit, train, evaluate, or recommend a same-sex couple as prospective foster or adoptive parents. (VC, Ex. 9 at 1–2.) If Catholic Charities "refuses to comply" with this new policy, the directive states that

Defendants will terminate Catholic Charities' contracts, and thus prohibit it from serving foster children. (VC, Ex. 9 at 2.)

## RELEVANT LEGAL STANDARD

In deciding whether to grant a preliminary injunction, a court must consider "(1) the likelihood of success on the merits; (2) irreparable harm absent injunctive relief; (3) substantial harm to others from the proposed injunction; and (4) the broader public interest." *Nat'l Credit Union Admin Bd. v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017). "The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Trans. Auth.*, 163 F.3d 341, 348 (6th Cir. 1998). The Sixth Circuit thus recognizes that "preservation of the court's ability to exercise meaningful review may require affirmative relief in order to prevent some future irreparable injury." *Id.*

## ARGUMENT

### I.  The new policy violates Michigan's statutory protections for faith-based foster care and adoption providers.

The Michigan Legislature anticipated situations like this one. In 2015, it enacted Public Acts 53, 54, and 55, expressing its will that Michigan "child placing agencies" remain "free[ ] to abstain from conduct that conflicts with [their] sincerely held religious beliefs." Mich. Comp. Laws § 722.124e(1)(e). Because Defendants' new policy violates

9

both the text and intent of those laws, Catholic Charities is likely to succeed on its state statutory claim (Count I).

When the U.S. Supreme Court issued its same-sex marriage ruling in 2015, it determined that believing marriage is a union of one man and one woman is a "decent and honorable" belief that continues to be held "in good faith by reasonable and sincere people." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594, 2602 (2015). And because the First Amendment protects that belief, "religious organizations and persons" must be "given proper protection" to "continue the family structure they have long revered." *Id.* at 2607.

Public Acts 53, 54, and 55 provide this "proper protection." Together, they guarantee that faith-based providers like Catholic Charities can continue to serve foster children consistently with their religious beliefs, while at the same time ensuring that no person's ability to adopt or participate in foster care is denied.

Specifically, under Public Act 53, DHHS may not cancel or refuse to renew a contract or take any other "adverse action" against a child placing agency whose sincerely held religious beliefs prevent it from providing "any service" or accepting a referral. Mich. Comp. Laws §§ 722.124e, 722.124f. Although the law does not allow an agency to decline "foster care case management and adoption services" for a particular child *after* it accepts a referral to perform those services, *id.* § 722.124e(7)(b), the agency can decline the referral "if the services would

10

conflict with" its religious beliefs, *id.* § 722.124f(1). Further, Public Act 53 clarifies that the child placing agency retains "sole discretion" to decide whether to perform pre-referral activities and services "related to that referral," such as recruiting, training, studying, and recommending prospective foster care and adoptive parents. *Id.*

Public Act 54 bolsters these religious protections by extending them to all adoption services, including foster-care-related adoptions. *Id.* § 710.23g. Public Act 55, which amended the law regulating DHHS, reiterates that "the department shall not take an adverse action against a child placing agency" because the agency has not or will not provide services that conflict with its beliefs. *Id.* § 400.5a.

Here, Defendants' new policy violates both "the purpose and intent" of these laws. *Adair v. Michigan*, 785 N.W.2d 119, 125 (Mich. 2010). Defendants threaten to "terminate" the contracts needed to serve foster children if Catholic Charities continues to follow its sincerely held religious beliefs and "refuses to comply" with the new policy by "referring" same-sex couples to other providers, or by declining to train, evaluate, or license such couples as prospective foster or adoptive parents. (VC, Ex. 9 at 2.) But Public Acts 53, 54, and 55 forbid Defendants from taking adverse action on these grounds. While Defendants may disagree with the legislative policies reflected in those laws, they are not at liberty to impose contradictory ones and ignore whole statutes.

11

## II. The new policy violates Catholic Charities' free-exercise and free-speech rights under the Michigan and U.S. Constitutions.

Although Michigan's strong statutory protection makes reaching the other claims unnecessary, a preliminary injunction is also warranted because Catholic Charities is likely to succeed on its state and federal constitutional claims.

