# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHOLIC CHARITIES
WEST MICHIGAN,

    Plaintiff,

v.

MICHIGAN DEPARTMENT
OF HEALTH AND HUMAN
SERVICES; ROBERT GORDON, in
his official capacity as Director
of the Michigan Department of
Health and Human Services;
MICHIGAN CHILDREN'S
SERVICES AGENCY; JENNIFER
WRAYNO, in her official capacity as
Acting Executive Director of
Michigan Children's Services Agency;
DANA NESSEL, in her official
capacity as Attorney General of
Michigan.

    Defendants.

2:19-CV-11661-DPH-DRG

Hon. Denise Page Hood

Hon. David R. Grand

**DECLARATION OF CHRIS SLATER IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

_____/

## DECLARATION OF CHRIS SLATER

I, Christopher Slater, hereby declare and state as follows:

1. I am over 18 years of age and of sound mind. I have personal knowledge of the facts stated in this affidavit and, if called upon, could testify competently to these facts.

2. I am the CEO of Catholic Charities West Michigan, and have served in that position since July 2018. I first began working at Catholic Charities in 2015. Before being named CEO, I served as Catholic Charities' CFO and interim CEO. I received a bachelor's degree in business administration from Western Michigan University in 2009. I also am a certified public accountant.

3. Founded in 1947, Catholic Charities is a nonprofit religious organization affiliated with the Roman Catholic Diocese of Grand Rapids. It was created to assist the Diocese and its Bishop to carry out the Church's ministry to the poor, weak, and distressed—a ministry that is commanded by the Catholic faith.

4. The Scriptures teach us again and again to imitate Jesus Christ's love for the poor and needy. The Epistle of St. James, for example, teaches that true religion is to care for the orphan and the widow (James 1:27). And in the Gospel of Matthew, Jesus describes the last judgment and says that we will be judged based on how we treat the poor and vulnerable (Matthew 25:31–46). The Catholic Church puts these teachings into practice through, among other things, child welfare service organizations such as Catholic Charities.

5. As a Catholic organization, Catholic Charities believes and adheres to the teachings and doctrines of Scripture and the Catholic Church. As such, all of its services are offered in accord with Catholic teaching and designed to support individuals, families, and communities in their emotional, social, and spiritual development, with particular concern for those who are poor and vulnerable.

6. Today, Catholic Charities is one of the region's largest social services providers. It offers a wide-array of child welfare, family preservation, behavioral health, and community outreach services throughout 18 counties in western Michigan. Through these programs, Catholic Charities serves a diverse community, ministering to over 21,000 individuals each year without regard to race, religion, sex, marital status, gender identity, sexual orientation, or any other protected characteristic.

7. In addition to its other ministries, Catholic Charities serves Michigan's children and families through foster care and adoption programs. Catholic Charities' foster care and adoption services are compelled by, and thus an exercise of, its religious beliefs. Catholic Charities believes that each human person is made in the image of God and has dignity, and that it is called to care for orphans and children whose parents cannot care for them. As an approved child placing agency, Catholic Charities certifies foster homes for licensure, evaluates

and recommends applicants for adoption, and facilitates child placements.

8. Catholic Charities is one of the largest foster care and adoption providers in the State of Michigan. It has approximately 280 employees, about 100 of whom focus exclusively on providing foster care and adoption services. Catholic Charities has over 300 foster children in its care and custody on any given day, serves approximately 450 foster children annually, and has approximately 170 licensed foster care homes. In just the past 10 years, Catholic Charities has placed approximately 4,500 children in loving adoptive or foster homes.

9. Consistent with the teachings and doctrine of the Catholic Church, Catholic Charities believes that marriage is the sacramental union of one man and one woman. To protect this belief and its Catholic identity, Catholic Charities adopted a written statement of faith for its foster care and adoption ministry. That statement of faith prohibits Catholic Charities from recommending or facilitating child placements with same-sex couples, consistent with Catholic teaching and doctrine about marriage and family.

10. Catholic Charities makes its religious nature and character clear throughout all of its programs and services. And its religious convictions, including those related to marriage and family, are central to its Catholic identity and are very well known. This is a distinguishing feature of Catholic Charities. Because of its distinctly

religious nature and beliefs, Catholic Charities is particularly successful at recruiting foster families and adoptive parents that the State and secular providers do not, and could not, recruit. While Catholic Charities does not limit those it serves to any particular religion, it successfully recruits many foster families and adoptive parents who share its faith and religious beliefs.

11. Close cooperation and collaboration between Catholic Charities and the prospective parents is essential because the foster care process and adoption process are personal and intimate experiences. A critical component of Catholic Charities' involvement is to provide counseling and guidance to the prospective foster and adoptive parents throughout each step of the application, home study, placement, supervision, and finalization process.

12. The home study process, in particular, is especially personal because it requires in-depth discussions and training about the proper environment for, and approach to, raising children. As part of the home study, Catholic Charities must visit the applicant's home in person and evaluate each person living in it. During that process, Catholic Charities interviews the applicants to assess their strengths and weaknesses and to explore important topics related to marital stability, parenting experience, parenting philosophy, family origin and dynamics, faith and religious practice, financial stability, and the

ability to parent a child of a different race or culture or a child with special needs, among other things.