### A. Strict scrutiny applies under Article I, § 4 of the Michigan Constitution.

The Michigan Constitution, which includes a free exercise clause, an establishment clause, and a freedom of conscience and to worship clause, provides broader religious protections than its federal counterpart. Mich. Const. 1963, art 1, § 4; *Country Mill Farms, LLC v. City of East Lansing*, 280 F. Supp. 3d 1029, 1056 (W.D. Mich. 2017). Courts evaluate alleged violations of Article 1, § 4 of the Michigan Constitution using a five-factor compelling-interest test that asks: (1) whether plaintiff's belief, or conduct motivated by belief, is sincerely held; (2) whether that belief or conduct is religious; (3) whether that belief or conduct is burdened by state action; (4) whether that burden is justified by a compelling state interest; and (5) whether the state could satisfy its interest through a less obtrusive regulation. *Country Mill*, 280 F. Supp. 3d at 1056. In other words, if government action burdens sincere religious beliefs, it must pass strict scrutiny. Defendants cannot satisfy that test.

12

The first two elements—the sincerity and religious nature of Catholic Charities' beliefs—are easily satisfied here. (*See* Slater Decl. ¶¶ 9, 14; VC ¶¶ 22–32.) As to the third element, Defendants' new policy heavily burdens Catholic Charities' religious beliefs and practices. Indeed, if Catholic Charities follows its beliefs about marriage, Defendants will cancel its contracts and in fact bar it from ministering to children by providing any foster services. This substantially burdens Catholic Charities' religion because it "coerce[s]" Catholic Charities "into violating [its] religious beliefs" and "penalize[s] religious activity by denying [Catholic Charities] an equal share of the rights, benefits, and privileges enjoyed by other citizens." *People v. DeJonge*, 501 N.W.2d 127, 136 (Mich. 1993) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 US 439, 449 (1988)).

Because Defendants' new policy substantially burdens Catholic Charities' sincerely held religious beliefs and practices, it must survive strict scrutiny under the fourth and fifth elements. As explained below, it cannot satisfy that heightened level of review.

### B. Strict scrutiny applies under the Free Exercise Clause of the U.S. Constitution.

The new policy also triggers, and fails to satisfy, strict scrutiny under the federal free exercise clause for several independent reasons.

13

### 1. The new policy completely excludes Catholic Charities from a long-established religious ministry because of its beliefs about marriage.

Although courts often evaluate federal free-exercise claims under *Employment Division v. Smith*, 494 U.S. 872 (1990), that case does not always govern. The Supreme Court has rejected the idea that "any application" of a neutral and generally applicable law is "necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 n.2 (2017).

In *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), for example, the Supreme Court unanimously held that the government may not apply a neutral and generally applicable nondiscrimination law to a religious school if it would interfere with the school's selection of its teachers and ability to operate consistently with its faith. And in *Masterpiece Cakeshop, Ltd v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018), the Court agreed that the government could not invoke a nondiscrimination rule to compel clergy "to perform [a same-sex wedding] ceremony," regardless of whether the government imposed that rule on secular officiants and regardless of any offense caused to same-sex couples.

The same respect and deference to Catholic Charities' religious autonomy is owed here. Like clergy's involvement in marriage ceremonies and the church's involvement in education, religious groups have been serving orphans and abandoned children for centuries. The

14

government cannot now drive them off the field, demanding that they bow the knee to the government's preferred views on topics that have always been central to religious faith and teachings: marriage, family, and the proper raising of the next generation. The Free Exercise Clause prohibits the government from conducting such a hostile takeover of long-established religious ministries—whether that be marriages (*Masterpiece*), schools (*Hosanna-Tabor*), or caring for abused, neglected, and abandoned children.

### 2. The new policy discriminates against Catholic Charities by conditioning a government benefit on giving up its religious beliefs and identity.

In *Trinity Lutheran*, 137 S. Ct. at 2021, the Supreme Court held that any "policy [which] expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character … imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." There, the Court concluded that the State of Missouri could not exclude a church-operated preschool and daycare from a playground safety grant program because of the preschool's religious nature. 137 S. Ct. at 2025. The Free Exercise Clause, the Court explained, forbids the government from requiring an organization "to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." *Id*. at 2024.