13. After assessing a prospective foster or adoptive parent, Catholic Charities must then provide the State with a written evaluation and recommendation. The State requires Catholic Charities to prepare a written report analyzing the home environment and relationships in the home, among other things, and to make an official recommendation stating whether Catholic Charities believes placing a child with the applicant(s) would be in the child's best interests.

14. Catholic Charities serves and places children regardless of the child's race, sex, religion, color, gender identity, sexual orientation, or any other protected characteristics. But because of its Catholic beliefs about human nature and the nature of marriage and family, it does not believe that foster or adoption placement with same-sex couples is in the best interests of children, and so cannot consistent with its faith and conscience assist in making such placements. Instead, and consistent with state law, if a same-sex couple asks Catholic Charities to license them as foster or adoptive parents, Catholic Charities refers the couple to one of the numerous other providers that are able to assist the couple.

15. Notably, DHHS provides foster care services at county offices throughout the state, and there are numerous other private

foster care and adoption providers in western Michigan that do not share Catholic Charities' particular religious beliefs.

16. Catholic Charites routinely serves same-sex couples throughout its numerous other ministries. For example, Catholic Charities regularly serves same-sex couples through its food and baby pantry programs, pregnancy services, mental health and addiction treatment programs, domestic violence treatment program, senior companion services, and foster grandparent program, among other things.

17. In Michigan, a child placing agency such as Catholic Charities cannot oversee foster care placements or facilitate public adoptions *at all* unless it enters into a contract with the State. Under such contracts, a child placing agency is eligible to receive referrals and reimbursement payments from DHHS for the performance of certain foster care or adoption services. Currently, DHHS contracts with about 90 child placing agencies to perform foster care and adoption services throughout Michigan, some of which are faith-based and some of which are secular. The number of private agencies with which DHHS can contract is not fixed.

18. For decades, the State has entered into contracts with Catholic Charities to perform foster care and public adoption services. Under the current contracts, DHHS does not make any reimbursement payment to Catholic Charities unless it accepts a referral. The contracts

recognize, however, that Michigan law gives Catholic Charities the sole discretion to decide whether or not to accept a referral.

19. If Catholic Charities decides to accept a foster care referral from DHHS, it receives a per diem from the State after the child is placed with a foster family or relative caregiver. While a portion of that per diem covers some of Catholic Charities' costs, the rest of the per diem is passed along to the foster family or caregiver to defray the costs of caring for the child. If Catholic Charities accepts an adoption referral from DHHS, it receives lump sum payments when the child is placed with a family, the adoption is finalized, and the adoption is made permanent.

20. Any pre-placement services that Catholic Charities performs, such as training, studying, and recommending parents for foster care or adoption generally are not referred by DHHS or paid for under the contracts. Catholic Charities pays for these pre-placement activities and services with its own funds received from private donations made directly to Catholic Charities.

21. Catholic Charities' foster care and adoption ministry exceeds state minimum requirements, providing services and opportunities that the State does not, and could not, provide. For example, Catholic Charities provides monthly foster parent training opportunities; comprehensive consultations; mentors; behavioral specialists; 24-hour emergency on-call services; an on-site dentist for children; medical,

dental, clothing, and extracurricular funds for children; transportation services; and a "Family Visit House," where parents and children can visit each other and enjoy their time together in a comfortable, homelike environment. To offer all of these extra services, Catholic Charities must (and does) raise additional funds from private contributions to enable it to provide services to children who are abandoned or in need of a home well beyond those covered by any reimbursement payments it receives from DHHS for accepting referrals.

22. If Catholic Charities could no longer partner with the State, it would be prohibited from providing foster care and public adoption services entirely. That is because, in Michigan, a child placing agency cannot legally offer such services unless it has a contract with and accepts referrals from the State. Thus, if the State canceled Catholic Charities' contracts, Catholic Charities' foster care and public adoption ministry would cease to exist.

23. This would absolutely stop Catholic Charities from carrying out its faith-commanded ministry to children who are abandoned or in need of a home; it would deprive at least 100 Michiganders that are employed in Catholic Charities' fostering and adoption ministry of not just their jobs, but of the opportunity to serve through a faith-based ministry; it would deprive the approximately 170 foster families currently licensed through Catholic Charities of their choice to work with a faith-based agency; and most critically, it would harm the more

9

than 300 foster children that Catholic Charities currently has in its care and the many hundreds that it will otherwise serve over just the next few years.

24. In my view, such a tragic result is completely unnecessary. The State has long been aware of Catholic Charities' religious beliefs and practices, including those related to same-sex marriage. In fact, before Defendants adopted their new policy, local DHHS offices regularly cooperated with Catholic Charities to ensure that it could continue serving Michigan's children and families without being asked to compromise its religious beliefs.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of June 2019, in Grand Rapids, Michigan.

_____
Chris Slater, CEO
Catholic Charities West Michigan