15

Yet that is precisely what the new policy does. Defendants are conditioning a public benefit—the ability to participate in state foster care and adoption programs and receive reimbursement payments—on Catholic Charities' willingness to renounce its religious beliefs and character as it pertains to marriage and family. Such a rule "imposes a penalty on the free exercise of religion that must be subjected to the most rigorous scrutiny." *Id.*

### 3. The new policy singles out religious beliefs and is based on religious hostility.

The government may in certain circumstances be permitted to "burden faith-based conduct" through the enforcement of "neutral and generally applicable rules." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) (citing *Smith*, 494 U.S. at 890). However, when the policy or rule "appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions or worse is a veiled cover for targeting a belief or a faith-based practice," *id.*, it "must run the gauntlet of strict scrutiny." *Id.* at 740.

Here, Defendants' new policy is hostile, not neutral. Instead of protecting faith-based providers as Michigan law requires, the new policy penalizes religious providers that adhere to certain beliefs about marriage and family that are despised by AG Nessel (and DHHS under her instruction). Indeed, the new policy immediately followed the State's settlement of a lawsuit challenging its partnership with certain

faith-based providers, and the plain text of the policy demonstrates that its purpose is to single out those providers' religious beliefs and practices. (VC, Ex. 9 at 1–2) (describing prohibited practices exclusively in terms of declining services to "LGBTQ individual[s]" or "same-sex couple[s]," despite assertion that policy was enforcing broad nondiscrimination provision). The Supreme Court has made clear that a law or regulation is not neutral if its practical effect or "object" is to "infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533–34 (1993).

Moreover, the driving force behind the new policy—AG Nessel—has labeled those that share Catholic Charities' beliefs about marriage as "a radical fringe," "reprehensible," and "hate mongers," and disparaged them as "dislik[ing] gay people more than [they] care about the needs of foster care kids." (VC ¶¶ 138–42.)[7] Through both actions and words, Defendants have violated their "duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint." *Masterpiece*, 138 S. Ct. at 1731.

---

[7] Defendant Nessel's assertion that religious service providers are ignoring the needs of foster children is false and grimly ironic, since DHHS does not dispute that Catholic Charites has an outstanding record of placing children rapidly and placing them in healthy environments. It is Defendant Nessel and DHHS that are seeking to deny the children of Michigan the benefit of these services solely to enforce their ideology and punish dissent.

### 4. The new policy is woefully underinclusive.

The new policy also triggers strict scrutiny because it is not "generally applicable." In *Lukumi*, the Supreme Court struck down an ordinance that prohibited ritual animal sacrifice but allowed animal killings in many other contexts. The Court explained that a law is not generally applicable if it exempts *non*religious conduct that undermines the government's interests "in a similar or greater degree than [religious conduct] does." 508 U.S. at 543–44.

The State's purported interest here is eliminating discrimination in child placements, but the new policy cannot be reconciled with the multitude of regulations and organizations that discriminate on other protected characteristics. In fact, Michigan regulations *require* child placing agencies to assess prospective foster and adoptive parents based on otherwise protected characteristics such as race, religion, gender, and marital status. For example, agencies must assess applicants' "[m]arital and family status" and "[s]pirituality or religious beliefs." Mich. Admin. Code, R. 400.12310(3)(a), R. 400.12605(3)(a). They must also make placements based on the applicants' preferred "gender, race, [and] ethnic background." *Id.*, R. 400.12605(3)(k), R. 400.12709(2), R. 400.12310(3)(h), R. 400.12404(3). Moreover, agencies must take into account the "child and child's family's religious preference" when making foster placements, *id.*, R. 400.12404(4)(d), and consider race, ethnicity, and cultural identity when recruiting adoptive parents, *id.*, R.

18

400.12706(2)(b). Because these exemptions undermine any claimed interest in "nondiscrimination" as much or more than Catholic Charities' faith-driven selections, strict scrutiny applies. *Lukumi*, 508 U.S. at 543–44.

### C.  Strict scrutiny applies because the new policy compels Catholic Charities' speech.

A preliminary injunction should also issue because Defendants' new policy would require Catholic Charities to convey, in writing, repeatedly, an opinion that it believes to be false—namely, that same-sex parents *will* be in the child's best interests. This violates both the First Amendment and the Michigan's free speech guarantee.[8]

A long line of Supreme Court precedent precludes the government from forcing a citizen "to utter what is not in his mind," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943), or to affirm "a belief with which the speaker disagrees," *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). Courts thus apply strict scrutiny to government actions that compel speech, particularly when sincere religious beliefs are at stake. *See, e.g.*, *Hurley*, 515 U.S. 557 (1995) (using public accommodations law to force a parade to include an LGBT group was compelled speech).

---

[8] *Thomas M. Cooley Law Sch. v. Doe 1*, 833 N.W.2d 331, 348 (Mich. Ct. App. 2013) ("right to free speech under the Michigan Constitution is coterminous with the right to free speech under the First Amendment").

Nor does "professional speech"—that is, speech made by "individuals who provide personalized services to clients and who are subject to a generally applicable licensing and regulatory regime"—receive diminished constitutional protection. *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) (state regulation forcing pro-life pregnancy centers to publish notices about abortion failed strict scrutiny).

Strict scrutiny thus applies here. Catholic Charities evaluates candidate foster and adoptive parents, and must provide *written assessments* and *recommendations* to the State about whether particular candidate parents should be approved, and whether it is in the best interests of particular children to be placed in particular homes. (Slater Decl. ¶ 13.) The new policy would force Catholic Charities to affirm, in official submissions to the State, that placements with same-sex couples *will* be in the best interests of children, when in fact Catholic Charities' religious beliefs about human nature, marriage, and family teach it that those placements *will not* be in the best interests of children. Doing so would "alter the content of [Catholic Charities'] speech," and strict scrutiny must apply. *Id.* at 2371.

## D.  The new policy, as applied to Catholic Charities, does not survive strict scrutiny.

Because strict scrutiny applies, Defendants must prove that their new policy "advance[s] interests of the highest order and [is] narrowly

20

tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546.
Defendants cannot satisfy this "highest level of review." *Susan B.
Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016).

To determine whether there is a compelling interest, courts must
"scrutinize the asserted harm of granting specific exemptions to
particular religious claimants." *Burwell v. Hobby Lobby*, 573 U.S. 682,
726–27 (2014) (internal quotation marks and citation omitted). Even
"plausible hypotheses are not enough to satisfy strict scrutiny,"
*Contractors Ass'n of E. Pa. v. City of Phila.*, 6 F.3d 990, 1008 (3d Cir.
1993), and "ambiguous proof will not suffice," *Brown v. Entm't Merchs.
Ass'n*, 564 U.S. 786, 800 (2011). Accordingly, generalized speculations or
assertions do not even come close to satisfying strict scrutiny.

Here, there is no compelling governmental interest in forcing
Catholic Charities to violate its faith to continue its religious ministry
to foster children. Rather, the policy undermines the State's asserted
interest in "[h]aving as many possible qualified adoption and foster
parent agencies" serving "the children of this state." Mich. Comp. Laws
Ann. § 722.124e. The policy, if it is not enjoined, will result in faith-
based agencies like Catholic Charities no longer being allowed to
provide placement services to foster kids, thereby diminishing the
already scarce resources available to these needy children.

Defendants may assert that they are generally interested in
stopping "discrimination," but such "broadly formulated interests" are

21

insufficient to carry the heavy burden under strict scrutiny. *Hobby Lobby*, 573 U.S. at 726–27. And in any event, closer inspection shows that the State's own actions undermine any interest it ostensibly has in eliminating discrimination. As noted, Michigan law contains numerous exemptions allowing child placing agencies—including state-operated ones—to make distinctions based on otherwise protected characteristics such as race, religion, gender, and marital status in foster care and adoption licensing and placements.

In fact, Defendants concede that private child placing agencies may decline referrals from DHHS for *any* reason. (*See* VC, Ex. 8 at 5.) So, for example, if DHHS referred a same-sex couple for licensing, Catholic Charities would be allowed to decline the referral based on its religious beliefs. But under the challenged policy, if that same couple walked into Catholic Charities' office on their own accord, Catholic Charities could not refer the couple to another agency without being punished by the State. This makes *no* sense. Requiring Catholic Charities to train, study, and recommend same-sex couples as adoptive or foster parents in violation of its religious beliefs "cannot be regarded as protecting an interest of the highest order" when existing exemptions already permit "appreciable damage to that supposedly vital interest." *Lukumi*, 508 U.S. at 547.

Nor can Defendants show that their policy is the least restrictive means of satisfying their purported interest. This requirement is

22

"exceptionally demanding" and requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby*, 573 U.S. at 728. A policy fails this prong if the "interests could be achieved by narrower [policies] that burde[n] [the right] to a far lesser degree." *Lukumi*, 508 U.S. at 546.

And here, the State legislature has already identified a less restrictive alternative. Faith-based providers can refer to *numerous* other child-placing agencies when needed to abide by their sincerely held religious beliefs. Mich. Comp. Laws Ann. § 722.124e(4). Additionally, the policy fails because Michigan law allows—and in some cases requires—agencies to make distinctions based on other protected characteristics. Forcing Catholic Charities to choose between its religious beliefs and serving vulnerable children is thus unnecessary. *See Lukumi*, 508 U.S. at 546 ("underinclusive" ordinances cannot satisfy strict scrutiny).

## III.  A preliminary injunction would prevent Catholic Charities from suffering irreparable harm, result in no harm to anyone, and be in the public interest.

The remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also weigh in favor of a preliminary injunction.

Again, Defendants' new policy violates Catholic Charities' constitutional rights. And the loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Furthermore, because a child placing agency is prohibited from performing foster care and public adoption services in the absence of a contract with DHHS, the new policy would force Catholic Charities to close its 70-plus-year-old ministry to foster children. (Slater Decl. ¶¶ 22–23.)

The balance of equities likewise weighs in favor of Catholic Charities. A preliminary injunction would prevent statutory and constitutional violations and protect the hundreds of children and families in Catholic Charities' care while this case is pending. Preserving the status quo as it has existed for decades would not irreparably harm Defendants because same-sex couples interested in fostering or adopting may do so through numerous other agencies, including state-operated ones. Moreover, Defendants can have no legitimate interest in violating existing law or enforcing an unconstitutional policy. See *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment.").

Finally, protecting constitutional rights "is always in the public interest." *G & V Lounge, Inc. v. Michigan Liquor Control Comm.*, 23

F.3d 1071, 1079 (6th Cir. 1994). So too is ensuring that faith-based providers like Catholic Charities can continue providing adoption and foster care services "to the children of this state who are in need of these placement services." Mich. Comp. Laws § 722.124e(1)(c) As the Michigan Legislature recognized, "the more qualified agencies taking part in this process, the greater the likelihood that permanent child placement can be achieved." *Id.*

## CONCLUSION

Because existing state law and the Michigan and U.S. Constitutions prohibit Defendants from forcing Catholic Charities to choose between its religious beliefs and serving vulnerable and needy children, this Court should grant the requested preliminary injunction.

Dated:  June 26, 2019

James R. Wierenga (P48946)
David, Wierenga & Lauka, PC
99 Monroe Ave., NW, Ste. 1210
Grand Rapids, MI 49503
(616) 454-3883
jim@dwlawpc.com

Respectfully submitted,

/s/David Cortman
David A. Cortman (GA Bar 188810)
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA  30043
(770) 339-0774
dcortman@ADFlegal.org

Roger Brooks (NC Bar 16317)*
Jeremiah Galus (AZ Bar 030469)*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
rbrooks@ADFlegal.org
jgalus@ADFlegal.org
*Admission pending*

25

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2019, I caused the foregoing Motion for Preliminary Injunction to be electronically filed with the Clerk of the Court using the ECF system, which will provide electronic copies to counsel of record.

/s/David Cortman
David A. Cortman (GA Bar 188810)
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE, Ste. D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org